**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRISTINE M. BERNACCHI, on behalf of herself and all others similarly situated, | CASE NO. 15-cv-6369 |
| | <u>JURY TRIAL DEMANDED</u> |
| Plaintiff, | |
| v. | |
| INVESTMENT TECHNOLOGY GROUP, INC., ROBERT C. GASSER, STEVEN R. VIGLIOTTI, and MATS GOEBELS, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Christine M. Bernacchi ("Plaintiff"), by her attorneys, on behalf of herself and all others similarly situated, alleges the following based upon the investigation of Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based on personal knowledge. The investigation of counsel included, among other things, a review of Investment Technology Group, Inc. ("ITG" or the "Company") public filings with the United States Securities and Exchange Commission ("SEC"), press releases issued by the Company, public conference calls, media and news reports about the Company, and publicly available trading data relating to the price and volume of ITG common stock, and the *Order Instituting Administrative Cease-and-Desist Proceedings Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order*, dated August 12, 2015 (the "SEC Settlement Order").

## I.    **INTRODUCTION**

1.      This is a federal class action brought on behalf of a class consisting of all persons who purchased the publicly traded common stock of ITG between February 28, 2011 and August 3, 2015, inclusive (the "Class Period").

2.      This action is a securities fraud action brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder by the SEC by Plaintiff on behalf of all those who purchased the publicly traded common stock of ITG during the Class Period to recover damages caused to the Class by violations of the securities laws by defendants ITG, its former CEO and President Robert C. Gasser ("Gasser"), its CFO Steven R. Vigliotti ("Vigliotti"), and its former General Counsel Mats Goebels ("Goebels") (together, "Defendants").

3.      In ITG's Annual Report for the year ended December 31, 2014, filed with the SEC on Form 10-K on March 13, 2015 ("2014 10-K"), the Company describes itself as "an independent execution and research broker that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process."   Among its various services and products, the Company offers an alternative trading platform known as POSIT, which purportedly anonymously matches securities trades outside of the exchanges that make up the National Market System ("NMS").   Such platforms are sometimes referred to as "dark pools" because, ostensibly, they allow clients to trade without their trades being detected or observed by other market participants.  ITG's operations are split into four segments, the largest of which, by far, is the Electronic Brokerage segment (providing over half of the Company's revenue), and revenue from POSIT is a material component of that segment.

4.      Dark pools have come under scrutiny in recent years as concerns have arisen that they may clandestinely be used by their operators to "trade against" clients, or to sell their trade information to others who do so. Defendants have repeatedly represented that clients of POSIT were protected from such behavior.  For example, on December 18, 2012, the Defendant Gasser, testified before a subcommittee of the United States Senate that:

> Data security is a matter of paramount importance for all market participants, particularly when it comes to sensitive client information or trade data. We…take this responsibility seriously and we safeguard our data using a combination of up-to-date technological measures, strictly enforced information barriers, and robust policies and procedures concerning information security and protection of client confidential information.[1]

5.      Before and throughout the Class Period, the Company also publicly represented itself as trading securities almost exclusively on behalf of clients, rather than engaging in "principal trading," or trading for its own account, and hence avoiding conflicts of interest.  For example, in the Company's Q2 2010 Earnings Call on July 29, 2010, Gasser stated "institutional investors are drawn towards the national liquidity available in POSIT, **as well as ITG's role as an un-conflicted agency broker**." (Emphasis added).

6.      In reality, during 2010 and 2011, the Company's then Head of Algorithmic Trading and Head of Liquidity Management, Hitesh Mittal ("Mittal") was accessing the trade data of clients in the POSIT system and using it to "cross" or trade against them for the Company's account.  The improper trading took place in the Company's AlterNet Securities, Inc. subsidiary ("AlterNet") in a "proprietary trading pilot" program, the

---

[1]      *See* Statement of Robert C. Gasser, Chief Executive Office and President, ITG, "Computerized Trading Venues: What Should the Rules of the Road Be?" before the Subcommittee on Securities, Insurance, and Investment, Committee on Banking, Housing, and Urban Affairs, U.S. Senate, December 18, 2012, available at http://www.itg.com/news_events/ITG_Senate_Gasser_Testimony_18Dec12_FINAL.pdf

existence of which the Company kept secret from investors, its customers, and the SEC. The program, known as Project Omega was, according to the Wall Street Journal, something the Company hoped could help "bolster its finances."  Defendant Gasser personally chose Mittal to head Project Omega, and press reports have suggested that Gasser knew details of the improprieties that took place in the program.

7.     Mittal left the Company in July 2011, ostensibly as part of a "cost-cutting" measure, but the wrongful conduct was not then made public.  By the Fall of 2013, the SEC commenced an investigation, and in May 2015 the SEC informed the Company that it intended to bring serious charges, but this too was not disclosed at that time.

8.     On July 29, 2015, ITG issued a press release disclosing, for the first time, the underlying wrongful conduct and the SEC's investigation thereof ("July 29 Press Release").  The July 29 Press Release stated, *inter alia*, that during the second quarter of 2015 (ended June 30, 2015), ITG commenced settlement discussions with the SEC in connection with the SEC's investigation into a "proprietary trading pilot operated within ITG's AlterNet Securities, Inc. ("AlterNet") subsidiary for sixteen months in 2010 through mid-2011," which investigation focused on:

> …customer disclosures, Form ATS regulatory filings and customer information controls relating to the pilot's trading activity, which included (a) crossing against sell-side clients in POSIT and (b) violations of ITG policy and procedures by a former employee. These violations principally involved information breaches for a period of several months in 2010 regarding sell-side parent orders flowing into ITG's algorithms and executions by all customers in non-POSIT markets that were not otherwise available to ITG clients.[2]

---

[2]     The conduct described in the July 29 Press Release and in subsequent press reports and in the SEC Settlement Order (defined below) is sometimes referred to herein as the "Underlying Wrongdoing."

9.      The July 29 Press Release stated that ITG expected to pay an aggregate amount of approximately $20.3 million, including an $18 million civil penalty, disgorgement of $2.1 million in improperly gotten trading revenues, and about $250,000 in prejudgment interest, in a settlement with the SEC.  ITG announced that as a result of the probable settlement, it was reserving approximately $21.5 million.  Additionally, the Company incurred $2.3 million in legal and other related costs in its second quarter of 2015 in connection with the expected SEC settlement, bringing its total costs in connection with the matter to $22.6 million.  As a result of these costs, the Company incurred a net loss for the quarter ended June 30, 2015 of $10.2 million.

10.      The July 29 Press Release further disclosed that Board member Kevin J.P. O'Hara ("O'Hara") had resigned on July 23, 2015.  O'Hara's resignation letter, also released the same day, stated, *inter alia*, that "over the last several months, continuous fundamental, strategic and vital differences of opinion and direction have transpired at the Board level and, in particular, between me and the Board's leadership," and that he no longer wished to be the "loyal opposition."

11.      On July 30, 2015, ITG's share price fell by approximately 23.5%, or $5.64 per share, to close at $18.36 per share.

12.      Further, on August 3, 2015, prior to market open, the Company announced that it was replacing Gasser as CEO, as well as its general counsel, Mats Goebels.  The Wall Street Journal reported that day that the departures were related to Gasser's failure to disclose certain details of the improper conduct relating to POSIT to the Board.

13.      On August 3, 2015, ITG's share price declined by approximately 4%, or $0.84 per share, to close at $19.51 per share.

14.     Moreover, on August 4, 2015, before market open, in ITG's earnings call for the second quarter of 2015 (ended June 30, 2015), Defendant Vigliotti reported that "[i]n the three trading days since we announced the potential SEC settlement… in the U.S. our volume market share was down about 25%."  This was likely a result of customer mistrust flowing from the disclosures.  Further, Vigliotti stated that, "[w]hile we recorded the reserve for the potential settlement in the second quarter, there was and still is a fair amount of work to do in the third quarter to reach a final settlement order. As a result, we expect a significant amount of legal and other fees related to this matter in the third quarter."

15.     On August 4, 2015, ITG's share price fell approximately 5.28%, or $1.03 per share, to close at $18.48 per share.

16.     On August 12, 2015, the SEC announced its settlement with ITG and released the SEC Settlement Order.  The SEC Settlement Order included detailed admissions of wrongdoing by the Company, including admissions that:

- Project Omega "accessed live feeds of ITG customer and POSIT subscriber order and execution information and traded algorithmically based on that information in POSIT and other market centers";

- ITG promoted itself, and POSIT, as an unconflicted "agency-only" broker free of conflicts of interests with customers, while simultaneously and secretly engaging in proprietary trading against those customers;

- ITG failed to establish adequate safeguards and procedures to protect the confidential trading information of the subscribers to POSIT, including allowing at least 140 employees to access confidential customer trading information and allowing Project Omega to access a "live feed of highly confidential information regarding sell-side subscribers' orders bound for POSIT and utilizing that information for the benefit of Project Omega's trading activities"; and

- ITG violated SEC rules and regulations by failing to disclose to the SEC the existence of Project Omega and its proprietary trading activities and use of

highly confidential customer information, even *after* the Company's compliance department became aware of the improper activities.

17.     The SEC Settlement Order confirmed that ITG would pay disgorgement of $2,081,304, prejudgment interest of $256,532, and a civil money penalty of $18,000,000 – the highest ever paid in connection with operation of an Alternative Trading System.

## II.     JURISDICTION AND VENUE

18.     The claims asserted arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by Section 27 of the Exchange Act.  Venue is proper pursuant to Section 27 of the Exchange Act because during the Class Period Defendant ITG and the Individual Defendants conducted business in and wrongful conduct took place in this District.

## III.     THE PARTIES

19.     Plaintiff purchased ITG's publicly traded common stock as detailed in the attached Certification and was damaged thereby.

20.     Defendant ITG is incorporated in Delaware and its current principal executive offices are located at 165 Broadway, New York, New York 10006.

21.     Defendant Gasser was the Company's Chief Executive Officer and President until August 1, 2015.  Defendant Gasser signed the Company's annual reports filed with the SEC on Form 10-K for the years 2010, 2011, 2012, 2013, and 2014, as well as the SOX Certifications (defined below) appended thereto, and the Company's quarterly report on Form 10-Q for the quarter ended March 31, 2015, with knowledge of or reckless disregard for the false statements therein.  Gasser also knowingly or recklessly made various other public false statements, including in investor conference calls and in testimony before the U.S. Senate.

22.     Defendant Vigliotti was the Company's Chief Financial Officer and a Managing Director of ITG throughout the Class Period.  Defendant Vigliotti signed the Company's annual reports filed with the SEC on Form 10-K for the years 2010, 2011, 2012, 2013, and 2014, as well as the SOX Certifications (defined below) appended thereto, and the Company's quarterly report on Form 10-Q for the quarter ended March 31, 2015 ("Q1 2015 10-Q"), as well as the SOX Certification (defined below) appended thereto, with knowledge of or reckless disregard for the false statements therein.

23.     Defendant Goebels was the Company's General Counsel and a Managing Director until August 1, 2015.  Defendant Goebels signed the Company's Form ATS filed with the SEC on December 13, 2013 and published on the Company's website, with knowledge of or reckless disregard for the false statements therein.

24.     Defendants Gasser, Vigliotti, and Goebels are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of ITG's quarterly reports, annual reports, other filings with the SEC, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants each made materially false statements, including by signing quarterly and annual reports and other SEC filings that contained materially false statements and omissions.  Further, because of their positions and access to material non-public information available to them but not to the public, each of the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive

representations which were being made were then materially false and misleading. The Individual Defendants are thus liable for the false statements pleaded herein.

## IV.    CLASS ACTION ALLEGATIONS

25.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class of all persons who purchased the publicly traded common stock during the Class Period (the "Class").

26.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at the present time and can only be ascertained through appropriate discovery, According to ITG's 2014 10-K, as of February 23, 2015 the Company had approximately 5,416 stockholders of record or through nominees in street name accounts with brokers. Throughout the Class Period, ITG had at least 34 million, and as many as 39 million, shares of common stock outstanding, which were actively traded on the NYSE in an efficient market.

27.    Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class have sustained damages because of Defendants' unlawful activities alleged herein. Plaintiff has retained counsel competent and experienced in class and securities litigation and intends to pursue this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff. Plaintiff has no interests which are contrary to or in conflict with those of the Class that Plaintiff seeks to represent.

28.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be

encountered in the management of this action that would preclude its maintenance as a class action.

29.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether Defendants misstated and/or omitted to state material facts in their public statements and filings with the SEC;

(c)     whether Defendants participated directly or indirectly in the course of conduct complained of herein; and

(d)     whether the members of the Class have sustained damages and the proper measure of such damages.

## V.     FALSE AND MISLEADING STATEMENTS

30.     During the Class Period, Defendants' statements were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that, as detailed in the SEC Settlement Order, between April 2010 through July 2011, the Company operated a proprietary trading pilot called "Project Omega" within the Company's AlterNet subsidiary that involved "crossing against sell-side clients in POSIT" and violations of the Company's policies and procedures by Mittal, a former ITG Managing Director, Head of Algorithmic Trading, and Head of Liquidity Management;

(b) that Mittal, while head of Project Omega, along with numerous other employees, accessed private client data within the Company while simultaneously operating a proprietary trading strategy, a clear conflict of interest;

(c) that this conduct violated Regulation ATS; and

(d) that the Company was under investigation for this conduct by the SEC by Fall 2013, and faced an enforcement action by May 2015, which threatened major fines and legal costs as well as reputational harm to the Company and loss of customers;

31.     The Class Period begins on February 28, 2011 when Defendants Gasser and Vigliotti caused the Company to file its Annual Report for the year ended December 31, 2010 with the SEC on Form 10-K ("2010 10-K").  The 2010 10-K, which was signed by Defendants Gasser and Vigliotti stated:

> ITG's POSIT was launched in 1987 as a scheduled electronic trade matching system. **The POSIT suite provides anonymous matching of nondisplayed equity orders to minimize market impact** and may provide opportunities for price improvement within the National Best Bid and Offer ("NBBO").... POSIT Marketplace uses dark pool aggregation technology to provide clients with simplified access to an expanded range of liquidity destinations **and incorporates advanced liquidity filter technology to help ensure that clients are protected from gaming** and are only interacting with quality liquidity…. **POSIT Alert offers a way to tap into a reserve of hidden liquidity with minimal information leakage**.

(Emphasis added).

32.     This statement was materially false and misleading because the Company failed to disclose the material facts delineated above in ¶ 30(a)-(c) and failed to disclose that ITG through Project Omega was secretly accessing its client trading information and using such information to trade ITG's clients.

33.     The 2010 10-K also stated:

Regulation ATS permits "alternative trading systems" such as POSIT to be operated in compliance with Regulation ATS by U.S. broker-dealers without having to register as a national securities exchange. Accordingly, POSIT is not registered with the SEC as an exchange. **We continue to review and monitor POSIT's systems and procedures to ensure compliance with Regulation ATS.**

(Emphasis added).

34.     This statement was materially false and misleading because Defendants failed to disclose that in committing the Underlying Wrongdoing, ITG failed to ensure compliance with Regulation ATS's required "Procedures to ensure the confidential treatment of trading information" found in 17 CFR § 242.301(b)(10):

(i) The alternative trading system shall establish adequate safeguards and procedures to protect subscribers' confidential trading information. Such safeguards and procedures shall include:

(A) Limiting access to the confidential trading information of subscribers to those employees of the alternative trading system who are operating the system or responsible for its compliance with these or any other applicable rules;

(B) Implementing standards controlling employees of the alternative trading system trading for their own accounts; and

(ii) The alternative trading system shall adopt and implement adequate oversight procedures to ensure that the safeguards and procedures established pursuant to paragraph (b)(10)(i) of this section are followed.

35.     Further, the 2010 10-K stated "A portion of our revenues is derived from principal trading for our own account where we incur risk. **All such principal trading activity is conducted in accordance with applicable regulatory requirements, including those pertaining to the maintenance of information barriers.**" (Emphasis added).

36.     This statement was materially false and misleading because Defendants failed to disclose that ITG's (undisclosed) proprietary trading via Project Omega was not conducted in accordance with applicable regulatory requirements, including the above-mentioned requirements found in 17 CFR § 242.301(b)(10).

37.     And similarly, the 2010 10-K stated:

> …employee errors or misconduct **could** subject us to financial losses or regulatory sanctions and seriously harm our reputation. It is not always possible to prevent employee errors or misconduct, and the precautions we take to prevent and detect this activity **may** not be effective in all cases. Misconduct by our employees **could** include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers or improper use of confidential information. Such misconduct **could** result in losses, litigation or other material adverse effects on the Company.

(Emphasis added).

38.     This statement was materially false and misleading because Defendants failed to disclose that the conduct delineated above in ¶ 30(a)-(c) had already occurred and was continuing with the knowledge of at least one of the signatories of the 2010 10-K, Defendant Gasser.

39.     The 2010 10-K also included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") of Defendants Gasser and Vigliotti, which state, in part. the following:

> (2) The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

40.     This statement was materially false and misleading because the Company had failed to disclose the material facts delineated above in ¶ 30(a)-(c).

41.     On October 24, 2011, the SEC announced that one of ITG's competitors, Pipeline Trading Systems ("Pipeline"), would pay a $1 million fine for improperly trading

against its own dark pool clients using one of its subsidiaries, and for failing to disclose this practice.  As a result of this news, ITG reportedly received numerous inquiries from concerned customers about whether ITG engaged in similar practices.  On November 3, 2011, during the Company's earnings call for the third quarter of 2011, an analyst asked Gasser to comment in relation to the Pipeline controversy, and Gasser responded, in part:

> I would say that it's surprising, it's shocking, I think for everyone that's engaged in this space, whether or not you're buy-side or sell-side firm. We've been very clear about our business model and how we execute our business. We've communicated that broadly to clients. As you know we've been talking about various elements of our business very publicly, particularly the sell-side and the spread trading business back to Q1 of '09, right and that is no way analogous to what Pipeline was doing, but certainly any nuance to our model we feel absolutely compelled to communicate very clearly and very transparently.

42.     This statement was materially false and misleading because Gasser failed to disclose the material facts delineated above in ¶ 30(a)-(c).

43.     On February 28, 2012, ITG filed its Annual Report for the year ended December 31, 2011 with the SEC on Form 10-K ("2011 10-K"), which was signed by Defendants Gasser and Vigliotti.  The 2011 10-K contained materially false and misleading statements substantially similar to those quoted from the 2010 10-K in ¶¶ 31, 33, and 37 herein, as well as SOX certifications of Defendants Gasser and Vigliotti substantially identical to that quoted in ¶ 39.

44.     On December 18, 2012, Gasser testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment of the Committee on Banking, Housing, and Urban Affairs.  During this statement, Gasser said:

> Data security is a matter of paramount importance for all market participants, particularly when it comes to sensitive client information or trade data. We…take this responsibility seriously and we safeguard our data using a combination of up-to-date technological measures, strictly enforced

information barriers, and robust policies and procedures concerning information security and protection of client confidential information.

45.     This statement was materially false and misleading because Gasser failed to disclose that the Company failed to safeguard data, enforce information barriers, or uphold its own policies and procedures concerning information security and protection of client information and failed to disclose the facts delineated above in ¶ 30(a)-(c).

46.     On March 6, 2013, ITG filed with the SEC its Annual Report for the year ended December 31, 2012 with the SEC on Form 10-K ("2012 10-K"), which was signed by Defendants Gasser and Vigliotti.  The 2012 10-K stated:

> POSIT was launched in 1987 as a point-in-time electronic crossing network. POSIT operates as an Alternative Trading System ("ATS"), providing anonymous continuous and scheduled crossing of non-displayed (or dark) equity orders and price improvement opportunities within the National Best Bid and Offer ("NBBO").
>
> ***
>
> POSIT Marketplace provides access to POSIT liquidity, the dark pools of other ATSs, and certain exchange hidden order types. POSIT Marketplace is a dark pool aggregator that provides clients with access to a large range of liquidity destinations. **POSIT Marketplace uses advanced quantitative techniques in an effort to protect clients from gaming and to interact with quality liquidity.**

(Emphasis added).

47.     This statement was materially false and misleading because Defendants failed to disclose the material facts delineated above in ¶ 30(a)-(c).

48.     The 2012 10-K further contained materially false and misleading statements substantially similar to those quoted from the 2010 10-K in ¶¶ 33 and 37, as well as SOX certifications of Defendants Gasser and Vigliotti substantially identical to those quoted in ¶ 39.

49.     On December 13, 2013, Defendant Goebels caused ITG to file with the SEC a Form ATS for its POSIT platform.[3]  The Company also made the 2013 Form ATS available on its own website.  The 2013 Form ATS was signed by Goebels and stated:

ITG employs controls that may prevent the interaction between certain types of Subscriber orders. The motivations for these controls are to: (1) **protect customer orders from adverse selection, gaming, and/or potential market manipulation**; (2) ensure the stability of POSIT's order handling and execution systems; (3) address economic considerations; and (4) **maintain the quality and integrity of POSIT's liquidity pool**. **These measures are primarily employed to ensure the securing of best execution for all Subscriber orders, which is a paramount consideration of ITG and POSIT**.

50.     Further, the 2013 Form ATS stated:

ITG has a U.S. broker-dealer affiliate called AlterNet Securities, Inc. ("AlterNet"). Based on specific client instructions, **AlterNet may submit orders to POSIT for the sole purpose of facilitating broker-dealer client orders on a riskless principal and/or net trading basis.** Accordingly, AlterNet will not route an order to POSIT until after a broker-dealer client order is received. If the AlterNet order is filled in POSIT, the entire position will be immediately allocated by AlterNet to the broker-dealer client order. AlterNet executes client orders at prices that are at or within the NBBO. **AlterNet maintains written disclosures regarding the net trading relationship, which are provided to all AlterNet clients. Neither ITG nor AlterNet engage in any of the following activities: (1) at-risk or directional proprietary trading; (2) market making; (3) capital commitment, and/or (4) establishing directional positions.**

51.     And further, the 2013 Form ATS stated:

ITG and POSIT employ several measures, controls, and reviews to protect customer orders from toxic order flow and gaming strategies. **Furthermore, ITG closely monitors the trading activity in the ATS for execution quality, potential regulatory violations, and inappropriate conduct.**

***

ITG maintains and enforces robust policies and procedures designed to ensure that POSIT matches Subscriber Orders in accordance with

---

[3]     Form ATS filings are required by the SEC's Regulation ATS, which pertains to "Alternative Trading Systems" such as ITG's POSIT.

applicable law. Specifically, ITG employs a wide range of surveillance reports and monitoring controls to detect and prevent potential violations of federal securities laws and regulations, as well as SRO rules, including, but not limited to, Rule 611 of Regulation NMS (Order Protection Rule) and FINRA Rule 5310 (Best Execution).

52.     Finally, the 2013 Form ATS stated:

With respect to system security and confidentiality, **access to information relating to the orders of a particular client within the system is limited to the ITG registered personnel assigned to the particular client. Access by those persons to other Subscribers' order information is strictly prohibited and monitored. Only certain support personnel on the POSIT support desk may have access to all orders within the system as required in case of a problem.** Managers who are responsible for the system are provided daily summary reports outlining any security risks or unauthorized access attempts.  Furthermore, among other things, **ITG's compliance department reviews the personal trading records of registered persons entering orders into POSIT on behalf of customers and POSIT support personnel in accordance with ITG compliance policies and procedures to detect whether confidential user trade information is being misused.**

(Emphasis added).

53.     The statements in ¶¶ 49-52 were materially false and misleading because ITG and Goebels failed to disclose the material facts delineated above in ¶ 30(a)-(c).

54.     On March 17, 2014, ITG filed its Annual Report for the year ended December 31, 2013 with the SEC on Form 10-K ("2013 10-K"), which was signed by Defendants Gasser and Vigliotti.  The 2013 10-K contained materially false and misleading statements substantially similar to those quoted herein from the 2010 10-K in ¶¶ 33 and 37, and from the 2012 10-K in ¶ 46, as well as SOX certifications of Defendants Gasser and Vigliotti substantially identical to those quoted in ¶ 39.

55.     On March 13, 2015, ITG filed the 2014 10-K with the SEC.  The 2014 10-K, which was signed by Defendants Gasser and Vigliotti, contained materially false and misleading statements substantially similar to those quoted herein from the 2010 10-K in

¶¶ 33 and 37, and from the 2012 10-K in ¶ 46, as well as SOX certifications of Defendants
Gasser and Vigliotti substantially identical to those quoted in ¶ 39.

56.     On May 10, 2015, the Company filed with the SEC the Q1 2015 10-Q,
which, in addition to SOX certifications of Defendants Gasser and Vigliotti substantially
identical to those quoted in ¶ 39, contained the following statement, under the heading
"Legal Matters":

> The Company is not a party to any pending legal proceedings other than
> claims and lawsuits arising in the ordinary course of business. The
> Company's broker-dealer subsidiaries are involved in ongoing
> investigations and other proceedings by government agencies and self-
> regulatory organizations regarding its business, which may result in
> judgments, settlements, fines, penalties, injunctions or other relief. **The
> Company is unable to provide a reasonable estimate of any potential
> liability given the stage of such proceedings**. However, the Company
> believes, based on information currently available, that the outcome of such
> proceedings, individually or in the aggregate, will not likely have a material
> adverse effect on its consolidated financial position. **In light of the
> inherent uncertainties of such proceedings, however, an adverse
> outcome of such proceedings may have a material impact on the results
> of operations for any particular period.**

(Emphasis added).

57.     This statement was materially false and misleading because by this time,
according to the Wall Street Journal, the SEC had already told ITG that it was planning to
bring "serious charges" against the Company.

### VI.     THE TRUTH BEGINS TO EMERGE

58.     On July 29, 2015, after the market closed, ITG issued a press release
disclosing that ITG was nearing a settlement with the SEC relating to a theretofore
undisclosed investigation of the Company.  The press release read, in relevant part:

**ITG Announces Preliminary Second Quarter 2015 Earnings
Guidance, Including Reserve for Probable SEC Settlement**

Also Announces Resignation of Board Member Kevin O'Hara

NEW YORK, July 29, 2015 – ITG (NYSE: ITG), a leading independent execution broker and research provider, today announced that it expects its results for the second quarter of 2015 to be a GAAP net loss of $10.2 million, or $0.30 per diluted share, including a reserve for a probable settlement with the Securities and Exchange Commission ("SEC") and related fees totaling $22.6 million pre-tax and $21.6 million after taxes, or $0.62 per diluted share. Excluding the impact of these charges, adjusted net income is expected to be $11.4 million, or $0.32 per diluted share.

**Probable SEC Settlement**

During the second quarter of 2015, ITG commenced settlement discussions with the Staff of the Division of Enforcement of the SEC (the "SEC Enforcement Division") in connection with the SEC's investigation into a proprietary trading pilot operated within ITG's AlterNet Securities, Inc. ("AlterNet") subsidiary for sixteen months in 2010 through mid-2011. The investigation is focused on customer disclosures, Form ATS regulatory filings and customer information controls relating to the pilot's trading activity, which included (a) crossing against sell-side clients in POSIT and (b) violations of ITG policy and procedures by a former employee. These violations principally involved information breaches for a period of several months in 2010 regarding sell-side parent orders flowing into ITG's algorithms and executions by all customers in non-POSIT markets that were not otherwise available to ITG clients. ITG has negotiated a potential settlement with the Staff of the SEC Enforcement Division. Based on the terms of the potential settlement, ITG would pay an aggregate amount of $20.3 million representing a civil penalty of $18 million, disgorgement of approximately $2.1 million in trading revenues and prejudgment interest of approximately $250,000. As a result, ITG reserved $20.3 million for a probable settlement with the SEC and incurred $2.3 million in legal and other related costs associated with this matter during the second quarter of 2015.

Final resolution of this matter is subject to preparation and negotiation of documentation satisfactory to all the parties, including approval by ITG's Board of Directors and authorization by the SEC. ITG can provide no assurances that a satisfactory final agreement will be reached and that authorization by the SEC will be obtained or with respect to the timing or definitive terms of any such agreement or approvals.

Until this matter is fully resolved, ITG expects to continue to incur costs, primarily professional fees and expenses, which may be significant.

\*\*\*

**Board Member Resignation**
On July 23, 2015, Kevin J.P. O'Hara resigned from ITG's Board of Directors effective immediately.

59.     The July 29, 2015 press release also attached as an exhibit O'Hara's resignation letter, which stated, in part, that "over the last several months, continuous fundamental, strategic and vital differences of opinion and direction have transpired at the Board level and, in particular, between me and the Board's leadership."

60.     On July 30, 2015, ITG shares declined from a closing price on the prior day of $24.00 per share to close of $18.36 per share, a decline of $5.64 per share or approximately 24% on heavier than usual volume.

61.     On August 3, 2015, prior to market open, the Company issued a press release announcing that it was replacing Gasser as CEO, as well as Goebels as General Counsel.  On August 3, ITG shares declined $0.84 per share, or approximately 4%, to close at $19.51 per share on heavier than usual volume.

62.     On August 3, 2015, J.P. Morgan issued an analyst research report on ITG, which, *inter alia*, analyzed the significance of ITG's recent disclosures about the Underlying Wrongdoing.  The report stated, in part:

> ITG has announced a possible settlement with the SEC regarding both 1) **disclosure deficiencies relating to a proprietary trading program and 2) a former senior employee's use of protected information to execute proprietary trades, a use of information that was/is against company policy**. ITG has both apologized for the disclosure breach and has tightened controls meaningfully limiting access by ITG employees to such information. ITG no longer participates in proprietary trading in the US, having shut down the experiment in 2011.
>
> **What makes the settlement with the SEC potentially harmful is that ITG has developed a brand around superior trade execution based on conflict-free agency only trading**. Thus, ITG's willingness to experiment with proprietary trading without disclosing it to clients

**damages that reputation. While ITG indicated the senior employee who was operating the proprietary platform and used customer trading information had separated from the company, that separation doesn't appear to have happened immediately, which warrants further questions.**

*** 

Pilot Program Part of AlterNet.
The possible settlement with the SEC pertains to the crossing of US sell-side orderflow in Posit with an ITG proprietary operation without informing customers.

**ITG denied participating in proprietary trading in reaction to customer inquiries to the SEC's 2011 settlement with Pipeline for similar activities**. ITG's response to clients came just months after it appears to have shut down proprietary trading in the US. In addition, we understand that the head of ITG proprietary trading was able to access aggregate trading information for a few months before being caught, stripped of access, and later leaving the firm.

*** 

Agency Trading, Especially at ITG Is Built on Trust.
**What could make the announcement by ITG particularly damaging is that ITG's trading business, as a primarily an agency-only broker, is buil[t] on trust. Some trading customers will look at the disclosures thus far by ITG and will decide that they don't want to do business with ITG anymore.** Other [sic] will wait for the details from the SEC settlement. Given that agency trading is about liquidity, especially in Posit, if enough customers walk away from doing business with ITG, liquidity could be impaired, with some systems becoming potentially less valuable to end customers.

(Emphasis added).

63.     On August 4, 2015, before market open, ITG issued a press release reporting

its financial results for the second quarter of 2015.  The press release stated, *inter alia*:

Second quarter 2015 highlights included:

* GAAP net loss of $10.2 million, or $0.30 per diluted share compared to GAAP net income of $12.9 million, or $0.35 per diluted share for the second quarter of 2014. The GAAP net loss for the second quarter of 2015 includes

a reserve for a probable settlement with the SEC and related legal and other fees totaling $22.6 million pre-tax and $21.6 million after taxes, or $0.62 per diluted share.

\* As previously announced, the probable SEC settlement relates to customer disclosures, Form ATS regulatory filings and customer information controls relating to a proprietary trading pilot operated by ITG subsidiary AlterNet for 16 months in 2010 through mid-2011, which included (a) crossing against sell-side clients in POSIT and (b) violations of ITG policy and procedures by a former employee. These violations principally involved information breaches for a period of several months in 2010 regarding sell-side parent orders flowing into ITG's algorithms and executions by all customers in non-POSIT markets that were not otherwise available to ITG clients.

64.     Also on August 4, 2015, before market open, ITG held its earnings call for the second quarter of 2015.  During the call, Defendant Vigliotti reported that "[i]n the three trading days since we announced the potential SEC settlement… in the U.S. our volume market share was down about 25%."  Further, Vigliotti stated that, "[w]hile we recorded the reserve for the potential settlement in the second quarter, there was and still is a fair amount of work to do in the third quarter to reach a final settlement order. As a result, we expect a significant amount of legal and other fees related to this matter in the third quarter."

65.     During the day on August 4, 2015, ITG's shares fell 5.28%, or $1.03 per share, to close at $18.48 per share on heavier than usual volume.

66.     On the evening of August 6, 2015, the Wall Street Journal published an article reporting new facts and details about the Underlying Wrongdoing.  The article, titled "Investigation Into Pilot Program Darkens Brokerage Outlook," read, in part:

**A pilot project by Investment Technology Group Inc., nicknamed "Project Omega," was designed to improve trading, fend off competition and stem steady declines in revenue.**

That was in 2010. Five years later, the in-house project has become an albatross that has led to a potential settlement with the Securities and Exchange Commission over alleged trading improprieties and the removal of the company's chief executive, Robert Gasser.

**Several clients have defected in the past week, say people familiar with the matter, and ITG shares have dropped more than 20%.** Analysts have speculated about whether ITG may be sold.

It is a stark turnaround from ITG's heyday in the mid-2000s when electronic trading began to dominate and ITG was a prominent player in helping hedge funds and others complete trades in markets around the world.

Founded in 1987 as a division of investment bank Jefferies, ITG has marketed itself as a technology firm without conflicts of interest, powered by an academic understanding of the markets. It offers trade-cost analysis, trading algorithms and research. It also was one of the earliest operators of the private trading venues known as dark pools, which were originally designed to help institutions trade anonymously with less impact on the price of shares. ITG's dark pool is called Posit. The company split from Jefferies in 1999 and went public.

**When ITG quietly set up Project Omega, the company hoped the pilot could help bolster its finances, according to people familiar with the matter.** The firm had posted year-over-year declines in net income in each quarter since mid-2008 and announced a restructuring of its U.S. business in December 2009 that included staff cuts. The firm also was under pressure from investors to expand its business and follow the lead of competitor Knight Capital Group Inc., which had a thriving trading business at the time, according to the people.

**Mr. Gasser tapped Hitesh Mittal, then a senior executive, to develop Project Omega, they said.**

**Subsequent investigations by the SEC and by the firm's legal counsel found that while he was heading the project, Mr. Mittal accessed private client data within the firm to get an edge on trading**, according to people with knowledge of the matter.

**For brokers, the need to keep orders secret is paramount. If a broker places an order to buy shares of a particular stock with ITG, an employee with access to private client data could try to buy the stock on an exchange and then try to resell that stock to the broker in ITG's dark pool at a higher price.**

Mr. Mittal didn't respond to messages and declined to comment through a spokesman for AQR Capital Management LLC, the $136 billion hedge-fund firm, where he holds the title of head of trading. Mr. Mittal was put on temporary paid leave after ITG announced it was in settlement negotiations with the SEC. **AQR said its understanding when it hired Mr. Mittal in 2012 was that he had left the firm solely because of a round of layoffs.**

**Part of the problem was Mr. Mittal's dual roles, according to the people familiar with the matter. He had access to client information and was simultaneously operating a proprietary trading strategy, which was a conflict of interest, they said. The firm also had said previously that it was conflict-free because it didn't engage in proprietary trading.**

A new employee uncovered the alleged improprieties, the people said. During a review of the program, Jamie Selway, a market-structure expert hired in August 2010, **found evidence suggesting that Mr. Mittal had accessed private client data and brought it to ITG's compliance team.** The program was taken offline in early December, and an outside lawyer was hired to assess the trading program.

In late December, the pilot was restarted without access to private client data, according to the firm. In July 2011, Mr. Mittal was let go as part of a round of layoffs at the company, ITG said. Mr. Selway, who replaced Mr. Mittal as head of liquidity management, shut down Project Omega immediately afterward, according to the people familiar with the matter.

**The issues didn't arise again until the SEC began its investigation in the fall of 2013.**

While the board was aware of the pilot program, at no point was it officially notified of the alleged improprieties until May of this year, according to the results of the internal review of ITG executive actions by law firm Cahill Gordon & Reindel LLP. That was when the SEC told the company that it was planning to bring serious charges against ITG in large part due to the actions of Mr. Mittal, people familiar with the matter said.

On Saturday, ITG replaced Mr. Gasser as chief executive. Mr. Gasser was removed after an external review found he hadn't disclosed to the board important details about the actions that led to the SEC case, according to people familiar with the matter.

A lawyer for Mr. Gasser said he fully informed the board about the trading pilot in 2010. "**The board was aware and approved of the planning and execution of every aspect of Project Omega in 2010,**" said Martin Flumenbaum, an attorney for Mr. Gasser at the firm Paul, Weiss, Rifkind, Wharton & Garrison LLP.

Now, as the firm awaits the SEC's signoff on a final settlement over the program, its board is tasked with naming a permanent chief executive.

(Emphasis added).

67.     On August 7, 2015, Financial News reported that the Company's European trading volume – both through its electronic brokerage business and over its POSIT platform – had begun to decline significantly as a result of the disclosure of the Defendants' wrongful conduct.[4]

68.     Finally, on August 12, 2015 the SEC announced its settlement with ITG and issued the SEC Settlement Order.  The SEC Settlement Order stated that ITG and AlterNet "admit the facts set forth" in the body of the SEC Settlement Order and "**acknowledge that their conduct violated federal securities laws.**" (Emphasis added). The SEC Settlement Order summarized the Underlying Wrongdoing, in part, as follows:

> Between approximately April 2010 and July 2011, ITG violated the federal securities laws and regulations in multiple ways as a result of its operation of an undisclosed proprietary trading desk known within ITG as "Project Omega" ("Project Omega" or "Omega").  During the period of April to December 2010, Project Omega accessed live feeds of ITG customer and POSIT subscriber order and execution information and traded algorithmically based on that information in POSIT and in other market centers. In connection with one of its trading strategies, Project Omega identified and traded with sell-side subscribers in POSIT and ensured that those subscribers' orders were configured in POSIT to trade "aggressively," or in a manner that benefitted Omega by enabling it to earn the full "bid-ask spread" when taking the other side of their orders.

> Project Omega, which operated as part of AlterNet, traded a total of approximately 1.3 billion shares, including approximately 262 million shares with subscribers in POSIT. ITG's proprietary trading gross revenues resulting from Project Omega totaled approximately $2,081,304.

> **While Project Omega was engaging in proprietary trading, including with ITG's own customers, ITG was simultaneously promoting itself,**

---

[4]     Tim Cave, "ITG feels the pinch in Europe after SEC revelation," Financial News, August 7, 2015, available at http://www.efinancialnews.com/story/2015-08-07/itg-feels-the-pinch-in-europe-after-sec-revelation

and POSIT, as an independent "agency only" broker that did not have conflicts of interest with its customers and that protected the confidentiality of its customers' trade information.

Project Omega was managed and overseen by an ITG senior executive who at the time served as the firm's Head of Liquidity Management (the "Liquidity Executive"). **The Liquidity Executive designed and directed Omega's trading strategies even though they violated written policies set by ITG's compliance department restricting Omega's access to customer information.**

ITG Inc. and AlterNet violated Sections 17(a)(2) and 17(a)(3) of the Securities Act by engaging in a course of business that operated as a fraud and by failing to disclose to ITG customers and POSIT subscribers, among other things, that: **(i) ITG was operating a proprietary trading desk while at the same time promoting its brokerage services and POSIT by describing ITG as an independent "agency-only" broker; (ii) the proprietary trading desk, until December 2010, accessed live feeds of highly confidential order and execution information and used this information to inform its own trading decisions; and (iii) one of the proprietary trading desk's strategies involved identifying sell-side subscribers with which the desk wanted to trade in POSIT, and ensuring that those subscribers' orders were configured to trade "aggressively" in POSIT.**

ITG Inc. violated Rule 301(b)(2) of Regulation ATS by failing to file an amendment on Form ATS at least 20 days before it launched Project Omega disclosing the commencement of its proprietary trading activities and that one of its primary trading strategies would involve accessing confidential information regarding subscribers' identities and orders and trading algorithmically based on a live feed of highly confidential information regarding open orders bound for the POSIT dark pool.

ITG Inc. violated Rule 301(b)(10) of Regulation ATS by failing to establish adequate safeguards and procedures to protect the confidential trading information of the subscribers to POSIT. Among other things, ITG Inc. violated Rule 301(b)(10) by failing to limit access to the confidential trading information of POSIT subscribers to those employees who were operating POSIT or responsible for its compliance with applicable rules. Instead, ITG Inc. permitted employees operating Omega to access information regarding POSIT subscribers and their orders, and did not take adequate steps to prevent Project Omega from accessing a live feed of highly confidential information regarding sell-side subscribers' orders bound for POSIT and utilizing that information for the benefit of Project Omega's trading activities.

(Emphasis added).

69.     The SEC Settlement Order states that ITG's compliance department and senior management learned of improprieties within Project Omega in early to mid-December 2010, and that Project Omega was then suspended, its trading strategies were modified, and it was restarted on or around December 21, 2010.  However, "no changes were made to its organizational structure," with the "Liquidity Executive" (Mittal) "continu[ing] to manage Project Omega and direct direct its trading strategies while also continuing his overall product management responsibilities for ITG's trading algorithms, smart order routers and POSIT, which included access to confidential customer order and trade information."  Moreover, the "other members of the team also continued in the same roles they had before the temporary suspension."

70.     The SEC Settlement Order further notes that:

> Despite the removal of the improper direct feeds, in connection with the Facilitation Strategy [one of the Project Omega trading strategies described in the Order], **Project Omega continued to have improper access to information identifying POSIT subscribers**. In addition, the Omega team continued to coordinate with ITG's POSIT development team to identify the sell-side subscribers for Omega to trade within POSIT and to ensure that such subscribers were configured to trade "aggressively" in POSIT.

(Emphasis added).

71.     The SEC Settlement Order states that Project Omega continued to operate until July 11, 2011, when its operations were ceased and Mittal was terminated.  Even after this time, ITG "continued to keep Project Omega and its trading activities confidential and made no disclosure of it publicly, to subscribers, or to the [SEC] via an amendment to the POSIT Form ATS."

72.     The SEC Settlement Order states that ITG's conduct constituted willful violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 ("Securities

Act"),  and of rule 301(b)(2) and Rule 301(b)(10) of regulation ATS, and orders them to cease and desist from committing all such violations, and to pay disgorgement of $2,081,304, prejudgment interest of $256,532, and a civil penalty in the amount of $18,000,000 – the largest civil penalty to date assessed by the SEC against an Alternative Trading System, according to press reports.

## VII.   LOSS CAUSATION/ECONOMIC LOSS

73.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated ITG's stock price and operated as a fraud or deceit on Class Period purchasers of ITG stock by misrepresenting the Company's regulatory compliance and its practices relating to customer trading data and proprietary trading, and by not disclosing that the Company was under investigation by the SEC.   Later, however, when Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of ITG stock fell precipitously as the prior artificial inflation came out of ITG's stock price. As a result of their purchases of ITG stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

74.    As a direct result of the public revelations regarding the truth about ITG's improper practices and the resulting SEC investigation and probable settlement, the price of ITG's stock materially declined.   This drop removed the inflation from ITG's stock price, causing real economic loss to investors who purchased the stock during the Class Period.

75.    The decline in ITG's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and

the market. The timing and magnitude of ITG's stock price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## VIII.   FRAUD-ON-THE-MARKET DOCTRINE

76.     At all relevant times, the market for ITG's common stock was an efficient market for the following reasons, among others:

(a)     The Company's common stock met the requirements for public listing and was listed and actively traded on the NYSE, a highly efficient market;

(b)     As a regulated issuer, the Company filed periodic public reports with the SEC; and

(c)     The Company regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

77.     As a result, the market for the Company's publicly traded common stock promptly digested current information with respect to ITG from all publicly available sources and reflected such information in the price of the Company's common stock. Under these circumstances, all purchasers of the Company's publicly traded common stock during the Class Period suffered similar injury through their purchase of the publicly traded common stock of ITG at artificially inflated prices and a presumption of reliance applies.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS

78.    Defendants had the motive to conceal the undisclosed adverse facts herein because those facts, if disclosed, threatened the Company's business, as they could reduce the trust customers had in the Company and drive those customers elsewhere.  Defendants had the opportunity to perpetrate the fraudulent scheme described herein because the Individual Defendants were the most senior officers of ITG, issued statements and press releases on behalf of ITG and had the opportunity to commit the fraud alleged herein.

79.    Moreover, Defendants' knowledge of the Underlying Wrongdoing is implied by certain facts reported in the press.  For example, on August 7, 2015, the Wall Street Journal reported that Gasser and the full Board not only knew about Project Omega, but that Gasser had personally selected Mittal to head the project.  The Company further hired an expert to review the program, and when the expert uncovered improprieties, he brought them to the attention of the Company's compliance team, which in turn led the Company to hire an outside lawyer to investigate.  Mittal was terminated shortly thereafter, in July 2011.

80.    The Wall Street Journal further reported that "Mr. Gasser was removed [as CEO] after an external review found he hadn't disclosed to the board important details about the actions that led to the SEC case," implying that he knew details about the improprieties in the program.  Further, a lawyer for Gasser has, in turn, stated that Gasser told the Board all of the relevant details of Project Omega and that "[t]he board was aware and approved of the planning and execution of every aspect of Project Omega in 2010."

## X.   NO SAFE HARBOR

81.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of ITG who knew that those statements were false when made.

### FIRST CLAIM FOR RELIEF
#### For Violation of Section 10(b) of the 1934 Act
#### and Rule 10b-5 Against All Defendants

82.     Plaintiff incorporates ¶¶ 1-81 by reference.

83.     During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were materially false and misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

84.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of ITG publicly traded common stock during the Class Period.

85.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for ITG's publicly traded common stock.  Plaintiff and the Class would not have purchased ITG common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

86.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of ITG common stock during the Class Period.

## SECOND CLAIM FOR RELIEF
### For Violation of Section 20(a) of the 1934 Act
### Against Defendants Gasser, Vigliotti, and Goebels

87.     Plaintiff incorporates ¶¶ 1-81 by reference.

88.     The Individual Defendants acted as a controlling person of ITG within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual

Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

89.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

90.     As set forth above, ITG violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint. By virtue of their positions each as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of ITG's and the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows: declaring this action to be a proper class action; awarding damages, including interest; awarding reasonable costs, including attorneys' fees; and such equitable/injunctive relief as the Court may deem proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 12, 2015                    KAPLAN FOX & KILSHEIMER LLP

*/s/ Frederic S. Fox*

Frederic S. Fox
Donald R. Hall
Jeffery P. Campisi
Joshua H. Saltzman
850 Third Avenue, 14th Floor
New York, NY 10022
Tel: (212) 687-1980
Fax: (212) 687-7714
Email: ffox@kaplanfox.com
Email: dhall@kaplanfox.com
Email: jcampisi@kaplanfox.com
Email: jsaltzman@kaplanfox.com

Marc A. Wites
WITES & KAPETAN, P.A.
4400 North Federal Highway
Lighthouse Point, FL 33064
Telephone: 954-570-8989
Facsimile: 954-354-0205
Email: mwites@wklawyers.com

*Attorneys for Plaintiff*