**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re Investment Technology Group, Inc. Securities Litigation | No. 15 Civ. 6369 (JFK) |
| | Consolidated |
| | **CLASS ACTION** |
| | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| | Jury Trial Demanded |

# TABLE OF CONTENTS


I. INTRODUCTION ....................................................................................................2

II. THE FRAUDULENT SCHEME ...............................................................................4

A. ITG Fosters a Reputation for Providing Innovation with Independence ................4

B. Ignoring Its Reputation, ITG, Defendants and the Board Secretly Launched Project Omega, a Proprietary Trading Desk ..........................................................7

C. Hitesh Mittal and the Project Omega Team "Game" Client Orders in POSIT and Directly Access Confidential Client Trade Data.............................................11

1. The Facilitation Strategy..............................................................................12

2. The Heatmap Strategy..................................................................................14

D. Defendants Learn About Project Omega's Trading Schemes, Yet Do Not Stop Project Omega ...........................................................................................15

E. Project Omega's Revenues and Total Shares Traded ...........................................17

F. During the Class Period—for Five Years Straight—ITG and the Individual Defendants Concealed Project Omega and Its Fraudulent Trading from Shareholders..........................................................................................................17

G. The SEC Investigates Project Omega and ITG Agrees to Pay a $20.3 Million Fine ..................................................................................................21

III. JURISDICTION AND VENUE...............................................................................22

IV. PARTIES ..................................................................................................................23

A. Lead Plaintiff ...................................................................................................23

B. Defendants ......................................................................................................23

1. The Company..............................................................................................23

2. The Individual Defendants............................................................................23

V. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS PRIOR TO THE CLASS PERIOD .........................................................................................24

VI. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD .............................................................................................26

A. Defendants Made Material Misrepresentations to Conceal Project Omega During Its Pendency.............................................................................................27

1. Annual Report Form 10-K for 2010 ..........................................................27

2. First and Second Quarter Fiscal Year 2011 Results ..................................29

B. Defendants' Made Misleading Statements and Omissions to Cover-Up the Existence of Project Omega After It Ended.........................................................32

1. Third Quarter Fiscal Year 2011 Results ....................................................34

2. Annual Report Form 10-K for Year End 2011 .....36

3. First, Second, and Third Quarters 2012 .....37

4. Senate Testimony by Gasser .....43

5. Annual Report Form 10-K for Year End 2012 .....45

6. First and Second Quarters Fiscal Year 2013 .....47

C. Defendants' Misleading Statements and Omissions Concealing the SEC Investigation .....50

1. Third Quarter 2013 Results .....50

2. Form ATS Disclosure .....52

3. Annual Report Form 10-K for Year End 2013 .....55

4. First Quarter Fiscal 2014 Results .....59

5. 2014 Forms 10-Q .....60

6. Second Quarter Fiscal 2014 Results .....63

7. Third Quarter Fiscal 2014 Results .....64

8. Annual Report Form 10-K Year End 2014 .....66

9. First Quarter Fiscal 2015 Results .....69

VII. THE SEC INVESTIGATION AND SEC ORDER ARE PUBLICLY DISCLOSED AND THE TRUTH IS REVEALED .....73

VIII. ADDITIONAL SCIENTER ALLEGATIONS .....79

A. ITG Knew in December 2010 that Project Omega Had Improperly Accessed Confidential Client Order Information .....80

B. ITG's Termination of Gasser and Goebels Is Circumstantial Evidence of Their Knowledge .....82

C. The Individual Defendants Are Presumed to Know About ITG's "Core Business"—the POSIT Securities Exchange .....83

D. Project Omega Violated ITG's Own Policies and Procedures .....83

E. Gasser's and Goebels' Insider Sales During the Class Period Further Support a Strong Inference of Their Scienter .....86

1. During the Class Period, Gasser and Goebels Together Reaped More than $2.9 Million in Insider Trading Proceeds .....86

2. Trades During the Class Period Made Pursuant to 10b5-1 Plans Are Not Insulated from Scrutiny .....90

F. Defendants' SOX Certifications Are Probative of Scienter .....93

G. Defendants Exhibited a Pattern of Failing to Disclose Material Information About the Transactions and Their Consequences .....95

H. Defendants Violated Numerous SEC Regulations in Failing To Disclose Material Information About the SEC Investigation and Related Risks.................96

I. Defendants Violated Generally Accepted Accounting Principles in Failing to Disclose the SEC Investigation and Related Risks..........................................99

J. The Cumulative Knowledge of ITG's Executives Is Imputed to the Company.........................................................................................101

IX. LOSS CAUSATION.........................................................................................101

A. July 29, 2015 Corrective Disclosures ...............................................................103

B. August 3-4, 2015 Corrective Disclosures .........................................................106

X. APPLICABILITY OF PRESUMPTION OF RELIANCE.............................................110

XI. CONTROL PERSON ALLEGATIONS / GROUP PLEADING...................................111

XII. INAPPLICABILITY OF SAFE HARBOR...................................................................113

XIII. CLASS ACTION ALLEGATIONS...................................................................114

XIV. PRAYER FOR RELIEF...................................................................................120

XV. JURY DEMAND .........................................................................................120

Lead Plaintiff Metzler Investment GmbH ("Metzler" or "Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, by their undersigned attorneys, alleges the following against Investment Technology Group, Inc. (the "Company" or "ITG") and the Individual Defendants (defined below), upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon the investigation conducted by and through its counsel, which included, among other things, the review and analysis of: (i) press releases, news articles, transcripts, and other public statements issued by or concerning the Company and the Individual Defendants; (ii) research reports issued by financial analysts concerning the Company; (iii) reports filed publicly by the Company with the U.S. Securities and Exchange Commission ("SEC"); (iv) ITG's corporate website; (v) interviews with former ITG employees concerning the relevant subject matter; and (vi) other publicly available information. Lead Plaintiff expects to receive additional materials from the SEC pursuant to a Freedom of Information Act request and believes that substantial additional evidentiary support for the allegations herein will continue to emerge through discovery.

Lead Plaintiff brings this federal securities class action on behalf of itself and on behalf of a class consisting of all persons and entities that, between February 28, 2011, through August 3, 2015, inclusive (the "Class Period"), purchased or otherwise acquired shares of the Company's common stock, and were damaged thereby, subject to certain exclusions addressed in Part XIII below (the "Class"). The defendants in this action are Robert Gasser ("Gasser"), ITG's former Chief Executive Officer ("CEO"); Steven Vigliotti ("Vigliotti"), ITG's current Chief Financial Officer ("CFO"); and Mat Goebels ("Goebels"), ITG's former General Counsel (collectively, the

"Defendants" or, when referring to individuals, the "Individual Defendants"). Lead Plaintiff's claims arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule l0b-5 promulgated thereunder.

## I. INTRODUCTION

1. This case presents the classic paradigm of securities fraud. During the Class Period, ITG and the Individual Defendants explicitly and consistently claimed that the Company was an independent, "agency only" or "execution" broker. The Company claimed that POSIT® ("POSIT"), its alternative trading system ("ATS") or "dark pool," was a confidential market where institutional investors could make large trades with complete anonymity.

2. In 1987, when ITG was founded, electronic trading was a new concept, and POSIT was ITG's flagship product, the first of its kind. During the Class Period and even today, POSIT remains ITG's calling card—the core of its business operations. From its founding onward, ITG built its reputation on POSIT and the Company's putative position as an independent broker that only executes trades. ITG claimed not to trade for its own account. This separated ITG from its competitors, who were often owned by, or linked closely to, large investment banks that engaged in proprietary trading for their own accounts, leading to conflicts of interest.

3. ITG created a brand, and that brand was successful. Analysts and shareholders alike accepted this brand. And ITG became known for these two essential components, its agency-only status and POSIT.

4. As it turned out, these representations were false and misleading. ITG was, in fact, concealing the very risks that it claimed did not exist within its walls. Shortly before the beginning of the Class Period, in early 2010, ITG's Board of Directors (the "Board") and Gasser approved but did not disclose publicly an experimental and secret proprietary trading desk called "Project Omega." Project Omega operated for more than a year trading for the Company's own account.

5. At the close of the Class Period in 2015, ITG and the Individual Defendants disclosed—*for the first time*—the existence of Project Omega. Moreover, the Company admitted that Project Omega had illegally accessed confidential customer trade data within POSIT in order to maximize profitability. Shareholders also learned that Project Omega was not the work of a single individual. The disclosures were all the more damning because in December 2010 Defendants learned of the illegal access to client data, yet did virtually nothing.

6. During the Class Period, Defendants failed to ensure that sufficient controls or firewalls were in place to prevent the gaming of client data. Additionally, Defendants did not disclose to shareholders and customers the blatant breaches of confidentiality. Nor did they disclose that ITG was trading for its own account. Upon learning of the improprieties relating to Project Omega in late 2010, Defendants did not shut the program down. Instead, Defendants reprimanded the executive in charge of Omega and allowed the project to continue trading until July 2011.

7. After years of secrecy, ITG's fraudulent activities finally came to light. The SEC began investigating the Company in 2013. In 2015, the investigation resulted in an agreed-upon SEC Order, disclosing the fraud and fining the Company $20.3 million (the largest fine ever assessed by the agency against a dark pool). Longtime Board Member Kevin J.P. O'Hara resigned, explaining that he had tired of acting as the "'loyal opposition.'" ITG, Current Report (Form 8-K), at Ex. 99.2 (July 23, 2015) ("2015 Form 8-K") ("O'Hara Resignation Letter"). ITG fired Gasser for hiding facts about Project Omega from the Board, and Goebels left the Company for issues related to the scandal.

8. In short, Defendants created a brand built on confidentiality, impartiality and trust. Then, behind closed doors, they intentionally engaged in activities that have irreparably tarnished

that brand and may ultimately destroy it. When these facts became public in July and August of 2015, not surprisingly, the Company's public share price plummeted, causing investors to lose millions. This action seeks redress for the harm that Defendants' deception caused to shareholders.

## II. THE FRAUDULENT SCHEME

### A. ITG Fosters a Reputation for Providing Innovation with Independence

9. ITG was founded in 1987, as a division of Jeffries. Both before and during the Class Period, the Company's business and brand was based on two pillars: technological innovation and independent, conflict-free brokerage services. In a February 10, 2014 press release, ITG stated precisely this: "Over our 27-year history ITG has ***built a reputation for innovation***, ***integrity***, and an intense focus on service." Press Release, ITG, ITG Announces New Managing Director Promotions (Feb. 10, 2014).[1]

10. When it was founded in 1987, ITG focused on electronic equity trading for institutional investors. Although common now, at that time, electronic trading was a fledgling concept. ITG was one of the first firms to offer the service. The Company's first and most important innovation was POSIT, an ATS or, as they are more commonly known, a "dark pool." ITG runs POSIT through its subsidiary ITG, Inc. ITG, Inc., is a registered broker-dealer incorporated in Delaware and with its principal place of business in New York. Introduced at ITG's founding, POSIT is at the heart of this case. It was then and remains at present the core of ITG's operations.

11. In the Spring of 2015, POSIT had more than $109 billion worth of trades in a single quarter. Even so, POSIT is not the largest dark pool by today's standards. Before the revelations giving rise to this case, POSIT was ninth in terms of dark pool size. POSIT, however, has added

---

[1] Unless otherwise indicated, all emphases are added.

significance because of its age. In 1987 POSIT was innovative. It is one of, if not "the," first dark pool in operation. As Gasser explained when testifying in 2012 before the Senate Subcommittee on Securities, Insurance, Investment Committee on Banking, Housing and Urban Affairs, "POSIT is the granddaddy of dark pools." *Computerized Trading Venues: Hearing Before the Subcomm. On* Sec., Ins., & Inv. Comm. on Banking, Housing & Urban Affairs U.S. S. at 14 (Dec. 18, 2012) ("2012 Gasser Testimony"). Accordingly, during the Class Period, when investors thought of ITG, they thought of POSIT.

12. For example, a post from November 15, 2009 describes POSIT as "ITG's ***flagship*** . . . system [that] enables clients to trade ***confidentially amongst themselves*** using proprietary algorithms to match buy and sell orders without human intervention." *See* Paul Price, *Investment Technology Group: POSIT-ively Cheap*," Seeking Alpha, Nov. 15, 2009.[2] In a 2011 interview, an ITG managing director noted that POSIT was the ITG's "flagship" product and explained that POSIT had been an integral part of the Company's brand since its founding. *See* Interview by Sarah Rudolph of JLN Options with Pat Read, Head of Derivatives, ITG (Nov. 30, 2011).[3] "It was really the first dark pool or crossing mechanism to allow customer-to-customer crosses, giving the institutional client with large block orders the potential for a mid-market fill. The idea was to reduce market impact and execution costs and remain ***anonymous***." *Id.* The director went on to explain that ITG rose to prominence, in large part, because of POSIT: "ITG was a pioneer in the space and the first to gain a large amount of traction in that marketplace." *Id.*

13. Like all dark pools, POSIT was supposed to be "dark." That is, it anonymously matches securities trades outside of traditional exchanges that make up the National Market

---

2 http://seekingalpha.com/article/173446-investment-technology-group-posit-tively-cheap.

3 http://www.johnlothiannews.com/2011/11/jln-options-interview-pat-read-head-of-derivatives-at-itg/#.VmbgH00QWpo.

System ("NMS"), e.g., the New York Stock Exchange or NASDAQ. Dark pools are useful because they provide anonymity. They allow institutions to trade without immediately revealing their identity or the size of their trade to the market at large. This prevents the large trades from immediately moving the price of the stock and it provides liquidity that might not otherwise exist.

14. This confidentiality and anonymity is precisely what ITG told its investors to expect from POSIT both before and during the Class Period. The Company explained to its shareholders that POSIT allowed clients "to trade single stocks and portfolios of equity securities among themselves in a ***confidential environment***." ITG, Annual Report (Form 10-K), at 1 (Mar. 28, 2000) ("1999 Form 10-K"). ITG explained that confidentiality was, in fact, the primary benefit of POSIT: "***Confidential*** matching of buy and sell orders eliminates market impact." *Id.* at 2.

15. Independent, conflict-free broker execution was the second pillar of ITG's brand. ITG had long marketed itself as an independent, agency or execution only broker. The Company consistently told investors that this independence lowered its risk profile. For example, early ITG SEC filings claimed that: "We do not act as a market-maker with respect to any securities or otherwise act as a principal in any securities transactions; we act only on an agency basis. Therefore, we do not have exposure to credit risks in the way that traditional broker-dealers have such exposure." 1999 Form 10-K at 9.

16. Independence and lack of conflict were common themes whenever ITG executives publicly discussed the business. In his statement to the Senate Subcommittee in 2009, Gasser characterized ITG as a "***pure agent***." *Dark Pools, Flash Orders, High Frequency Trading, and Other Market Structure Issues Before the Subcomm. On* Sec., Ins., & Inv. Comm. on Banking, Housing & Urban Affairs U.S. S. at 5 (Oct. 28, 2009) (statement of Robert C. Gasser, Chief Exec. Officer & President ITG). Likewise, in a June 3, 2010 presentation, Gasser reiterated: "We don't

market make. So we don't commit capital to principal trading. It's—quite frankly, it's one of our biggest differentiators as a firm. In that, when you deal with us, you're dealing with an agent. There is no information leakage that we can take advantage of." Transcript of Sandler O'Neill Global Exchange & Brokerage Conference, Bloomberg at 5 (June 3, 2010) ("Sandler O'Neill Tr.").

17. ITG's statements gained traction with the investing public and, as the Class Period began, the Company's brand as an independent, agency-only broker was well known. In July 2010, for example, Bloomberg described ITG as "an agency broker, meaning it executes customer orders and provides related services, but doesn't earn money from proprietary trading or committing capital to facilitate clients' buying and selling." Nina Mehta, *ITG Hires Stock Market Structure Analyst Jamie Selway*, Bloomberg Bus. (July 20, 2010). *The Wall Street Journal* ("*Wall Street Journal*") noted that "ITG has marketed itself as a technology firm without conflicts of interest, powered by an academic understanding of the markets." Bradley Hope & Sarah Krouse, *Investigation Into Pilot Program Darkens Brokerage's Outlook*, Wall St. J., Aug. 6, 2015 ("*Investigation Into Pilot Program* Article").

18. In short, during the relevant time period, ITG intentionally and successfully persuaded the investing public that it was running POSIT, a dark pool, at a reduced risk because of the Company's conflict-free independence.

### B. Ignoring Its Reputation, ITG, Defendants and the Board Secretly Launched Project Omega, a Proprietary Trading Desk

19. Between 2009 and early 2010, in the midst of the financial crisis, ITG's revenue, not surprisingly had fallen. The Company, like nearly all financial companies at the time, was searching for ways to boost its bottom line. After posting year-over-year declines in net income in each quarter since mid-2008, the firm was under increasing pressure from investors, and in December 2009, ITG announced a restructuring in the U.S. that included staff cuts.

20. Motivated by the Company's struggles, senior managers recommended to the Board that the Company explore proprietary trading, i.e., trading for its own account using algorithmic high frequency trading. Algorithmic trading uses computer programs to generate and execute orders in markets with electronic access. High frequency trading simply refers to algorithmic trading executed at very high speeds.

21. Proprietary trading was a significant departure from ITG's core "agency only" business model and public profile. From the outset, the Board and the senior managers recognized that it presented a reputational risk for the firm. Despite this risk, the Board and Gasser approved a limited scope, proprietary trading desk code-named "Project Omega." Project Omega was a part of AlterNet. AlterNet is also a broker-dealer, a subsidiary of ITG, and a Delaware corporation. For purpose of these allegations, during the Class Period, ITG and the Individual Defendants controlled AlterNet and simply used it to run Project Omega.

22. Given their positions within the Company, each of the Individual Defendants were aware that Project Omega was launched. As a member of the Board, Gasser was not merely aware of it, he explicitly approved it. An August 6, 2015 article in the *Wall Street Journal*, for example, noted that Gasser's attorney had confirmed that ITG's Board "'was aware and approved of the planning and execution of every aspect of Project Omega in 2010.'" *Investigation Into Pilot Program* Article.

23. Notwithstanding the risks posed by Project Omega, neither the Board or the Individual Defendants disclosed Project Omega to anyone. Project Omega's trading activities were kept secret. Defendants did not inform POSIT subscribers or public shareholders like Lead Plaintiff throughout the Class Period.

24. Gasser chose Hitesh Mittal to run Project Omega. Mr. Mittal had a close professional relationship with Gasser. While he was running Project Omega, he had direct access to Gasser and reported his activities to him. The senior managers and the Board agreed with Gasser's choice of Mr. Mittal.

25. At the time, Mr. Mittal was the Company's global head of liquidity management and was also responsible for ITG's electronic brokerage products. This included the Company's algorithmic trading suite, its smart order routers, and POSIT. Mr. Mittal had also previously been the Head of Product Management for ITG's algorithmic trading group where he was responsible for designing and building ITG's entire suite of trading algorithms. In addition, he managed the team of software developers who wrote the code for those algorithms. In other words, Mr. Mittal was intimately familiar with ITG's algorithms and POSIT, ***and he had access to client trading data***. This created a serious—and obvious—conflict of interest because ITG promised its clients trading in POSIT confidentiality.

26. The Board and Gasser permitted Mr. Mittal to choose his own team to run Project Omega. Mr. Mittal chose a small group including two software developers and two project managers. Of the four team members, all but one had experience with algorithms and was intimately familiar with the trading patterns of ITG's programs—trading patterns that ITG's clients used in POSIT and elsewhere. None of the team members, however, was experienced in proprietary trading. One of the project managers, a junior employee, was assigned the compliance role, also known as "Series 24."[4]

[4] Series 24 refers to the General Securities Principal Qualification Examination administered by the Financial Industry Regulatory Authority ("FINRA") which assesses the competency of an entry-level general securities principal candidate and qualifies the individual to act as a principal and supervise a FINRA member's general securities business.

27. In approximately January 2010, Mr. Mittal and his team began engaging in simulated trading activities. This trading continued through March 2010, and in April, Project Omega began executing live trades. Live trading continued for fourteen days, from April 5, 2010 until April 19, 2010. Mr. Mittal and his team began live trading again in June 2010.

28. During the test phases, ITG's compliance department informed Mr. Mittal that there were limits to Project Omega. Mr. Mittal and his team were supposed to set up firewalls and were prohibited from accessing confidential client trading data. ITG's compliance department sent Mr. Mittal two memos, on April 1, 2010, and June 7, 2010. The April memo instructed Mr. Mittal that "'OMEGA will not have access to information regarding POSIT order flow.'" ITG & AlterNet, Exchange Act Release No. 9887, 2015 WL 4748216 (Aug. 12, 2015) (the "SEC Order") (copy attached as Ex. A). The June memo instructed Mr. Mittal that the Company "'must ensure that OMEGA will not have access to information regarding ITG (includes POSIT) and/or AlterNet buy-side or sell-side customer order flow," and that Omega "'may not coordinate trading strategies or share order flow and/or execution information'" with non-Omega employees. *Id.*

29. Despite these directives, there is no evidence the senior managers or any of the Individual Defendants took steps to ensure that appropriate firewalls existed. Quite the contrary, Mr. Mittal did have access to POSIT order flow. He was not walled off from such information, nor was his team. For example, although Project Omega had dedicated office space, Mr. Mittal did not have any such space. He continued to use his old office where he was responsible for electronic trading clients. His team member in charge of compliance continued to spend the large majority of his time working with algorithms that accessed customer data. He often accessed client files from his Project Omega office space, and one of the software developers would switch between projects in the client group and Project Omega during overlapping time periods.

**C. Hitesh Mittal and the Project Omega Team "Game" Client Orders in POSIT and Directly Access Confidential Client Trade Data**

30. After it went live, Project Omega employed two principal trading strategies—the "Facilitation Strategy" and the "Heatmap Strategy." These strategies were automated, and both were based on high frequency algorithmic buying and selling of stocks in order to make small profits or "spreads" between the purchase and sale price within extremely short time frames. Both were trading for the Company's own account, contrary to ITG's agency-only reputation. And both strategies depended on ITG employees accessing confidential client trading data in POSIT—where ITG had proclaimed that its clients could trade anonymously.

31. The Facilitation and Heatmap Strategies relied on Project Omega purchasing or selling at or within the National Best Bid and Offer ("NBBO"). Under NBBO, the "bid-ask spread" is the difference between the highest bid (i.e., purchase price) and the lowest offer (i.e., sales price). The Securities Information Processor, a subscription program, consolidates and sells data from all exchanges and this information constitutes the NBBO. Project Omega profited by making very fast trades in a very short time frame.

32. All customers in POSIT had three possible "pegs" that were linked to the NBBO, and customers could trade "passive," "midpoint," or "aggressive." *See* SEC Order ¶ 40. If a customer chose to be "passive," it would only buy (bid) at the lowest possible NBBO price or sell (offer) at the highest possible NBBO price. *Id.* Conversely, if a customer chose to be "aggressive" the customer was willing to buy (bid) at the highest possible NBBO price and/or sell (offer) at the lowest possible NBBO price. *Id.*

33. Aggressive buyers and sellers were willing to "cross the spread." This simply means that, for whatever reason, the customer was willing to buy or sell at less than the optimal price so long as the trade was executed. Midpoint customers, of course, would only execute on

the middle ground. Given the foregoing, aggressive buyers would only match up with passive sellers and passive buyers would only match up with aggressive sellers.

34. This system works if customer data, identity and trade peg, are confidential. If POSIT customers entered the pool and matched so be it. Those customers found the liquidity partner they wanted. However, if the pegs were not confidential, then a counterparty could buy securities on the open market at one price, knowing the it could immediately sell at a higher price in POSIT. This is the equivalent of knowing your counterparty's bottom line walking into a negotiation, and it is exactly what transpired with the Facilitation Strategy.

**1. The Facilitation Strategy**

35. From approximately April to December 2010, Project Omega used the Facilitation Strategy, which was designed by Mr. Mittal. Mr. Mittal arranged for a live feed of customer trading data called the "Aleri Feed." The Aleri Fee provided Project Omega with notification of open orders of ITG customers routed through POSIT. Mr. Mittal and his team accessed the feed through Aleri software.

36. The Aleri Feed provided real-time data that include a customer's: (1) client identifier; (2) symbol; (3) side (buy side or sell side); (4) the quantity of shares involved; (5) filled shares; (6) target price; (7) ITG algorithm in which the order was located; and (8) the time parameters. As noted, this information was not available to customers of POSIT. It was supposed to be confidential to counterparties in the dark pool.

37. With this information, Mr. Mittal and the Project Omega team detected open orders of sell-side subscribers and opened positions in the relevant security in another market at a favorable price. Project Omega would then close the order with unsuspecting ITG customers, selling at a higher price in POSIT. This allowed Project Omega to earn the full bid-ask spread as profit.

38. Two critical components of the Facilitation Strategy were Project Omega's ability to review confidential client data and to manipulate client pegs without their knowledge. First, the Project Omega team had access to the entire list of sell-side subscribers in POSIT. This allowed the Project Omega team to evaluate the success of its fraud. The team looked at profit and loss trade summaries and thereby determined which customers were best suited to be gamed. Project Omega tried to trade only with those customers that turned a profit for ITG. To gain access to this data, Mr. Mittal instructed members of the POSIT development team to "enable" the right customers to trade in POSIT with Project Omega. Again, typical POSIT customers did not have access to such confidential data. Only Project Omega did.

39. Second, the Facilitation Strategy allowed the Project Omega team to manipulate the pegs of POSIT customers without their knowledge. The strategy worked if Project Omega could earn the full bid-ask spread. To do that, a customer had to be pegged as an aggressive trader. Mr. Mittal directed the Project Omega software developers to coordinate with members outside of the team to ensure that all traders interacting with Project Omega were pegged as aggressive or to change the client's peg to aggressive in order to facilitate a trade. This ensured that Omega earned the full bid-ask spread.

40. In some instances the Facilitation Strategy did not work, and the trade was executed at a midpoint. When this happened, Mr. Mittal directed his team to find out why they had not earned the full bid ask spread.

41. This is how the Facilitation Strategy worked:

a. The Aleri Feed identified a sell side customer order to buy certain securities where the best buying price was $10.00 and the best selling price is $10.02 per share;

b. The Omega team would purchase the shares at $10.00 per share in another market;

c. ITG's algorithm would route the "aggressive" customer to POSIT where it could buy the shares; and

d. The Omega team would then sell the shares to the customer at the higher price of $10.02, and thus, earn the maximum spread of $0.02 per share.

42. Through the Facilitation Strategy, POSIT was a rigged game. Project Omega was able to only buy and sell at the most favorable prices the available based on its customer's confidential data.

**2. The Heatmap Strategy**

43. From approximately April to December 2010, Project Omega also used the Heatmap Strategy. This also relied on a live information feed (the "Heatmap Feed") of confidential information that included live trade execution data for all of ITG's customers, both sell-side and buy-side. Unlike the Facilitation Strategy, the Heatmap Feed involved trading on markets other than POSIT, i.e. in external dark pools. To obtain the Heatmap Feed, the Project Omega team leveraged an existing utility at ITG used by the Company's smart order routers that aggregated customer executions in external dark pools and generated "probability scores" relating to possible liquidity in those venues.

44. The Heatmap Feed that Omega received did not contain "probability scores" but rather various categories of real-time information on customer executions including: (a) destination (which dark pool); (b) symbol; (c) side; (d) report type (filled, partial fill, etc.); (e) quantity; (f) fill price; (g) time in force; (h) report time; (i) peg instruction (midpoint, bid, ask); (j) limit price; and (k) sequence number (linking parent and the child orders). Project Omega used the Heatmap Feed not merely for routing but also for determining what securities to trade.

45. Utilizing the Heatmap Feed, Omega's Heatmap algorithm would open positions in specific securities "passively" in displayed markets at the bid or the offer and then close them at

"midpoint" or better in the external dark pools selected by the feed. The goal of the strategy was to earn a "half spread" or better when opening and then closing positions.

46. This is how the Heatmap Strategy worked:

a. The Heatmap feed detected a midpoint execution price for an ITG customer to sell in certain shares in an external dark pool that was not POSIT where the best buying price was $10.00 and the best selling price was $10.02 per share. Project Omega would infer that there was midpoint liquidity in another dark pool;

b. Project Omega would buy shares of the relevant stock for $10.00 per share; and

c. Project Omega would then sell the shares at the midpoint for $10.01 in the external dark pool, resulting in profits of $0.01 per share for ITG.

**D. Defendants Learn About Project Omega's Trading Schemes, Yet Do Not Stop Project Omega**

47. In the late fall of 2010, Gasser directed two other ITG executives to speak with the Mr. Mittal and to gather information concerning Project Omega. Gasser wanted this information so he could make a presentation to the Board in February 2011.

48. In early to mid-December 2010, ITG's compliance department and senior management learned about the Facilitation Strategy and the Heatmap Strategy from Mr. Mittal, i.e., that Project Omega was trading based on a live feed of information regarding its customers' orders that had been sent to ITG's algorithms. As a result, ITG suspended Project Omega's trading.

49. Between approximately December 9 and 20, 2010, while Project Omega's trading activities were suspended, ITG's compliance department conducted a review of Omega's activities in order to make a report to the Company's senior management team.

50. On approximately December 20, 2010, ITG's senior managers and the compliance department met to discuss Project Omega. Gasser reprimanded Mr. Mittal, and allegedly Project

Omega changed its trading strategies. Following a meeting, the Company permitted Project Omega to restart live trading. Once again, despite the problems with Project Omega, Defendants did nothing to disclose Project Omega to its shareholders.

51. On or around December 21, 2010, Project Omega restarted a modified Facilitation Strategy that did not involve access to the Aleri Feed. In addition, Project Omega restarted a modified Heatmap Strategy on or around January 24, 2011, without direct access to the Heatmap Feed.

52. Despite the improprieties that had been discovered during the compliance department review, no changes were made to Project Omega's organizational structure. Mr. Mittal continued to manage Project Omega and direct its trading strategies while also continuing his overall product management responsibilities for ITG's trading algorithms, smart order routers and POSIT, which included access to confidential customer order and trade information. The other members of the team also continued in the same roles they had before the temporary suspension.

53. Despite the removal of the improper direct feeds, in connection with the Facilitation Strategy, Project Omega continued to have improper access to information identifying POSIT subscribers. In addition, the Project Omega team continued to coordinate with ITG's POSIT development team to identify the sell-side subscribers for Omega to trade within POSIT and to ensure that such subscribers were configured to trade "aggressively" in POSIT. In other words, the Board and the Individual Defendants took no action to put in place proper controls that would remedy the problems that clearly had been identified.

54. After resuming trading in late 2010, Project Omega continued to engage in live trading until on or around July 11, 2011. At that time, ITG discontinued Project Omega's operations. During and after the temporary suspension of Project Omega's trading activities in

December 2010, ITG continued to keep Project Omega and its trading activities confidential and made no disclosure of it publicly, to shareholders, to subscribers, or to the SEC via an amendment to the POSIT Form ATS.

55. Mr. Mittal left the Company in July 2011, ostensibly as part of a "cost-cutting" measure. Still, the Company did not disclose the wrongful conduct.

**E. Project Omega's Revenues and Total Shares Traded**

56. During the time period that Project Omega was in operation, from approximately April 2010 to July 2011, Project Omega traded a total of approximately 1.3 billion shares, including approximately 262 million shares traded with unsuspecting subscribers in POSIT in connection with the Facilitation Strategy.

57. ITG's gross revenues from Project Omega's trading activities totaled approximately $2,081,304.

**F. During the Class Period—for Five Years Straight—ITG and the Individual Defendants Concealed Project Omega and Its Fraudulent Trading from Shareholders**

58. At the start of the Class Period, the senior managers and Defendants had been explicitly informed of Project Omega and the fraudulent scheme. Nonetheless, during the Class Period, ITG continued to capitalize on its POSIT brand and its reputation as an independent broker-dealer, even though these pillars of its business had been compromised, exposing the Company to unmaterialized regulatory risk. In Class Period SEC filings, the Company repeatedly told investors that POSIT "***provides anonymous matching of non-displayed equity orders to minimize market impact***," *see, e.g.*, ITG, Annual Report (Form 10-K), at 3 (Feb. 28, 2011) ("2010 Form 10-K"); *accord* ITG, Annual Report (Form 10-K), at 2 (Feb. 28, 2012) ("2011 Form 10-K"), and that "POSIT operates as an Alternative Trading System ('ATS'), ***providing anonymous*** continuous and scheduled crossing of ***non-displayed (or dark) equity orders*** and price improvement

opportunities within the National Best Bid and Offer ('NBBO')," *see, e.g.*, ITG, Annual Report (Form 10-K), at 2 (Mar. 6, 2013) ("2012 Form 10-K"); ITG, Annual Report (Form 10-K), at 2 (Mar. 17, 2014) ("2013 Form 10-K"); ITG, Annual Report (Form 10-K), at 2 (Mar. 14, 2015) ("2014 Form 10-K"). ITG told its shareholders that POSIT provided additional "***liquidity with minimal information leakage***." *See, e.g.*, 2010 Form 10-K at 4; 2011 Form 10-K at 3.

59. ITG repeated such statements often in public commentary. For example, a PowerPoint presentation titled "Investor Overview" that accompanied a May 5, 2011 earnings call stated POSIT was ranked "#1 for Best Anonymity for a Dark Pool among top-tier buyside firms" and claimed that POSIT "give[s] buyers and sellers opportunities to match equity orders with ***complete confidentiality***." *Investor Overview First Quarter 2011*, ITG at 9, 14 (May 5, 2011) ("*Investor Overview* PowerPoint"). In his statement to the Senate Subcommittee in 2012, Gasser stated that ITG's commitment to protecting confidential information was strong: "We . . . take this responsibility seriously and we safeguard our data using a combination of up-to-date technological measures, ***strictly enforced information barriers***, and ***robust policies and procedures concerning information security and protection of client confidential information***." *Computerized Trading Venues" What Should the Rules of the Road Be? Before the Subcomm. On* Sec., Ins., & Inv. Comm. on Banking, Housing & Urban Affairs U.S. S. at 5 (Oct. 28, 2009) (statement of Robert C. Gasser, Chief Exec. Officer & President ITG).

60. During the Class Period, ITG continued to make the same types of statements it always had about its putative independence and lack of conflicts, despite the fact that POSIT's existence made them false or misleading. In its May 5, 2011 earnings call PowerPoint, ITG highlighted that its "***independent agency status*** make[s] ITG a trusted partner for many of the world's largest and most sophisticated institutional investors." *Institutional Investor* PowerPoint

at 16. In a November 2012 earnings call, Gasser credited the Company's recognition as the "best agency broker" in the Asian markets based on its "unconflicted business model." Transcript of Q3 2012 Earnings Call, Bloomberg at 3 (Nov. 1, 2012) ("Nov. 2012 Earnings Call"). Moreover, during the Class Period, ITG's SEC filings told shareholders it was an "***independent agency research broker***,"[5] an "***independent research and execution broker***,"[6] an "***independent execution and research broker***,"[7] or an "***independent execution broker and research provider***."[8]

61. Throughout the Class Period, ITG also touted the fact that POSIT was protected from "***gaming***," as compared to other dark pools. *See* 2010 Form 10-K at 4; 2011 Form 10-K at 3; 2012 Form 10-K at 2; 2013 Form 10-K at 2; 2014 Form 10-K at 2. It did so, despite the fact that Mr. Mittal and the Project Omega team had been gaming ITG customers and the POSIT dark pool for approximately a year. Gaming is a reference to the broker/sponsor of a dark pool using its customer information to its own advantage. While gaming can take different forms, as dark pools proliferated exponentially in the late 2000s, regulators and investors became much more concerned about the potential for abuse in these off-market trading venues. This is one of the reasons that Gasser testified before the Congressional Subcommittee about dark pools. ITG was,

---

5 2010 Form 10-K at 1; ITG, Quarterly Report (Form 10-Q), at 7 (May 9, 2011) ("1Q11 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 7 (Aug. 9, 2011) ("2Q11 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Nov. 8, 2011) ("3Q11 Form 10-Q").

6 ITG, Quarterly Report (Form 10-Q), at 8 (May 9, 2012) ("1Q12 Form 10-Q").

7 ITG, Quarterly Report (Form 10-Q), at 8 (Aug. 9, 2012) ("2Q12 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Nov. 9, 2012) ("3Q12 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (May 10, 2013) ("1Q13 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Aug. 8, 2013) ("2Q13 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Nov. 12, 2013) ("3Q13 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (May 12, 2014) ("1Q14 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Aug. 11, 2014) ("2Q14 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Nov. 10, 2014) ("3Q14 Form 10-Q").

8 ITG, Quarterly Report (Form 10-Q), at 8 (May 11, 2015) ("1Q15 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Aug. 10, 2015) ("2Q15 Form 10-Q"); ITG, Quarterly Report (Form 10-Q), at 8 (Nov. 9, 2015) ("3Q15 Form 10-Q").

therefore, playing on its long-heralded reputation for independence by saying, in essence, "That cannot happen here!"

62. In fact, ITG went a step further. When asked directly if its customers were at risk of gaming, ITG lied. In 2011, Pipeline Trading Systems LLC ("Pipeline"), an ITG competitor, settled with the SEC for failing to disclose its proprietary trading. ITG's customers became alarmed and contacted the Company about its standards and practices. In response, ITG sent a letter to its clients stating that it did not engage in proprietary trading, market making, capital commitment or establishing directional positions. *See* Ivy Schmerken, *Pipeline's Bombshell Hurts All Dark Pools*, InformationWeek, Nov. 15, 2011 ("*Pipeline's Bombshell* Article"). Gasser wrote: "'We strictly enforce the order handling and execution rules of Posit, which are clearly set forth in Form ATS on file with the Securities and Exchange Commission.'" *Id.* In an interview about the Pipeline controversy, Jamie Selway, managing director of ITG, said that Pipeline "'didn't describe in the Form ATS everything they were doing with their affiliate. . . . Moreover, they aggressively spoke about things that weren't true." *Id.* He summed up Pipeline's transgressions as follows: "'Pipeline cheated. We don't cheat.'" *Id.*

63. In sum, as a result of the foregoing misrepresentations and others like them, investors in ITG reasonably expected three things from the Company during the Class Period: (1) that POSIT, the Company's flagship, was—and would continue to be—a dark pool where customers could execute confidential trades; (2) that ITG was not trading on its own customers' data for its own account; and (3) that shares of ITG were a safer investment because, unlike similarly sized broker-dealers, ITG was not engaged in proprietary trading. As it turned out, none of these things were true, and shareholders like Lead Plaintiff were investing in a Company that

had concealed the risk associated with Project Omega. Those risks materialized in 2015 when the Company announced its settlement with the SEC for $20.3 million in fines.

**G. The SEC Investigates Project Omega and ITG Agrees to Pay a $20.3 Million Fine**

64. By the fall of 2013, the SEC commenced an investigation into Project Omega. The investigation revealed that ITG, through Project Omega, had real-time access to confidential client data and traded against the Company's own subscribers and to capture spreads between displayed and dark markets. By May 2015, the SEC had informed the Company that it intended to bring serious charges. Neither ITG nor the Individual Defendants disclosed the matter at that time.

65. In a July 29, 2015 press release, the Company stated, among other things, that during the second quarter of 2015 (ended June 30, 2015), ITG commenced settlement discussions with the SEC in connection with the agency's "investigation into a proprietary trading pilot operated within ITG's AlterNet Securities, Inc. ("AlterNet") subsidiary for sixteen months in 2010 through mid-2011." Press Release, ITG, ITG Announces Preliminary Second Quarter 2015 Earnings Guidance, Including Reserve for Probable SEC Settlement (July 29, 2015) ("ITG Settlement Press Release").

66. On August 12, 2015, the SEC announced its settlement with ITG and released its order instituting administrative and cease-and-desist proceedings against ITG and AlterNet. *See* SEC Order.

67. The most pertinent facts from the SEC Order are recited *supra*. Among other things, the SEC Order included a detailed admission by the Company of its wrongdoing including an acknowledgment that its conduct "violated the federal securities laws." *Id.* at 1. Specifically, ITG admitted violating sections 17(a)(2) and 17(a)(3) of the Securities Act, and Rules 301(b)(2) and 301(b)(10) of Regulation ATS. *Id.* at 2-3.

68. As a result of the SEC Order, ITG agreed to pay approximately $20.3 million in fines and disgorgement of profits. According to Andrew J. Ceresney, Director of the SEC's Division of Enforcement, the Company "'misused highly confidential customer order and trading information for its own benefit.'" Press Release, SEC, SEC Charges ITG With Operating Secret Trading Desk and Misusing Dark Pool Subscriber Trading Information (Aug. 12, 2015) ("SEC Press Release").[9] "'In doing so, ITG abused the trust of its customers and engaged in conduct justifying the significant sanctions imposed in this case,'" Mr. Ceresney added. *Id.* During a conference call, Mr. Ceresney went a step further, calling the Company's misconduct "egregious." Matt Robinson & Sam Mamudi, *ITG Pays Record Dark Pool Fine for Secret Trading Desk*, Bloomberg Bus. (Aug. 12, 2015). Indeed, the fine levied by the SEC against ITG is the largest assessed by the agency to date against a dark pool. As detailed herein, when these disclosures became public, ITG shareholders sustained millions of dollars in damage.

## III. JURISDICTION AND VENUE

69. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

70. Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b), as the Company's principal executive office is located within this District at 165 Broadway, New York, New York 10006, the Company's shares are publicly traded on the New York Stock Exchange ("NYSE"), and many of the acts and practices complained of herein occurred in substantial part in this District.

---

[9] http://www.sec.gov/news/pressrelease/2015-164.html.

71. In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Lead Plaintiff

72. On October 15, 2015, this Court appointed Metzler to serve as Lead Plaintiff in this action pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA").

73. Metzler is a German capital investment company (Kapitalanlagegesellschaft) headquartered in Frankfurt am Main, Germany, which controls and manages public and specialty investment funds. Metzler's funds purchased 99,507 shares of the Company's common stock during the Class Period and were damaged thereby. *See* ECF Nos. 29-1 & 29-2.

### B. Defendants

#### 1. The Company

74. Defendant ITG or the Company was founded in 1987 and is incorporated in Delaware and maintains its principal executive offices in New York City. The Company describes itself as "an independent execution and research broker partnering with global portfolio managers and traders throughout the investment process, from investment decision through to settlement." At all relevant times, the Company's common stock traded on the NYSE under the ticker symbol "ITG."

#### 2. The Individual Defendants

75. Defendant Robert Gasser was the Company's CEO and president from October 2006 until August 1, 2015. Gasser has been a member of the Company's Board from October 2006 until the present. Gasser signed the Company's annual reports filed with the SEC on Form 10-K for the years 2010, 2011, 2012, 2013, and 2014, as well as the SOX Certifications appended

thereto, and the Company's quarterly report on Form 10-Q for the quarter ended March 31, 2015, with knowledge of or reckless disregard for the false statements therein. Gasser also knowingly or recklessly made various other public false statements, including in investor conference calls and in testimony before the U.S. Senate.

76. Defendant Steven Vigliotti was the Company's CFO and a managing director of the Company throughout the Class Period; he still holds those positions at present. Vigliotti signed the Company's annual reports filed with the SEC on Form 10-K for the years 2010, 2011, 2012, 2013, and 2014, as well as the SOX Certifications appended thereto, and the Company's quarterly report on Form 10-Q for the quarter ended March 31, 2015, as well as the SOX Certification appended thereto, with knowledge of or reckless disregard for the false statements contained therein.

77. Defendant Mats Goebels, who joined ITG in 1998, was the Company's General Counsel and a managing director until August 1, 2015. During the Class Period, Goebels was responsible for all legal and regulatory matters. Goebels signed the Company's Form ATS, filed with the SEC on December 13, 2013 and published on the Company's website, with knowledge of or reckless disregard for the false statements contained therein.

## V. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS PRIOR TO THE CLASS PERIOD

78. Prior to the Class Period, Defendants made materially false and misleading statements and/or omitted material information concerning the Company and its operations. Defendants failed to correct these statements during the Class Period, as was their duty.

79. During a conference on June 3, 2010, Gasser discussed a revenue line derived from a "riskless principal trading" pricing structure, whereby ITG would match clients at the mid-point

of the NBBO, and earn a spread in lieu of a commission on the sell-side part of the trade. Sandler O'Neill Tr. at 5.

80. A riskless principal transaction is defined by FINRA as a trade in which a member who has received a customer order immediately executes an identical order in the marketplace, while taking on the role of principal, in order to fill the customer order.

81. During this discussion, Gasser stated: "I want to make one thing clear. We don't market make. So we don't commit capital to principal trading. It's—quite frankly, it's one of our biggest differentiators as a firm. In that, when you deal with us, you're dealing with an agent. There is no information leakage that we can take advantage of." *Id.*

82. This representation was materially false and misleading given that:

a. In April 2010, Project Omega had conducted live trading as part of an "alpha test phase," during which time ITG did market make and did commit capital to principal trading;

b. In June 2010, Project Omega resumed live trading, during which time ITG did market make and did commit capital to principal trading; and

c. Project Omega's primary trading strategies took advantage of "information leakage."

83. On July 29, 2010, the Company hosted a conference call to discuss its second quarter 2010 financial performance. During the call, Gasser remarked that "institutional investors are drawn towards . . . ITG[']s role as an un-conflicted agency broker." Transcript of Q2 2010 Earnings Call, Bloomberg at 2 (July 29, 2010).

84. Gasser's representation that ITG was an "un-conflicted agency broker" was materially false and misleading given that:

a. In July 2010, Project Omega resumed live trading, during which time ITG was *not* an "un-conflicted agency broker." Indeed, Project Omega was engaging in proprietary trading.

b. Indeed, in July 2010, ITG was trading against POSIT subscribers, as part of Project Omega's Facilitation Strategy.

85. During a conference on December 3, 2010, Gasser stated: "[A] lot of our large institutional clients appreciate the fact that when they enter our liquidity pool, our environment, that we are not trading principally or proprietarily on our own behalf. Their movement in securities is not informing potential trading decisions." Transcript of J.P. Morgan SMid Cap Conference, Bloomberg at 3 (Dec. 3, 2010).

86. Likewise, during a conference on December 9, 2010, Gasser stated that ITG is "an agent, which is in and of itself differentiated. We're not informed by your liquidity, by your order flow. We don't have a proprietary trading operation that takes advantage of that." Transcript of Keefe, Bruyette & Woods, Inc. Securities Brokerage & Market Structure Conference at 2, Bloomberg (Dec. 9, 2010).

87. The statements set forth in paragraphs 85 and 86 were materially false and misleading given that:

a. From June through December 2010, Project Omega continued live trading, during which time ITG was trading principally or proprietarily on its own behalf.

b. Under Project Omega's primary trading strategies, ITG's proprietary trading operation was informed by its customers' order flow and their movement in securities.

## VI. DEFENDANTS MADE FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

88. During the Class Period, Defendants made materially false and misleading statements and/or material omissions concerning ITG's business practices, including, among other things:

a. Misrepresentations that ITG was an unconflicted, independent agency broker;

b. Repeated failures to disclose that ITG was running an undisclosed proprietary trading desk that depended upon the unapproved and illicit use of customer and subscriber information that customers and subscribers had been assured was confidential;

c. Repeated failures to disclose and misrepresentations regarding ITG's use of confidential client information in trades for the Company's own benefit and against customers;

d. Misrepresentations that ITG was complying with Regulation ATS, GAAP and other applicable laws and regulations; and

e. Misrepresentations and omissions about ITG's exposure to material litigation and regulatory risks as a result of its unlawful actions and failure to disclose those actions.

89. Defendants' materially false and misleading statements and/or material omissions created the false impression to the investing public that Project Omega never existed; the Company was operating in accordance with laws and regulations; and ITG was not subject to scrutiny and material sanctions by the SEC.

## A. Defendants Made Material Misrepresentations to Conceal Project Omega During Its Pendency

### 1. Annual Report Form 10-K for 2010

90. The Class Period begins on February 28, 2011. On that date, ITG filed its Form 10-K for the year ended December 31, 2010, signed by Vigliotti, as well as Gasser and other members of the Board. In it, the Company touted its status as an independent agency-only broker:

> ***ITG is an independent agency research broker*** that partners with asset managers globally to improve performance throughout the investment process. A leader in electronic trading since launching the POSIT crossing network in 1987, ITG takes a consultative approach in delivering the highest quality institutional liquidity, execution services, analytical tools and proprietary research insights grounded in data. Asset managers rely on ***ITG's independence***, experience and intellectual capital to identify investment and trading opportunities, help mitigate risk, improve performance, and navigate increasingly complex markets.

2010 Form 10-K at 1.

91. This statement was materially false and misleading because ITG was not an independent, agency-only broker, but instead, through Project Omega, was exploiting confidential client information while trading for its own account against its customers.

92. In that same filing, the Company also emphasized the advantages presented by its POSIT product, namely that all trades would be anonymous, allowing investors to trade without affecting the market and providing liquidity where it might not otherwise exist.

93. For example, ITG falsely stated that "POSIT Marketplace . . . incorporates advanced liquidity filter technology ***to help ensure that clients are protected from gaming and are only interacting with quality liquidity***. . . . POSIT Alert ***offers a way to tap into a reserve of hidden liquidity with minimal information leakage***," and that "[t]he POSIT suite provides ***anonymous matching*** of non-displayed equity orders ***to minimize market impact and may provide opportunities for price improvement*** within the National Best Bid and Offer ('NBBO')."
*Id.* at 3-4.

94. These statements were false and misleading because the Company was knowingly exploiting confidential customer information to trade against its own customers and to capture spreads between displayed and dark markets. Such trades eliminated any client opportunity for price improvement.

95. Also in its 2010 Form 10-K, the Company repeatedly emphasized its compliance with Regulation ATS. For example, it stated: "A portion of our revenues is derived from principal trading for our own account where we incur risk. All such principal trading activity is conducted in accordance with applicable regulatory requirements, ***including those pertaining to the maintenance of information barriers***." *Id.* at 14. The Company also stated: "We continue to

review and monitor POSIT's systems and procedures ***to ensure compliance with Regulation ATS***." *Id.* at 8.

96. These statements were materially false and misleading because the Company was intentionally and deliberately accessing customer information for its own trading purposes, and to the detriment of its clients, in violation of Section 301(b)(10) of Regulation ATS, which requires that an ATS establish safeguards and procedures to protect subscribers' confidential trading information and to adopt and implement adequate oversight procedures to ensure that the safeguards and procedures for protecting that confidential trading information actually are being followed.

**2. First and Second Quarter Fiscal Year 2011 Results**

97. Throughout 2011, ITG continued to hold itself out as an independent agency broker and continued to trumpet the advantages of POSIT, despite the operation of an undisclosed proprietary trading desk and Project Omega's undisclosed continuing access to highly confidential customer order and trade information through July 11, 2011.

98. For example, on May 5, 2011, in its earnings call presentation, ITG held itself out as an "independent agency research broker": "Our broad product set and ***independent agency status*** make ITG a trusted partner for many of the world's largest and most sophisticated institutional investors." *Investor Overview* PowerPoint at 16.

99. This statement was false and misleading because ITG was not an independent, agency-only broker, but instead, through Project Omega, was exploiting confidential client information while trading for its own account against its customers.

100. In that same May 5, 2011 presentation, ITG emphasized the benefits of POSIT and the advantages provided by ITG, an independent agency broker, especially that all trades would be anonymous, allowing investors to trade without affecting the market and providing liquidity

where it might not otherwise exist. For example, the Company stated, "Proposed US regulatory changes recognize the need for ***anonymous block liquidity sources like POSIT®***." *Id.* at 2. It also stated that "ITG [was] ranked the #1 electronic broker by Greenwich Associates for DMA (Direct Market Access), and #1 for Best Anonymity for a Dark Pool among top-tier buyside firms." *Id.* at 9. The Company also described its POSIT Marketplace® as "Crossing destinations that give buyers and sellers opportunities to match equity orders with ***complete confidentiality***." *Id.* at 14. These statements were false and misleading because ITG was not an independent, agency-only broker, but instead, through Project Omega, was exploiting confidential client information while trading for its own account against its customers.

101. ITG made the same false and misleading statements in its Forms 10-Q for the first and second quarters of fiscal year 2011, filed on May 9, 2011 and August 11, 2011. In those filings, the Company highlighted its reputation as an independent research and execution broker. For example, it stated, "ITG is an ***independent agency research broker*** that partners with asset managers globally to improve performance throughout the investment process," and that "[a]sset managers rely on ***ITG's independence, experience and intellectual capital to help mitigate risk, improve performance*** and navigate increasingly complex markets." 1Q11 Form 10-Q at 7; 2Q11 Form 10-Q at 7.

102. These statements were false and misleading because ITG was not an independent, agency-only broker, but instead, through Project Omega, was exploiting confidential client information while trading for its own account against its customers.

103. ITG also misleadingly touted the claimed advantages of POSIT: "A leader in electronic trading since launching the POSIT crossing network in 1987, ITG takes a consultative approach in ***delivering the highest quality institutional liquidity***, execution services, analytical

tools and proprietary research insights grounded in data." 1Q11 Form 10-Q at 7; 2Q11 Form 10-Q at 7.

104. This statement made in both the 1Q11 and 2Q11 Forms 10-Q was false and misleading because, rather than providing "highest quality institutional liquidity," the Company was exploiting confidential client information while trading for its own account against its customers, through Project Omega.

105. The Company also misrepresented that "[t]here has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2010." 1Q11 Form 10-Q at 28; 2Q11 Form 10-Q at 38. This statement was false and misleading because Project Omega was restarted in December 2010, and the Company never disclosed its existence, or the fact that, through Project Omega, ITG was using confidential client information in trading for its own account against its customers.

106. In press releases issued throughout the first half of 2011, ITG consistently described itself as "an ***independent agency research broker***," and stated that "[a]sset managers rely on ITG's ***independence***, experience, and intellectual capital to help ***mitigate risk, improve performance***, and navigate increasingly complex markets." Press Release, ITG, ITG's Triton® Named Buy Side Trading System of the Year (Apr. 7, 2011) ("April 2011 Press Release"); Press Release, ITG, Investment Technology Group Reports First Quarter 2011 Results (May 5, 2011) ("May 2011 Press Release"); Press Release, ITG, ITG Takes Measures to Reduce Cost Base (July 12, 2011) ("July 12, 2011 Press Release"); *see also* Press Release, ITG, Investment Technology Group to Present at Wedbush Securities Conference (Mar. 1, 2011) ("Asset managers rely on ITG's independence, experience, and agility to help mitigate risk, improve performance and navigate increasingly complex markets."). These statements, which were made several times during the

pendency of Project Omega, were materially false and misleading because ITG was not an "independent agency research broker," but instead unlawfully accessed and exploited confidential customer information to trade against its own customers.

107. ITG also highlighted the advantages of POSIT, stating: "A leader in electronic trading since launching the POSIT® crossing network in 1987, ITG takes a consultative approach in delivering the ***highest quality institutional liquidity, execution services,*** analytical tools, and proprietary research insights grounded in data." April 2011 Press Release; May 2011 Press Release; July 12, 2011 Press Release.

108. Such statements were materially false or misleading because, through Project Omega, the Company was exploiting confidential client information while trading for its own account against its customers.

109. The Company also stated in its March 18, 2011 press release that "ITG's robust suite of algorithms ***aims to reduce market impact, maximize execution quality and improve trading performance***." Press Release, ITG, ITG Algorithms® Win Three Top Honors in New Buyside Survey (Mar. 18, 2011). This statement was materially false or misleading because the Company was, in fact, exploiting confidential client information while trading for its own account against its customers.

**B. Defendants' Made Misleading Statements and Omissions to Cover-Up the Existence of Project Omega After It Ended**

110. ITG stopped Project Omega in or around July 2011, but failed to disclose its existence. Instead, the Company continued to make the same or similar representations about its business practices. These statements were materially false or misleading because when viewed in the context of the Company's earlier Class Period statements, they created the false impression that ITG had always been an independent, agency-only broker, and that it had consistently

maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information.

111. In several press releases following the shutdown of Project Omega, the Company continued to use substantially similar language to describe ITG that it had used during the pendency of Project Omega implying that its business practices had been the same for the entire period. For example, ITG continued to describe the Company as an "independent agency research broker" that delivered the "highest quality institutional liquidity, execution services [and] analytical tools." Press Release, ITG, ITG Announces New Leadership Appointments (July 14, 2011) ("July 14, 2011 Press Release"); Press Release, ITG, Investment Technology Group Reports Second Quarter 2011 Results (Aug. 4, 2011) ("August 2011 Press Release"); Press Release, ITG, Investment Technology Group Reports Third Quarter 2011 Results (Nov. 3, 2011) ("November 2011 Press Release"). The Company added that asset managers relied on "ITG's independence, experience, and intellectual capital to help mitigate risk, improve performance, and navigate increasingly complex markets." July 14, 2011 Press Release; August 2011 Press Release; November 2011 Press Release.

112. These statements were materially false or misleading because when viewed in the context of Defendants' earlier Class Period statements, they created the false impression that ITG was and always had been an independent research and execution broker even though during Project Omega the Company had unlawfully accessed and exploited confidential client information while trading for its own account against its customers.

113. According to an article dated November 15, 2011, ITG sent a letter to its clients on October 25, 2011. *See Pipeline's Bombshell* Article. That letter was in response to news that ITG's competitor, Pipeline, had settled with the SEC for failing to disclose its proprietary trading.

In the letter, ITG represented that it did not engage in proprietary trading, market making, capital commitment or establishing directional positions. In that regard, Gasser stated, "'We strictly enforce the order handling and execution rules of Posit, which are clearly set forth in Form ATS on file with the Securities and Exchange Commission.'" *Id.*

114. In that same article, Jamie Selway, managing director at ITG, was quoted as saying: "'Pipeline cheated. We don't cheat.'" *Id.*

115. The immediately preceding statements, *see* ¶¶ 113-14, were materially false or misleading because they failed to disclose and continued to conceal that ITG had been engaging in precisely the same conduct as Pipeline until about July 2011. Specifically, these statements omitted material information: (i) that ITG had exploited confidential client information while trading for its own account against its customers; and (ii) that the Company had violated Section 301(b)(10) of Regulation ATS by intentionally and deliberately accessing customer information for its own trading purposes, and to the detriment of its clients. Indeed, these statements misled investors into believing that ITG was complying, and always had fully complied, with Regulation ATS, and that it had never misused its customers' confidential information to engage in proprietary trading. These statements also were misleading because they gave the false impression that ITG did not face the same regulatory risks and financial exposure as did Pipeline, even though ITG faced even greater exposure.

**1. Third Quarter Fiscal Year 2011 Results**

116. On November 3, 2011, the Company hosted a conference call to discuss its third quarter fiscal 2011 financial performance. When the question-and-answer session opened, an analyst from Sandler O'Neill sought to obtain ITG's views regarding the recent disclosure that its

competitor, Pipeline, was "trading, interacting with the flow and not disclosing." Transcript of Q3 2011 Earnings Call, Bloomberg at 7 (Nov. 3, 2011). Gasser responded:

> I think you're being politically correct, Rich in calling it a faux pas to begin with. I would say that ***it's surprising, it's shocking***, I think for everyone that's engaged in this space, whether or not you're buy-side or sell-side firm.
>
> ***We've been very clear about our business model and how we execute our business. We've communicated that broadly to clients***. As you know we've been talking about various elements of our business very publicly, particularly the sell-side and the spread trading business back to Q1 of '09, right and that is no way analogous to what Pipeline was doing, but ***certainly any nuance to our model we feel absolutely compelled to communicate very clearly and very transparently***.

*Id.*

117. This statement by Gasser was materially false or misleading because he failed to disclose that ITG had intentionally accessed confidential client information while trading for its own account against its customers. In fact, Gasser affirmatively (and falsely) represented that ITG's representations and statements about its trading had been complete and transparent, despite knowing of improprieties relating to Project Omega. *See supra* ¶¶ 30-55 (improprieties and knowledge); *see also e.g.*, ¶¶ 88, 90, 92, 93 (previous misrepresentations). This statement also was misleading because it gave the false impression that ITG did not face the same regulatory risks and financial exposure as did Pipeline, even though ITG faced even greater exposure.

118. On November 8, 2011, ITG filed its Form 10-Q for the third quarter of fiscal year 2011, signed by Vigliotti and certified by Gasser and Vigliotti, which included the time period from July 1, 2011 through the cessation of Project Omega on or about July 11, 2011. In this filing, the Company continued to emphasize its reputation as an independent agency research broker. For example, it stated, "ITG is an ***independent agency research broker*** that partners with asset managers globally to improve performance throughout the investment process," and that "[a]sset

managers rely on ***ITG's independence, experience and intellectual capital to help mitigate risk, improve performance*** and navigate increasingly complex markets." 3Q11 Form 10-Q at 8.

119. These statements were materially misleading because ITG was not an independent, agency-only broker, but instead, through Project Omega, which had ended during the third quarter of 2011, had unlawfully accessed and exploited confidential client information while trading for its own account against its customers.

120. Also in its 3Q11 Form 10-Q, ITG misleadingly represented the claimed advantages of POSIT: "A leader in electronic trading since launching the POSIT crossing network in 1987, ITG takes a consultative approach in ***delivering the highest quality institutional liquidity***, execution services, analytical tools and proprietary research insights grounded in data." *Id.* at 8.

121. This statement was materially false or misleading because, rather than providing "highest quality institutional liquidity," the Company had exploited confidential client information while trading for its own account against its customers, through Project Omega, which had ended in the third quarter of 2011.

122. The Company also misrepresented in its 3Q11 Form 10-Q that "[t]here has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2010." *Id.* at 38. This statement was false and misleading because Project Omega was restarted in December 2010, and the Company never disclosed its existence, or the fact that through Project Omega, it was using confidential client information in trading for its own account against its customers.

**2. Annual Report Form 10-K for Year End 2011**

123. On February 28, 2012, ITG filed its 2011 Form 10-K for fiscal year 2011, signed by Vigliotti, Gasser, and other members of the Board. In its 2011 Form 10-K, the Company emphasized its reputation as an independent agency broker, and falsely and misleadingly described

the advantages presented by its POSIT product, namely that all trades would be anonymous, allowing investors to trade without affecting the market and providing liquidity where it might not otherwise exist.

124. For example, ITG falsely stated that "POSIT Marketplace . . . incorporates advanced liquidity filter technology to help ensure that ***clients are protected from gaming and are only interacting with quality liquidity***. . . . POSIT Alert offers a way to ***access a reserve of hidden liquidity with minimal information leakage***," and that "[t]he POSIT suite currently provides ***anonymous continuous matching of non-displayed equity orders to minimize market impact and may provide opportunities for price improvement within the National Best Bid and Offer ('NBBO')***." 2011 Form 10-K at 2-3.

125. These statements were materially false or misleading because during the period covered by this Form 10-K, the Company was knowingly exploiting confidential customer information to trade against its own customers and to capture spreads between displayed and dark markets. Such trades eliminated any client opportunity for price improvement.

**3. First, Second, and Third Quarters 2012**

126. Throughout the Class Period, including in its SEC filings and press releases of 2012, ITG failed to make corrective disclosures concerning the existence of Project Omega, despite an ongoing duty to do so. Instead, it attempted to conceal the existence of Project Omega by repeatedly emphasizing the Company's independent agency-only status, its unconflicted business model, and its risk controls designed to prevent information leakage and predatory trading. When coupled with earlier misleading statements made during the period from April 2010 to July 2011, and continuing through the 2010 Form 10-K and the 2011 Form 10-K, the statements referenced herein from the first, second and third quarters of 2012 misled investors by implying that throughout its existence: (a) ITG maintained the same independent, unconflicted business

model; (b) the Company's same independent agency business model protected client's confidential information; (c) ITG's same independent, unconflicted agency business model prevented information leakage; (d) ITG's same independent, unconflicted business model maintained adequate informational barriers and risk controls; and (e) the Company complied with applicable laws and regulations.

127. ITG made the same false and misleading statements in its Forms 10-Q for the first, second, and third quarters of fiscal year 2012 (filed on May 9, 2012, August 9, 2012, and November 9, 2012, respectively). In those filings, the Company highlighted its reputation as an independent research and execution broker. For example, it stated, "ITG is ***an independent execution and research broker*** that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process." 2Q12 Form 10-Q at 8; 3Q12 Form 10-Q at 8; *see also* 1Q12 Form 10-Q at 8 ("ITG is ***an independent research and execution broker*** that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process.").

128. Viewed in the context of Defendants' numerous other Class Period statements, *see, e.g., supra* ¶¶ 90, 98, 101, 106, 111, this statement was materially false or misleading. It created the misimpression that ITG was and always had been an independent research and execution broker, even though during Project Omega it had unlawfully accessed and exploited confidential client information while trading for its own account against its customers.

129. ITG also misrepresented the advantages and services provided to clients: "From investment decision through to settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets." 1Q12 Form 10-Q at 8; 2Q12 Form 10-Q at 8; 3Q12 Form 10-Q at 8.

130. Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 101, 106, 109, 118, this statement was materially false or misleading. It created the false impression that the Company had always traded in the best interests of its clients in order to "improve performance" and "mitigate risk," while in fact the Company had knowingly and unlawfully accessed and exploited confidential customer information to trade ***against*** its own customers and to capture spreads between displayed and dark markets. Such trades eliminated any client opportunity for price improvement.

131. ITG also misleadingly touted the claimed advantages of POSIT: "A leader in electronic trading since launching the POSIT crossing network in 1987, ITG takes a consultative approach in ***delivering the highest quality institutional liquidity***, execution services, analytical tools and proprietary research." 1Q12 Form 10-Q at 8; 2Q12 Form 10-Q at 8; 3Q12 Form 10-Q at 8.

132. Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 93, 103, 107, 120, this statement was materially false or misleading. It created the false impression that the Company had always "delivered the highest quality institutional liquidity," while in actuality, the Company had exploited confidential client information while trading for its own account against its customers, through Project Omega.

*133.* The Company also misrepresented that "[t]here has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2011." 1Q12 Form 10-Q at 28; 2Q12 Form 10-Q at 34; 3Q12 Form 10-Q at 34. Each time this statement was made, it was false and misleading because the Company continued to conceal the existence of Project Omega, and that it had been using confidential client information in trading for its own account against its customers, despite an ongoing duty to disclose such activity. Such statements

also were materially false or misleading because the Company was aware that its undisclosed proprietary trading based on improper access to confidential client information presented the significant risk of reputational harm and the risk of liability in the form of substantial fines and penalties for non-compliance with securities laws and regulations.

134. Throughout 2012, the Company and various ITG officers made misrepresentations in press releases and on analyst conference calls. For example, in its February 1, 2012 press release, in the section labeled "About ITG," ITG described itself as follows:

> ITG is an ***independent*** research and execution broker that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process. From investment decision through settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets.

Press Release, ITG, ITG Reports Fourth Quarter 2011 Results (Feb. 1, 2012).

135. ITG's press releases repeated statements substantially similar to that in ¶ 134 throughout 2012. *See* Press Release, ITG, ITG launches POSIT Alert for Asia Pacific (Mar. 26, 2012) (same); *see also* Press Release, ITG, ITG Launches New Switch Trade Execution Strategy (July 24, 2012) (noting "ITG is an independent execution and research broker"); Press Release, ITG, ITG Reports Second Quarter 2012 Results (Aug. 9, 2012) (same); Press Release, ITG, ITG Wins Best Agency Broker Award (Oct. 29, 2012) ("October 2012 Press Release") (same).

136. Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 98, 101, 109, 124, the foregoing statements made in the press releases were materially false or misleading. It created the misimpression that ITG was and always had been an independent, research and execution broker, seeking to improve its clients' performance, even though during Project Omega ITG had unlawfully accessed and exploited confidential client information while trading for its own account against its customers.

137. On August 9, 2012, the same day ITG filed its 2Q12 Form 10-Q, the Company hosted a conference call to discuss its second quarter fiscal 2012 financial performance. During his opening remarks, Gasser stated, "***ITG has a robust set of risk controls across our platform*** to prevent major trading errors. ***Among the controls is our business model. We act as an agent, not a principal***, in the vast majority of our trading globally." Transcript of Q2 2012 Earnings Call, Bloomberg at 2 (Aug. 9, 2012).

138. Later, in the same conference call, Gasser went on to tout "ITG's best-in-class global execution capabilities" and "the reliability of our service." *Id.* at 3. He then emphasized, once again, the agency model by stating:

> But ***I would just focus on our own model*** and tell you that when you're an agent and you're focused on clients and you're focused on that outcome, and that's why I highlighted in my remarks, clients are extraordinarily sensitive, and given the quality of the tools we give them, they're extraordinarily sensitive to the Execution products going awry or to not performing to specifications
>
> . . . And so we feel good about the ***strength of our risk controls***, but we're never satisfied. But we do think that ***one thing that makes our model very different is the fact that it's an agency client-driven model***.

*Id.* at 6-7.

139. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 95, 100, 106, 116, 124, Gasser's statements on the conference call were materially misleading. They created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information. As set forth elsewhere herein, such was not the case. In actuality, Gasser was aware that individuals associated with Project Omega had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

140. In a press release dated October 29, 2012, the Company quoted Michael Corcoran, ITG's Head of Asia Pacific Sales and Trading: "'***We are very proud to be recognized as the best agency broker in Asia***. ***ITG's unconflicted business model*** is at the heart of what we do and reflects our focus on servicing institutional investors and consistently delivering best execution.'" October 2012 Press Release.

141. Viewed in the context of Defendants' numerous other Class Period statements, *see supra, e.g.*, ¶¶ 90, 98, 113, 116, 127, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

142. Three days later, on November 1, 2012, the Company hosted a conference call to discuss its third quarter fiscal 2012 financial performance. During his opening remarks, Gasser stated: "Our efforts in the region were recognized last week when Asian investor ***named ITG the region's best agency broker***, highlighting the value of our ***unconflicted business model*** to our clients there." Nov. 2012 Earnings Call at 3.

143. Gasser's statement in paragraph 142 above was materially false or misleading for the same reason Corcoran's statement was. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

144. During that same third-quarter conference call, Gasser also stated, "POSIT Match and Dynamic Open are both good examples of how our product development efforts help

institutional investors, ***source quality liquidity***, ***prevent information leakage and avoid the predatory strategy***—strategies of some high-frequency traders." *Id.*

145. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 95, 103, 120, 124, Gasser's statement in paragraph 144 above was materially false or misleading. It created the false impression that POSIT helped investors source quality liquidity and prevent information leakage, while in fact, Company had exploited confidential client information to its own advantage and its clients' detriment in its proprietary trading. Defendants had not disclosed the existence or scope of ITG's proprietary trading and misuse of confidential client information, despite an ongoing duty to disclose such information and to correct prior false and misleading statements.

**4. Senate Testimony by Gasser**

146. On December 18, 2012, Gasser testified before the U.S. Senate Subcommittee on Securities, Insurance, and Investment Committee on Banking, Housing and Urban Affairs, about the issue regarding the quality of United States equity markets. He made several false and misleading statements during his testimony, including statements about ITG being an agency-only broker, and the benefits presented by POSIT. First, he stated, "ITG is not a market maker, and ***we do not take on proprietary positions***. In other words, ***we do not have skin in the game*** when it comes to the debates around broker internalization, as our system provides meaningful price improvement to buyside investors, as described in Reg NMS." 2012 Gasser Testimony at 8.

147. Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 93, 98, 101, 113, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega it had exploited confidential client information while trading for its own account against its customers.

148. He also stated, "ITG's been operating a dark pool for 25 years, and that's POSIT. POSIT is the granddaddy of dark pools, if you will. It is a system that is -- that brings together institutional investors, ***allows them to interact with one another directly and anonymously***. So, they don't know size. ***They don't know who their counterparty is***. It's -- and ***we improve price***. So in other words, we -- we trade at the mid-point." *Id.* at 14.

149. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 93, 100, 124, 129, this statement was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information. As set forth elsewhere herein, such was not the case. In actuality, Gasser was aware that individuals associated with Project Omega had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

150. Finally, Gasser misrepresented the extent to which the confidentiality of client information was maintained:

> Data security is a matter of paramount importance for all market participants, particularly when it comes to sensitive client information or trade data. We, along with the vast majority of other market participants, take this responsibility seriously and we safeguard our data using a combination of up-to-date technological measures, strictly enforced information barriers, and robust policies and procedures concerning information security and protection of client confidential information.

2012 Gasser Statement at 13.

151. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 95, 100, 103, 137, Gasser's statement in paragraph 150 above was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information. As set forth elsewhere herein, such was not the case. In actuality, Gasser

was aware that individuals associated with Project Omega had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

### 5. Annual Report Form 10-K for Year End 2012

152. On January 31, 2013, the Company held a conference call to discuss its fourth quarter financial performance. In his opening remarks, Gasser continued to tout ITG's "standing as the preeminent global ***independent agency broker***." Transcript of Q4 2012 Earnings Call, Bloomberg at 3 (Jan. 31, 2013). He stated that firms turn to ITG "for the same reasons that institutions turn to us[:] quality of product, service, global footprint and the ***agency model***." *Id.* at 2.

153. Viewed in the context of Defendants' numerous other Class Period statements, *see supra, e.g.*, ¶¶ 90, 98, 101, 106, 127, these statements were materially false or misleading. They created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega it had exploited confidential client information while trading for its own account against its customers.

154. On March 6, 2013, ITG filed its 2012 Form 10-K for the fiscal year 2012, which included prior years' financial information, signed by Gasser, as well as Vigliotti, and other members of the Board. The 2012 Form 10-K continued to describe ITG as "an ***independent execution and research broker*** that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process." 2012 Form 10-K at 1.

155. Viewed in the context of Defendants' earlier Class Period statements, *see supra, e.g.*, ¶¶ 90, 101, 111, 118, 134, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

156. This Form 10-K also misrepresented the advantages and services ITG promised to clients, including the advantages presented by its POSIT product, namely that all trades would be anonymous, allowing investors to trade without affecting the market and providing liquidity where it might not otherwise exist. For example, it stated,

a. "From investment decision through to settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets." *Id.*

b. "POSIT operates as an Alternative Trading System ('ATS'), providing ***anonymous*** continuous and scheduled crossing of non-displayed (or dark) equity orders and price improvement opportunities within the National Best Bid and Offer ('NBBO')." *Id.* at 2.

c. "POSIT Marketplace uses advanced quantitative techniques in an effort ***to protect clients from gaming and to interact with quality liquidity***." *Id.*

d. ***Our business relies on the secure storage, processing and transmission of data, including our clients' confidential data***, in our internal systems and through our vendor networks and communications infrastructure. Third parties who are able to breach or disrupt our, or our vendors', security systems may be able to cause system damage or failures or perform unauthorized trading that could result in significant losses. *Id.* at 11.

157. Viewed in the context of Defendants' earlier Class Period statements, *see supra, e.g.*, ¶¶ 93, 101, 106, 138, 150, these statements were materially misleading. They created the false impression that ITG was protecting confidential client information from third parties who, the Company suggested, posed the greatest risk to clients. In fact, the greatest risk was from ITG itself, which had knowingly accessed and exploited—rather than protected, as it suggested—confidential customer information to trade against its own customers and to capture spreads between displayed and dark markets. Such trades eliminated any client opportunity for price improvement, violated the Company's guarantees of confidentiality and anonymity, and exposed ITG to significant risk (including, but not limited to, legal and reputational risk).

158. ITG also falsely assured investors that it was continuing "to review and monitor POSIT's systems and procedures ***to ensure compliance with Regulation ATS***." *Id.* at 7.

159. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 95, 113, 138, 150, this statement was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information in compliance with Regulation ATS. As set forth elsewhere herein, such was not the case. In actuality, the Company was aware that individuals associated with Project Omega, in violation of Regulation ATS, had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

160. ITG also falsely stated that "[m]isconduct by our employees ***could*** include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers or improper use of confidential information." *Id.* at 18.

161. This statement was false and misleading because ITG already was aware that its employees had engaged in improper activities, including undisclosed proprietary trading, and improper use of confidential client information.

**6. First and Second Quarters Fiscal Year 2013**

162. On May 10, 2013, August 8, 2013, and November 12, 2013, ITG filed its Form 10-Q's for the first, second, and third quarter of fiscal year 2013, respectively, signed by Vigliotti and certified by Gasser and Vigliotti. In those filings, the Company highlighted its reputation as an independent research and execution broker. For example, it stated, "ITG is ***an independent execution and research broker*** that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process." 1Q13 Form 10-Q at 8; 2Q13 Form 10-Q at 8; *see also* 3Q13 Form 10-Q at 8 ("ITG is ***an independent execution and research***

***broker*** that partners with global portfolio managers and traders to provide innovative financial technology and unique data-driven insights throughout the investment process.").

163. Viewed in the context of Defendants' numerous other Class Period statements, *see supra, e.g.*, ¶¶ 90, 98, 101, 134, 154, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

164. ITG also misrepresented the advantages and services provided to clients: "From investment decision through to settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets." 1Q13 Form 10-Q at 8; 2Q13 Form 10-Q at 8; *see also* 3Q13 Form 10-Q at 8.

165. Viewed in the context of Defendants' numerous other Class Period statements, *see supra, e.g.*, ¶¶ 101, 106, 118, 134, 156, this statement, made in the Company's 1Q12 Form 10-Q, 2Q12 Form 10-Q, and 3Q12 Form 10-Q, was materially false or misleading. It created the misimpression that ITG was and always had been an independent, research and execution broker, seeking to improve its clients' performance, even though during Project Omega the Company had unlawfully accessed and exploited confidential client information while trading for its own account against its customers.

166. Also in its 1Q13, 2Q13, and 3Q13 Forms 10-Q, ITG misleadingly touted the claimed advantages of POSIT: "A leader in electronic trading since launching the POSIT crossing network in 1987, ITG takes a consultative approach in ***delivering the highest quality institutional liquidity***, execution services, analytical tools and proprietary research."

167. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 107, 120, 131, 144, this statement was materially false or misleading. It created the false impression that POSIT helped investors source quality liquidity, while in fact, Company had exploited confidential client information to its own advantage and its clients' detriment in its proprietary trading. The Company had not disclosed the existence or scope of its proprietary trading and misuse of confidential client information, despite an ongoing duty to disclose such information and to correct prior false and misleading statements.

168. The Company also misrepresented that "[t]here has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2012." 1Q13 Form 10-Q at 27; 2Q13 Form 10-Q at 33; 3Q13 Form 10-Q at 32. Each time this statement was made, it was materially false or misleading because the Company continued to conceal the existence of Project Omega, and that it had been using confidential client information in trading for its own account against its customers, despite an ongoing duty to disclose such activity. Such statements also were materially false or misleading because the Company was aware that its undisclosed proprietary trading based on improper access to confidential client information presented the significant risk of reputational harm and the risk of liability in the form of substantial fines and penalties for non-compliance with securities laws and regulations.

169. In a press release dated July 19, 2013, ITG, again calling itself "an independent execution and research broker," stated:

> "***Throughout our 26-year history***, ITG has strived to establish ***trusted relationships*** with institutional investors and to provide them with cutting-edge tools and services to help improve investment performance," ***said ITG Chief Executive Officer and President, Bob Gasser***. "These awards for Best Agency Broker and Best FX TCA Provider recognize the strength of ***our unconflicted***

> ***agency model*** as well as our ability to develop innovative new offerings across asset classes."

Press Release, ITG, ITG Named Best Agency Broker and Best FX TCA Provider (July 19, 2013).

170. Viewed in the context of Defendants' numerous other Class Period statements, *see supra, e.g.*, ¶¶ 90, 98, 101, 140, 142, this statement was materially false or misleading. It created the false impression that ITG was, and had been throughout its 26-year history, an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

**C. Defendants' Misleading Statements and Omissions Concealing the SEC Investigation**

**1. Third Quarter 2013 Results**

171. According to published news reports, the SEC Investigation began no later than the fall of 2013.

172. On November 12, 2013, ITG filed its Form 10-Q for the third quarter of fiscal year 2013, signed by Vigliotti and certified by Gasser and Vigliotti. In it, the Company repeated material misrepresentations that it had made in its 1Q13 and 2Q13 Forms 10-Q. *See supra* ¶¶ 162, 164, 166, 168.

173. The 3Q13 Form 10-Q also falsely stated: "There has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2012." 3Q13 Form 10-Q at 32.

174. This statement was false and misleading because, according to published reports, the SEC had begun investigating ITG for the misconduct involved in Project Omega no later than the Fall of 2013. The SEC Investigation substantially increased the risk that the Company would

have to pay significant fines and penalties for its non-compliance with securities laws and regulations. ITG did not disclose those risks.

175. In addition, the 3Q13 Form 10-Q included the following misrepresentations regarding legal proceedings in which the Company was purportedly then involved:

> We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. In addition, our broker-dealers are regularly involved in reviews, inquiries, examinations, investigations and proceedings by government agencies and self-regulatory organizations regarding our business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. Although there can be no assurances, at this time the Company believes, based on information currently available, that the outcome of any such proceeding, review, inquiry, examination and investigation will not have a material adverse effect on our consolidated financial position or results of operations.

*Id.* at 32.

176. These representations were made in the "Legal Proceedings" section (Part II, Item 1) of the 3Q13 Form 10-Q. There is no "Contingencies" Note in this Form 10-Q offering any information regarding regulatory investigations or the like. Because the types of contingencies that would normally be addressed in a "Contingencies" Note to the financial statements would encompass pending or threatened litigation, as well as claims or assessments of all kinds—including those arising from, or associated with, the SEC Investigation—ITG had an affirmative obligation to disclose the SEC Investigation and material facts concerning its potential exposure. As a result of the SEC Investigation into Project Omega, it was probable that ITG and some of its representatives would be sanctioned by the SEC or was, or could or would be, subject to other proceedings associated with the SEC's Investigation or investigations by other authorities and shareholders. There also was a reasonable probability that ITG would be forced to admit wrongdoing and/or otherwise incur material financial penalties or reputational harm as a result of impending fines and penalties related to the SEC Investigation or other proceedings concerning

Project Omega. Defendants had a duty to disclose this information, but did not, and instead actively concealed the investigation and the existence of Project Omega in order to artificially inflate the price of ITG stock.

### 2. Form ATS Disclosure

177. On December 13, 2013, ITG filed with the SEC an amendment to its initial Form ATS for its POSIT platform, which was signed by Goebels ("Form ATS Amendment"). The Company also posted its Form ATS on its website by May 2014.

178. The Form ATS Amendment stated, in part:

> ITG employs controls that may prevent the interaction between certain types of Subscriber orders. The motivations for these controls are to: (1) ***protect customer orders from adverse selection, gaming, and/or potential market manipulation***; (2) ensure the stability of POSIT's order handling and execution systems; (3) address economic considerations; and (4) ***maintain the quality and integrity of POSIT's liquidity pool***. These measures are primarily employed to ensure the securing of ***best execution for all Subscriber orders***, which is a paramount consideration of ITG and POSIT.

Ex. A to Form ATS Amendment.

179. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 95, 113, 138, 150, this statement was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information. As set forth elsewhere herein, such was not the case. In actuality, the Company was aware that individuals associated with Project Omega had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

180. The Form ATS Amendment also stated:

a. "POSIT is designed to be a direct-access, institutional trading facility that ***offers confidentiality of client orders in equity securities and liquidity*** in a continuous trading environment . . . ."

b. "***Neither ITG nor AlterNet engage in*** any of the following activities: (1) ***at-risk or directional proprietary trading***; (2) ***market making***; (3) capital commitment[;] and/or (4) establishing directional positions."

c. "ITG and POSIT employ several measures, controls, and reviews to protect customer orders from toxic order flow and gaming strategies. Furthermore, ITG closely monitors the trading activity in the ATS for execution quality, potential regulatory violations, and inappropriate conduct."

d. "In addition to the above, ITG maintains and enforces robust policies and procedures designed to ensure that POSIT matches Subscriber Orders in accordance with applicable law. Specifically, ***ITG employs a wide range of surveillance reports and monitoring controls to detect and prevent potential violations of federal securities laws and regulations, as well as SRO rules***, including, but not limited to, Rule 611 of Regulation NMS (Order Protection Rule) and FINRA Rule 5310 (Best Execution)."

Ex. F to Form ATS Amendment.

181. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 93, 95, 113, 150, these statements were materially misleading. They created the misimpression that: (i) the Company had maintained the same independent, unconflicted business model throughout its existence, and had never exploited confidential client information for its own proprietary trading; (ii) ITG had always protected—and never exploited—client's confidential information; (iii) POSIT had always ensured the "best execution for all Subscriber orders" even though during the pendency of Project Omega, customers often did not receive "best execution," because the Company had traded against its own customers for its own benefit; and (iv) the Company had always complied with all applicable laws and regulations, including Regulation ATS.

182. The Form ATS Amendment stated further:

a. "With respect to system security and confidentiality, access to information relating to the orders of a particular client within the system is limited to the ITG registered personnel assigned to the particular client. ***Access by those persons to other Subscribers' order information is strictly prohibited and monitored***."

b. "Furthermore, among other things, ***ITG's compliance department reviews the personal trading records of registered persons*** entering orders into POSIT on behalf of customers and POSIT support personnel in accordance with ITG compliance policies and procedures ***to detect whether confidential user trade information is being misused***."

Ex. G to Form ATS Amendment.

183. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 95, 113, 124, 144, these statements were materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information. As set forth elsewhere herein, such was not the case. In actuality, the Company was aware that individuals associated with Project Omega had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

184. ITG's press releases throughout 2013 repeated the same misrepresentation about ITG's status as an "independent execution and research broker," and about ITG helping clients "improve performance," and "mitigate risk." For example, in February of 2013, in the section labeled "About ITG," ITG described itself as follows:

> ITG is an ***independent*** execution and research broker that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process. From investment decision through settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets.

Press Release, ITG, ITG Wins Award for Best Broker Dealer – Algorithms (Feb. 15, 2013).

185. ITG's press releases in March, July, August, and October of 2013 made the same misrepresentations. *See* Press Release, ITG, ITG Launches Next-Generation POSIT Alert (Mar. 19, 2013); Press Release, ITG, ITG Introduces ITG Dynamic Implementation Shortfall Algorithm 2.0 (July 16, 2013); Press Release, ITG, ITG Reports Second Quarter 2013 Results (Aug. 1, 2013);

Press Release, ITG, ITG Wins Top Honors at *The Trade* and *Financial News* Awards (Oct. 9, 2013). Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 101, 106, 118, 134, such statements were materially false or misleading. They created the misimpression that ITG was and always had been an independent, research and execution broker, seeking to improve its clients' performance, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

### 3. Annual Report Form 10-K for Year End 2013

186. On March 17, 2014, ITG filed its 2013 Form 10-K for the year ended December 31, 2013, with the SEC, which included prior years' financial information, signed by Vigliotti, as well as Gasser and other members of the Board. In its 2013 Form 10-K, ITG continued to hold itself out as an "independent execution and research broker":

> ITG is an ***independent execution and research broker*** that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process.

2013 Form 10-K at 1.

187. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 98, 123, 134, 152, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

188. This public filing also misrepresented the advantages and services ITG promised to clients, including the advantages presented by its POSIT product, namely that all trades would be

anonymous, allowing investors to trade without affecting the market and providing liquidity where it might not otherwise exist. For example, it stated,

a. "From investment decision through to settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets." *Id.*

b. "POSIT operates as an Alternative Trading System ('ATS'), providing ***anonymous*** continuous and scheduled crossing of non-displayed (or dark) equity orders and price improvement opportunities within the National Best Bid and Offer ('NBBO')." *Id.* at 2.

c. "POSIT Marketplace uses advanced quantitative techniques in an effort ***to protect clients from gaming and to interact with quality liquidity***." *Id.*

189. Viewed in the context of Defendants' earlier Class Period statements, *see supra, e.g.*, ¶¶ 90, 93, 101, 123, 156, these statements were materially false or misleading. They created the false impression that POSIT helped investors source maintain anonymity, improve performance, and source quality liquidity, while in fact, Company had unlawfully accessed and exploited confidential client information to its own advantage and its clients' detriment in its proprietary trading. The Company had not disclosed the existence or scope of its proprietary trading and misuse of confidential client information, despite an ongoing duty to disclose such information and to correct prior false and misleading statements.

190. In its 2013 Form 10-K the Company also emphasized the controls it had in place to protect client data and maintain its confidentiality:

> ***Our business relies on the secure storage, processing and transmission of data, including our clients' confidential data***, in our internal systems and through our vendor networks and communications infrastructure. Third parties who are able to breach or disrupt our or our vendors' security systems may be able to cause system damage or failures or perform unauthorized trading that could result in significant losses.

*Id.* at 11.

191. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 95, 100, 124, 150, 156, this statement was materially misleading. It created the false impression that the Company was protecting confidential client information from third parties who, the Company suggested, posed the greatest risk to clients. In fact, the greatest risk was from ITG itself, which had knowingly and unlawfully accessed and exploited—rather than protected, as it suggested—confidential customer information to trade against its own customers and to capture spreads between displayed and dark markets. Such trades eliminated any client opportunity for price improvement, violated the Company's guarantees of confidentiality and anonymity, and exposed ITG to significant risk (including, but not limited to, legal and reputational risk).

192. ITG also falsely assured investors that it was continuing "to review and monitor POSIT's systems and procedures ***to ensure compliance with Regulation ATS***." *Id.* at 7.

193. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 95, 113, 158, this statement was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information in compliance with Regulation ATS. As set forth elsewhere herein, such was not the case. In actuality, the Company was aware that individuals associated with Project Omega, in violation of Regulation ATS, had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

194. ITG also falsely stated that "[m]isconduct by our employees ***could*** include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers or improper use of confidential information." *Id.* at 18.

195. This statement was false and misleading because ITG already was aware that its employees had engaged in improper activities, including undisclosed proprietary trading, and improper use of confidential client information.

196. Moreover, the 2013 Form 10-K continued to use the following language regarding the legal matters or proceedings in which the Company was purportedly then involved:

> The Company is periodically involved in litigation and various legal matters that arise in the normal course of business, including proceedings relating to regulatory matters. Such matters are subject to many uncertainties and outcomes that are not predictable. At the current time, the Company does not believe that any of these matters will have a material adverse effect on its financial position or future results of operations.

*Id.* at 92. The Company also stated:

> We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. In addition, our broker-dealers are regularly involved in reviews, inquiries, examinations, investigations and proceedings by government agencies and self-regulatory organizations regarding our business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. Although there can be no assurances, at this time, the Company believes, based on information currently available, that the outcome of any such proceeding, review, inquiry, examination and investigation will not have a material adverse effect on our consolidated financial position or results of operations.

*Id.* at 19.

197. These representations were made in the "Legal Matters" section (Note 21, Commitments and Contingencies, of the Company's Audited Consolidated Financial Statements) and in the "Legal Proceedings" section (Part II, Item 3), respectively, of the 2013 Form 10-K. Because the types of contingencies that would normally be addressed in Note 21 would encompass pending or threatened litigation, as well as claims or assessments of all kinds—including those arising from, or associated with, the SEC Investigation—ITG had an affirmative obligation to disclose the SEC Investigation and material facts concerning its potential exposure. As a result of

the SEC Investigation into Project Omega, it was probable that ITG and some of its representatives would be sanctioned by the SEC or was, or could or would be, subject to other proceedings associated with the SEC's Investigation or investigations by other authorities and shareholders. There also was a reasonable probability that ITG would be forced to admit wrongdoing and/or otherwise incur material financial penalties or reputational harm as a result of impending fines and penalties related to the SEC Investigation or other proceedings concerning Project Omega. Defendants had a duty to disclose this information, but did not, and instead actively concealed the investigation and the existence of Project Omega in order to artificially inflate the price of ITG stock.

**4. First Quarter Fiscal 2014 Results**

198. Although ITG failed to disclose the pendency of the SEC Investigation, ITG continued to promote itself as a transparent company that protected its clients from toxic trade activity. On May 1, 2014, ITG held a conference call to discuss its financial results for the first quarter of 2014. Gasser announced that ITG was posting its Form ATS, which it files with the SEC, online, as well as instituting a "transparency" section on its website.

199. In that regard, Gasser stated:

> We encourage our clients to ask questions of us, and of all of their brokers, to ensure that we are truly working in their best interests in mind and striving for best execution.
>
> Towards that end, we've launched a new section on our website this morning devoted to ***execution transparency***, which highlights the different insights available to our clients, including detailed, granular execution reports and our Algo Prism real-time execution monitor, which provides visibility into the activity of each ITG algorithm, such as predicted and realized execution schedules, fill details and the location, type and price of every open order.
>
> ***We've also provided more detail on our flagship crossing network, POSIT, including the Form ATS, which we file with the SEC***, and a plain language guide

> to executions in POSIT. We hope that these materials will help educate our clients about how we work on their behalf.

Transcript of Q1 2014 Earnings Call, Bloomberg at 2 (May 1, 2014).

200. Gasser's statement was materially misleading because it created the false impression that: (i) the Company had maintained the same independent, unconflicted business model throughout its existence, and had never exploited confidential client information for its own proprietary trading; and (ii) the Company was fully disclosing details about POSIT when, in fact, it was continuing to conceal that it had exploited confidential client information for its own proprietary trading.

201. In that same conference call Gasser touted ITG by stating: "ITG was also ranked at the top for ***best protection against toxic activity***, which speaks to the strength of ***our commitment to best execution for our clients***." *Id.*

202. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 107, 109, 144, 150, 188, this statement was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information. As set forth elsewhere herein, such was not the case. In actuality, Gasser was aware that individuals associated with Project Omega had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

**5. 2014 Forms 10-Q**

203. Public filings made by ITG throughout 2014 contained numerous misrepresentations. For example, the Company stated, "ITG is ***an independent execution and research broker*** that partners with global portfolio managers and traders to provide unique data-

driven insights throughout the investment process." 1Q14 Form 10-Q at 8; 2Q14 Form 10-Q at 8; and 3Q14 Form 10-Q at 8.

204. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 101, 111, 152, 184, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

205. ITG also misrepresented the advantages and services provided to clients: "From investment decision through to settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets." 1Q14 Form 10-Q at 8; 2Q14 Form 10-Q at 8; and 3Q14 Form 10-Q at 8.

206. Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 101, 106, 129, 134, 164, this statement was materially false or misleading. It created the misimpression that ITG was and always had been an independent execution and research broker seeking to improve its clients' performance, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

207. ITG also misleadingly touted the claimed advantages of POSIT: "A leader in electronic trading since launching the POSIT crossing network in 1987, ITG takes a consultative approach in ***delivering the highest quality institutional liquidity***, execution services, analytical tools and proprietary research." 1Q14 Form 10-Q at 8; 2Q14 Form 10-Q at 8; and 3Q14 Form 10-Q at 8.

208. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 103, 107, 131, 166, 188, this statement was materially false or misleading. It created the false impression that POSIT helped investors source "the highest quality institutional liquidity," while in fact, Company had exploited confidential client information to its own advantage and its clients' detriment in its proprietary trading. The Company had not disclosed the existence or scope of its proprietary trading and misuse of confidential client information, despite an ongoing duty to disclose such information and to correct prior false and misleading statements.

209. ITG also misrepresented that "[t]here has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2013." 1Q14 Form 10-Q at 27; 2Q14 Form 10-Q at 33; and 3Q14 Form 10-Q at 33. Each time this statement was made, it was materially false or misleading because the Company continued to conceal the existence of Project Omega and that it had used confidential client information in trading for its own account against its customers, despite an ongoing duty to disclose such activity. Such statements also were materially false or misleading because the Company was aware that its undisclosed proprietary trading based on improper access to confidential client information presented the significant risk of reputational harm and the risk of liability in the form of substantial fines and penalties for non-compliance with securities laws and regulations.

210. In addition, the 1Q14, 2Q14, and 3Q14 Forms 10-Q included the following language regarding legal proceedings in which the Company was purportedly then involved:

> We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. In addition, our broker-dealers are regularly involved in reviews, inquiries, examinations, investigations and proceedings by government agencies and self-regulatory organizations regarding our business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. Although there can be no assurances, at this time, the Company believes, based on information currently available, that the outcome of any such proceeding, review, inquiry, examination and investigation will not have

> a material adverse effect on our consolidated financial position or results of operations.

1Q14 Form 10-Q at 27; 2Q14 Form 10-Q at 33; and 3Q14 Form 10-Q at 33.

211. Each of these representations was made in the "Legal Proceedings" section (Part II, Item 1) of the 2014 Forms 10-Q. Here again, there were no "Contingencies" Notes in the 2014 Forms 10-Q offering any information regarding regulatory investigations or the like. Because the types of contingencies that would normally be addressed in a "Contingencies" Note would encompass pending or threatened litigation, as well as claims or assessments of all kinds—including those arising from, or associated with, the SEC Investigation—ITG had an affirmative obligation to disclose the SEC Investigation and material facts concerning its potential exposure. As a result of the SEC Investigation into Project Omega, it was probable that ITG and some of its representatives would be sanctioned by the SEC or was, or could or would be, subject to other proceedings associated with the SEC's Investigation or investigations by other authorities and shareholders. There also was a reasonable probability that ITG would be forced to admit wrongdoing and/or otherwise incur material financial penalties or reputational harm as a result of impending fines and penalties related to the SEC Investigation or other proceedings concerning Project Omega. Defendants had a duty to disclose this information, but did not, and instead actively concealed the investigation and the existence of Project Omega in order to artificially inflate the price of ITG stock.

### 6. Second Quarter Fiscal 2014 Results

212. In a June 4, 2014 Press Release, Gasser referred to "'ITG's position as the world's leading independent electronic brokerage.'" Press Release, ITG, ITG Hires Timothy Reilly as Head of U.S. Electronic Sales (June 4, 2014).

213. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 101, 106, 152, 184, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

214. During a July 31, 2014 earnings call, ITG continued to conceal the existence of the SEC Investigation as well as the reasons why the SEC was investigating ITG—reasons known to Gasser. Instead, Gasser announced ITG had improved its ranking in the 2014 Greenwich Associates study of electronic trading, where ITG "ranked number two overall in electronic trading quality and number one for ***best protection against toxic counterparties or activities***." Transcript of Q2 2014 Earnings Call, Bloomberg at 2 (July 31, 2014).

215. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 93, 95, 106, 150, 191, this statement was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information. As set forth elsewhere herein, such was not the case. In actuality, the Company was aware that individuals associated with Project Omega had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

**7. Third Quarter Fiscal 2014 Results**

216. During the November 3, 2014 earnings call, Vigliotti pointed to ITG's "ability to be flexible around non-standard trade settlements and to preserve their anonymity" as a "strategic advantage as well as a cost advantage and enables [ITG] to bring in other sources of liquidity into POSIT." Transcript of Q3 2014 Earnings Call, Bloomberg at 7 (Nov. 3, 2014).

217. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 93, 107, 144, 188, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker and had always helped investors source quality liquidity, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

218. Throughout 2014, ITG continued to make false and misleading statements in its press releases. For example in its January 30, 2014 press release, in the section labeled "About ITG," ITG described itself as follows:

> ITG is an ***independent*** execution and research broker that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process. From investment decision through settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets.

Press Release, ITG, ITG Reports Fourth Quarter 2013 Results (Jan. 30, 2014).

219. ITG's press releases repeated substantially similar statements throughout 2014. *See, e.g.*, Press Release, ITG, ITG Releases February 2014 U.S. Trading Volumes (Mar. 10, 2014); Press Release, ITG, ITG Reports First Quarter 2014 Results (May 1, 2014); Press Release, ITG, ITG Reports Second Quarter 2014 Results (July 31, 2014); Press Release, ITG, ITG Increases Share Repurchase Authorization and Provides Third Quarter 2014 Earnings Guidance (Oct. 15, 2014).

220. Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 101, 106, 134, 184, such statements in ITG press releases were materially false or misleading in that they created the misimpression that ITG was and always had been an independent, research and execution broker, seeking to improve its clients' performance, even

though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

**8. Annual Report Form 10-K Year End 2014**

221. On March 13, 2015, ITG filed its 2014 Form 10-K for calendar year-end December 31, 2014, signed by Vigliotti, as well as Gasser and other members of the Board. In its 2014 Form 10-K, ITG continued to hold itself out as an "independent execution and research broker." 2014 Form 10-K at 1.

222. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 106, 123, 152, 186, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

223. ITG also misrepresented the advantages and services provided to clients: "From investment decision through to settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets." 2014 Form 10-K at 1.

224. Viewed in the context of Defendants' numerous other Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 101, 106, 129, 156, this statement was materially false or misleading. It created the misimpression that ITG was and always had been an independent execution and research broker seeking to improve its clients' performance, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

225. In this public filing, the Company also trumpeted the advantages and services it provided clients, including anonymity, improved performance and access to quality liquidity. In that regard, the following statements were made:

a. "POSIT was launched in 1987 as a point-in-time electronic crossing network. Today, POSIT operates as an Alternative Trading System ('ATS'), providing ***anonymous*** continuous and scheduled crossing of non-displayed (or dark) equity orders and price improvement opportunities within the National Best Bid and Offer ('NBBO')."

b. "POSIT Marketplace uses advanced quantitative techniques in an effort to interact with quality liquidity while protecting clients from gaming."

2014 Form 10-K at 2.

226. Viewed in the context of Defendants' earlier Class Period statements, *see supra, e.g.*, ¶¶ 93, 100, 148, 156, 188, these statements were materially false or misleading. It created the false impression that POSIT helped investors source quality liquidity, provided anonymity, and protected investors from gaming while in fact, the Company had unlawfully accessed and exploited confidential client information to its own advantage and its clients' detriment in its proprietary trading. The Company had not disclosed the existence or scope of its proprietary trading and misuse of confidential client information, despite an ongoing duty to disclose such information and to correct prior false and misleading statements.

227. The Company also stated in its 2014 Form 10-K: "We continue to review and monitor POSIT's systems and procedures ***to ensure compliance with Regulation ATS***." *Id.* at 8.

228. Viewed in the context of Defendants' earlier Class Period statements, *see supra, e.g.*, ¶¶ 95, 113, 158, 192, 199, this statement was materially misleading. It created the false impression that ITG had consistently maintained mechanisms and procedures to safeguard data, enforce information barriers, and ensure the security and protection of client information in compliance with Regulation ATS. As set forth elsewhere herein, such was not the case. In

actuality, the Company was aware that individuals associated with Project Omega, in violation of Regulation ATS, had accessed the trade data of clients in the POSIT system and used it to trade against them for ITG's own account.

229. ITG also made the following misrepresentation in its 2014 Form 10-K: "Misconduct by our employees ***could*** include hiding unauthorized activities from us, improper or unauthorized activities on behalf of customers or improper use of confidential information." *Id.* at 19.

230. This statement was materially false and misleading because ITG was already aware that its employees had engaged in improper activities, including undisclosed proprietary trading, and improper use of confidential client information.

231. In addition, the 2014 Form 10-K, included the following language regarding the legal matters in which the Company was purportedly then involved:

> The Company is periodically involved in litigation and various legal matters that arise in the normal course of business, including proceedings relating to regulatory matters. Such matters are subject to many uncertainties and outcomes that are not predictable. At the current time, the Company does not believe that any of these matters will have a material adverse effect on its financial position or future results of operations.

*Id.* at 87. The Company also stated:

> We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. In addition, our broker-dealers are regularly involved in reviews, inquiries, examinations, investigations and proceedings by government agencies and self-regulatory organizations regarding our business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. Although there can be no assurances, at this time, the Company believes, based on information currently available, that the outcome of any such proceeding, review, inquiry, examination and investigation will not have a material adverse effect on our consolidated financial position or results of operations.

*Id.* at 20.

232. These representations were made in the "Legal Matters" section (Note 21, Commitments and Contingencies, of the Company's Audited Consolidated Financial Statements) and in the "Legal Proceedings" section (Part I, Item 3), respectively, of the 2014 Form 10-K. Because the types of contingencies that would normally be addressed in a "Contingencies" Note to the financial statements would encompass pending or threatened litigation, as well as claims or assessments of all kinds—including those arising from, or associated with, the SEC Investigation—ITG had an affirmative obligation to disclose the SEC Investigation and material facts concerning its potential exposure. As a result of the SEC Investigation into Project Omega, it was probable that ITG and some of its representatives would be sanctioned by the SEC or was, or could or would be, subject to other proceedings associated with the SEC's Investigation or investigations by other authorities and shareholders. There also was a reasonable probability that ITG would be forced to admit wrongdoing and/or otherwise incur material financial penalties or reputational harm as a result of impending fines and penalties related to the SEC Investigation or other proceedings concerning Project Omega. Defendants had a duty to disclose this information, but did not, and instead actively concealed the investigation and the existence of Project Omega in order to artificially inflate the price of ITG stock.

**9. First Quarter Fiscal 2015 Results**

233. On May 11, 2015, ITG filed its Form 10-Q for the first quarter of fiscal year 2015, signed by Vigliotti, and certified by Gasser and Vigliotti. ITG stated: "ITG is ***an independent execution broker and research provider*** that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process." 1Q15 Form 10-Q at 8.

234. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 90, 98, 134, 152, 186, this statement was materially false or misleading. It created the false impression that ITG was and always had been an independent research and execution broker, even

though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

235. Here again, ITG also misrepresented the advantages and services provided to clients:

a. "From investment decision through to settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets."

b. "A leader in electronic trading since launching the POSIT crossing network in 1987, ITG takes a consultative approach in ***delivering the highest quality institutional liquidity***, execution services, analytical tools and proprietary research."

1Q15 Form 10-Q at 8.

236. Viewed in the context of Defendants' earlier Class Period statements, *see supra*, *e.g.*, ¶¶ 101, 106, 156, 164, 184, these statements were materially false or misleading. They created the false impression that POSIT helped investors source quality liquidity, provided anonymity, and protected investors from gaming while in fact, the Company had knowingly and unlawfully accessed and exploited confidential customer information to trade against its own customers and to capture spreads between displayed and dark markets. Such trades eliminated any client opportunity for price improvement and operated to the benefit of the Company and to the detriment of ITG's clients.

237. The Company also misrepresented in its 1Q15 Form 10-Q that "[t]here has been no significant change to the risks or uncertainties that may affect our results of operations since December 31, 2014." This statement was false and misleading because the Company continued to conceal the existence of Project Omega and that it had been using confidential client information in trading for its own account against its customers, despite an ongoing duty to disclose such activity. Such statements also were false and misleading because the Company was aware that its

undisclosed proprietary trading based on improper access to confidential client information presented the significant risk of reputational harm and the risk of liability in the form of substantial fines and penalties for non-compliance with securities laws and regulations.

238. Further, the 1Q15 Form 10-Q included the following language regarding legal matters in which the Company was purportedly then involved:

> The Company is not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. The Company's broker-dealer subsidiaries are involved in ongoing investigations and other proceedings by government agencies and self-regulatory organizations regarding its business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. The Company is unable to provide a reasonable estimate of any potential liability given the stage of such proceedings. However, the Company believes, based on information currently available, that the outcome of such proceedings, individually or in the aggregate, will not likely have a material adverse effect on its consolidated financial position. In light of the inherent uncertainties of such proceedings, however, an adverse outcome of such proceedings may have a material impact on the results of operations for any particular period.

*Id.* at 17. The Company also stated:

> We are not a party to any pending legal proceedings other than claims and lawsuits arising in the ordinary course of business. Our broker-dealer subsidiaries are involved in ongoing reviews, inquiries, examinations, investigations and other proceedings by government agencies and self-regulatory organizations regarding our business, which may result in judgments, settlements, fines, penalties, injunctions or other relief. We believe, based on information currently available, that the outcome of any such proceedings, individually or in the aggregate, will not likely have a material adverse effect on our consolidated financial position. However, in light of the inherent uncertainties of such proceedings, an adverse outcome of such proceedings may have a material impact on the results of operations for any particular period.

*Id.* at 27.

239. These representations were made in the "Legal Matters" section (Note 16, Contingencies—Legal Matters, of the Company's Unaudited Condensed Consolidated Financial Statements) and in the "Legal Proceedings" section (Part II, Item 1), respectively, of the 1Q15 Form 10-Q. Because the types of contingencies that would normally be addressed in Note 16

would encompass pending or threatened litigation, as well as claims or assessments of all kinds—including those arising from, or associated with, the SEC Investigation—ITG had an affirmative obligation to disclose the SEC Investigation and material facts concerning its potential exposure (as opposed to making cryptic references regarding "ongoing reviews" and "inherent uncertainties"). As a result of the SEC Investigation into Project Omega, it was probable that ITG and some of its representatives would be sanctioned by the SEC or was, or could or would be, subject to other proceedings associated with the SEC's Investigation or investigations by other authorities and shareholders. There also was a reasonable probability that ITG would be forced to admit wrongdoing and/or otherwise incur material financial penalties or reputational harm as a result of impending fines and penalties related to the SEC Investigation or other proceedings concerning Project Omega. Defendants had a duty to disclose this information, but did not, and instead actively concealed the investigation and the existence of Project Omega in order to artificially inflate the price of ITG stock.

240. Throughout the first half of 2015, ITG continued to make false and misleading statements in its press releases. For example, in its January 29, 2015 press release, in the section labeled "About ITG," ITG described itself as follows:

> ITG is an ***independent*** execution and research broker that partners with global portfolio managers and traders to provide unique data-driven insights throughout the investment process. From investment decision through settlement, ITG helps clients understand market trends, ***improve performance, mitigate risk*** and navigate increasingly complex markets.

Press Release, ITG, ITG Reports Fourth Quarter 2014 Results (Jan. 29, 2015).

241. Viewed in the context of Defendants' numerous other Class Period statements, *see supra, e.g.*, ¶¶ 90, 101, 106, 109, 164, this statement was materially false or misleading. It created the misimpression that ITG was and always had been an independent, research and execution

broker, seeking to improve its clients' performance, even though during Project Omega the Company had exploited confidential client information while trading for its own account against its customers.

## VII. THE SEC INVESTIGATION AND SEC ORDER ARE PUBLICLY DISCLOSED AND THE TRUTH IS REVEALED

242. From early 2010, when ITG's Board and senior managers approved Project Omega, until Summer 2015, Defendants did not disclose a single fact about Project Omega, the regulatory risk associated with Project Omega, or the ongoing SEC Investigation. On July 29, 2015, that all changed. After the market closed, ITG announced in a press release that:

a. it would experience a net loss of $10.2 million in the second quarter of 2015;

b. it was holding millions in reserve to settle with the SEC for the conduct underlying Project Omega; and

c. Mr. O'Hara, a Board member, was resigning.

*See* ITG Settlement Press Release.

243. For the first time ever, ITG acknowledged the SEC Investigation and disclosed conduct underlying Project Omega. The Company explained that it would "pay an aggregate amount of $20.3 million representing a civil penalty of $18 million, disgorgement of approximately $2.1 million in trading revenues and prejudgment interest of approximately $250,000. As a result ITG reserved $20.3 million for a probable settlement with the SEC and incurred $2.3 million in legal and other related costs." *Id.*

244. The release further explained that Mr. O'Hara had resigned from the Board on July 23, 2015. *Id.* Mr. O'Hara's resignation letter, also released the same day, stated, among other things, that "over the last several months, continuous fundamental, strategic and vital differences of opinion and direction have transpired at the Board level and, in particular, between me and the

Board's leadership," and that he no longer wished to be the "'loyal opposition.'" O'Hara Resignation Letter.

245. The closing price of ITG's stock dropped in a statistically significant manner from $24.00 per share on July 29, 2015, to $18.36 per share on July 30, 2015, a decline of $5.64 per share or approximately 24% on heavier than usual volume.

246. Analysts reacted to the July 29 press release: "We'll expect to learn more about ITG's infractions both (1) on their 2Q15 earnings conference call next week and (2) when the official agreement is released and the SEC publishes a statement. However, we were surprised ITG engaged in 'proprietary trading' given its ***'agency broker' reputation***." Sandler O'Neill + Partners, L.P., Company Note at 2 (July 30, 2015).

247. The *Wall Street Journal* reported that, during a client call on July 30, 2015, Gasser "apologized for not being more transparent about [Project Omega]." Sarah Krouse, *Global Finance: Brokerage's Orders Fall After SEC Disclosure*, Wall St. J., July 31, 2015. According to a transcript reviewed by the *Wall Street Journal*, Gasser said that he recognized that ITG's "'client disclosures about the pilot were insufficient'" and that he was "'disappointed by, and [took] full accountability for, these historical mistakes.'" *Id.*

248. In a press release dated August 3, 2015, the Company reported its disappointing earnings results for the quarter ended June 30, 2015. *See* Press Release, ITG, ITG Reports Second Quarter 2015 Results (Aug. 3, 2015) ("Second Quarter 2015 Results Press Release"). The results included the previously mentioned reserve and confirmed a net loss of $10.2, or $0.30 per diluted share, compared to the second quarter of 2014. *Id.* Commenting on the SEC settlement, the Company again explained that:

> As previously announced, the probable SEC settlement relates to customer disclosures, Form ATS regulatory filings and customer information controls

> relating to a proprietary trading pilot operated by ITG subsidiary AlterNet for 16 months in 2010 through mid-2011, which included (a) crossing against sell-side clients in POSIT and (b) violations of ITG policy and procedures by a former employee. These violations principally involved information breaches for a period of several months in 2010 regarding sell-side parent orders flowing into ITG's algorithms and executions by all customers in non-POSIT markets that were not otherwise available to ITG clients.

*Id.*

249. In a separate press release dated August 3, 2015, the Company announced that it had replaced Gasser, adding that "the potential settlement remains in process" and that the Board had "'concluded its independent review of the SEC matter at the end of last week.'" Press Release, ITG, ITG Announces Management Changes (Aug. 3, 2015) ("Management Changes Press Release"). A *Wall Street Journal* piece dated that same day reported that Goebels had left ITG "in a move related to the dark pool case." Bradley Hope & Sarah Krouse, *ITG Ousts CEO Gasser After Probe*, Aug. 3, 2015 ("*ITG Ousts CEO* Article").

250. In an August 3, 2015 note reacting to the latest ITG-related news, a J.P. Morgan analyst succinctly explained precisely why ITG's conduct was so damaging to investors:

> ITG has announced a possible settlement with the SEC regarding both 1) disclosure deficiencies relating to a proprietary trading program and 2) a former senior employee's use of protected information to execute proprietary trades, a use of information that was/is against company policy.
>
> ITG has both apologized for the disclosure breach and has tightened controls meaningfully limiting access by ITG employees to such information. ITG no longer participates in proprietary trading in the US, having shut down the experiment in 2011.
>
> ***What makes the settlement with the SEC potentially harmful is that ITG has developed a brand around superior trade execution based on conflict-free agency-only trading. Thus, ITG's willingness to experiment with proprietary trading without disclosing it to clients damages that reputation***. While ITG indicated the senior employee who was operating the proprietary platform and used customer trading information had separated from the company, that separation doesn't appear to have happened immediately, which warrants further questions.

> . . . .
>
> **Pilot Program Part of AlterNet.**
>
> The possible settlement with the SEC pertains to the crossing of US sell-side orderflow in Posit with an ITG proprietary operation without informing customers. ***ITG denied participating in proprietary trading in reaction to customer inquiries to the SEC's 2011 settlement with Pipeline for similar activities***. ITG's response to clients came just months after it appears to have shut down proprietary trading in the US. In addition, we understand that the head of ITG proprietary trading was able to access aggregate trading information for a few months before being caught, stripped of access, and later leaving the firm.
>
> . . . .
>
> **Agency Trading, Especially at ITG Is Built on Trust.**
>
> ***What could make the announcement by ITG particularly damaging is that ITG's trading business, as a primarily an agency-only broker, is buil[t] on trust. Some trading customers will look at the disclosures thus far by ITG and will decide that they don't want to do business with ITG anymore***. Other [trading customers] will wait for the details from the SEC settlement. Given that agency trading is about liquidity, especially in Posit, if enough customers walk away from doing business with ITG, liquidity could be impaired, with some systems becoming potentially less valuable to end customers.

J.P.Morgan Note, Investment Technology Group (Aug. 3, 2015) (J.P.Morgan Note").

251. As a result of the disclosures regarding the Company's termination of key personnel, the possible settlement with the SEC, and its disappointing earnings announcements tied to that settlement, the closing price of ITG's stock dropped in a statistically significant manner from $20.35 per share on July 31, 2015, to $18.48 per share on August 3, 2015, a decline of $0.84 per share or more than 4% on heavier than usual volume.

252. Before market open on August 4, 2015, ITG held its earnings call for the second quarter of 2015. During the call, Vigliotti reported that, "[i]n the three trading days since we announced the potential SEC settlement, . . . in the U.S. our volume market share was down about 25%." Transcript of Q2 2015 Earnings Call, Bloomberg at 5 (Aug. 8, 2014) ("Q2 2015 Earnings

Call"). Further, Vigliotti stated that, "[w]hile we recorded the reserve for the potential settlement in the second quarter, there was and still is a fair amount of work to do in the third quarter to reach a final settlement order. As a result, we expect a significant amount of legal and other fees related to this matter in the third quarter." *Id.* When asked by Christopher J. Allen, an analyst with Evercore ISI, to "walk [us] through a timeline of events? I mean, we know these events occurred in 2010, 2011, but when was the Board made aware? When was the SEC made aware?," Maureen O'Hara, Chairperson of the Board, expressly declined to do so on the ground that ITG had "not yet settled with the SEC." *Id.* at 8.

253. As a result of the foregoing disclosures made on the August 4, 2015 earnings call, the closing price of ITG's stock dropped in a statistically significant manner from $19.51 per share on August 3, 2015, to $18.48 per share on August 4, 2015, a decline of $1.03 per share or approximately 5.3% on heavier than usual volume.

254. On August 6, 2015, the Company filed a Form 8-K, stating that ITG had "terminated the employment of Robert Gasser as President and Chief Executive Officer of ITG." ITG, Current Report (Form 8-K), at 2 (Aug. 6, 2015). That same evening, the *Wall Street Journal* ran an article highlighting the ITG scandal. The article stated that Project Omega was an effort to address ITG's declining revenues in 2010. *See Investigation Into Pilot Program* Article. The authors noted that, despite its discontinuation, Project Omega was now an "albatross" around the Company's proverbial neck and that it had led to the SEC settlement, clients defecting, and plummeting stock prices for ITG. *Id.* The authors further stated that ITG had always "marketed itself as a technology firm without conflicts of interest." *Id.*

255. That same article also confirmed that it was Gasser who chose Mr. Mittal as the head of Project Omega and that, when he learned about the inappropriate conduct involved, he hid

it from the Board. *Id.* The lawyer for Gasser claimed the opposite: that he had informed the Board. *Id.*

256. On August 12, 2015, the SEC issued a press release announcing the settlement with ITG and released the SEC Order. As alleged herein, the SEC Order revealed the Project Omega fraud in great detail and established that ITG's conduct was "willful." The SEC's press release stated that, among other things, it had charged ITG with

a. "engaging in a course of business that operated as a fraud";

b. "failing to make disclosures about Project Omega and its proprietary trading activities"; and

c. "failing to amend its Form ATS filings in light of Project Omega's trading activities in POSIT, failing to establish adequate safeguards, and failing to implement adequate oversight procedures to protect the confidential trading information of POSIT subscribers."

SEC Press Release.

257. The SEC further announced that "ITG agreed to admit wrongdoing and pay disgorgement of $2,081,034 (the total proprietary revenues generated by Project Omega) plus prejudgment interest of $256,532 and a penalty of $18 million that is the SEC's largest to date against an alternative trading system." *Id.* According to the SEC, "'ITG created a secret trading desk and misused highly confidential customer order and trading information for its own benefit . . . . In doing so, ITG abused the trust of its customers and engaged in conduct justifying the significant sanctions imposed in this case.'" *Id.*

258. In conjunction with the release of the SEC Order, ITG issued a press release announcing that it had "reached a final settlement with the [SEC] in connection with a proprietary trading pilot program that operated for 16 months in 2010 through mid-2011." Press Release, ITG, ITG Completes Settlement with SEC (Aug. 12, 2015).

259. The revelations about Project Omega and ITG's fraud were material to shareholders because of the deep impact they had on the Company's core business. For example, a J.P. Morgan analyst noted that, "if enough customers walk away from doing business with ITG, liquidity could be impaired, with some systems becoming potentially less valuable to end customers." J.P.Morgan Note. A *Reuters* article highlighted just how meaningful the revelations were and how seriously ITG's trading customers took them: during the week and a half following ITG's July revelation regarding the SEC Investigation, the volume of trading in POSIT dropped by almost half, 44.9%. John McCrank, *ITG dark pool volume fell by nearly half following record fine*, Reuters, Aug. 24, 2015.

260. In a bulletin dated August 12, 2015, Evercore ISI analysts stated the details regarding ITG's access to client data "in and of themselves will likely further damage client relations for the company." Evercore ISI Bulletin, Investment Technology Group (Aug. 12, 2015). The analysts also emphasized that, not only was Project Omega itself fraudulent, but the Board did not act appropriately once it found out about the wrongdoing: "ITG's Board of Directors in 2010 approved an 'experiment' that went directly against ITG's brand, which was an incredible (not in a good way) decision to make. . . . In addition to this incredibly bad decision, we believe the Board should have acted much quicker to remove the former CEO once the Board was aware of the SEC investigation." *Id.*

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

261. Throughout the Class Period, Defendants knew between December 2010 and July 2011 that ITG engaged in proprietary trading using confidential customer order and trade information in direct contradiction of Defendants' public statements and ITG's own policies. Defendants' scienter is supported by: (1) Defendants' own admissions; (2) the termination of Gasser and Goebels; (3) the fact that POSIT was ITG's core operation; (4) the fact that Project

Omega violated ITG's own policies and procedures; (5) Gasser's and Goebels' insider sales during the Class Period; (6) Defendants' SOX certifications; (7) Defendants' pattern of non-disclosure; and (8) Defendants' violations of SEC regulations and Generally Accepted Accounting Principles ("GAAP"). Finally, the cumulative knowledge of Company personnel acting within the scope of their employment creates a strong inference of scienter that is imputed to the Company.

### A. ITG Knew in December 2010 that Project Omega Had Improperly Accessed Confidential Client Order Information

262. In the SEC Order, Defendants made the following admissions to the SEC about the Company's knowledge, as of December 2010, about Project Omega and ITG's undisclosed proprietary trading using confidential customer order and trade information:

a. ITG senior management recommended, and ITG's Board approved, a proprietary trading desk that became known as Project Omega, SEC Order ¶ 22;[10]

b. In December 2010, ITG's senior management and compliance department learned that Project Omega was improperly accessing subscriber order information, *id.* ¶¶ 60-64;

c. In the late fall of 2010, Gasser directed two other ITG executives to speak with Mr. Mittal to gather information concerning the operation of Project Omega for Gasser's information and to assist him in making a presentation to ITG's Board in February 2011, *id.* ¶ 60;

d. In early to mid-December 2010, ITG's compliance department and senior management learned—based on Mr. Mittal's admissions—that Project Omega was trading based on a live feed of information regarding sell-side customers' orders that had been sent to ITG's algorithms, *id.* ¶ 61;

e. Shortly thereafter, the compliance department and ITG's senior management learned additional details regarding Project Omega's use of the Facilitation Strategy and Heatmap Strategy, *id.* ¶ 61;

f. Between approximately December 9 and 20, 2010, while Project Omega's trading activities were suspended, ITG's compliance department conducted a review of Project Omega's activities in order to make a report to ITG's senior management, *id.* ¶ 62; and

---

[10] Gasser was on the Board at this time. *See supra* ¶ 75.

g. On approximately December 20, 2010, a meeting among ITG's senior management and compliance department was held to address Project Omega, during which Gasser reprimanded Mr. Mittal for violating ITG policy and placing the firm at risk, *id.* ¶ 64, ***yet, the very next day***, Gasser and other members of the ITG senior management team allowed Project Omega, with some modifications, to resume live-trading, *id.* ¶¶ 64-65.

263. Gasser subsequently made a presentation about Project Omega to the ITG Board in February 2011. *Id.* ¶ 60.

264. In addition, in a statement made in August 2015, Gasser's attorney said that Gasser had fully informed the Board about the trading pilot in 2010 and that the Board was "'aware and approved of the planning and approved of the planning and execution of every aspect of Project Omega in 2010.'" *Investigation Into Pilot Program* Article.

265. Thus, at all times during the Class Period, Defendants knew about Project Omega, but fraudulently concealed it from the market.

266. Once Defendants learned about Project Omega in December 2010, their decision to allow it to resume live-trading without additional, appropriate structural information firewalls, represented an extreme departure from the standards of ordinary care and amounted to reckless behavior. Given their knowledge about Project Omega (and the improprieties surrounding it), Defendants had an on-going duty to monitor Project Omega once it resumed live-trading to ensure known issues did not continue. Defendants' failure to so monitor Project Omega after permitting it to resume live-trading, at the very minimum, was reckless and supports a strong inference of scienter.[11]

---

[11] During the Class Period, Defendants made a number of specific statements regarding, *inter alia*, the Company's "independence" and the fact that the security of data, including sensitive client information and trade data, was of "paramount importance." Those specific pronouncements provide strong circumstantial evidence that Defendants were receiving some form of specific information about those matters. Alternatively, if Defendants were not knowledgeable about such matters before they spoke about them, such recklessness would readily satisfy the scienter

267. It is beyond dispute that scienter based on recklessness may be established where a defendant failed to review or check information that it had a duty to monitor. Here, a duty to monitor was imposed by law. In that regard, 17 CFR § 242.301(b)(10) requires all ATS's to make and keep written safeguards and written procedures to protect subscribers' confidential trading information and further to adopt and implement adequate oversight procedures to ensure that established safeguards and procedures are being followed. The SEC Order concluded that the Company had not fulfilled its obligations in this regard, concluding that the provisions of 17 CFR § 242.301(b)(10) had been "willfully violated." SEC Order ¶ 80(b).

**B. ITG's Termination of Gasser and Goebels Is Circumstantial Evidence of Their Knowledge**

268. Gasser's and Goebel's knowledge of and complicity in the fraudulent scheme described herein is further evidenced by their termination from ITG following an internal review commissioned by the Company's Board as a result of the SEC Investigation.

269. Specifically, on August 3, 2015, three days after ITG announced that it had set aside $20.3 million to settle the SEC Investigation, ITG announced that it had replaced Gasser.

270. In an article published that same day, the *Wall Street Journal* reported that Gasser "was ousted . . . after an investigation by an outside law firm found that he hadn't disclosed to the board some details of alleged improprieties related to the firm's 'dark pool,' according to people familiar with the matter." *ITG Ousts CEO* Article.

271. "Among the areas of concern identified by the review," the article continued, "was that Mr. Gasser didn't inform the board that Hitesh Mittal, ITG's former head of algorithmic trading, had accessed private client-trading information during [Project Omega]. The information,

---

requirement. Indeed, if a defendant speaks and does not have actual knowledge about the subject at hand, it would be reckless to reassure the public about these matters at all.

which wasn't available to others, was then allegedly used during the program to trade against clients' order flow, according to ITG." *Id.* Indeed, Mr. Mittal, who oversaw Project Omega, had access and reported to Gasser.

272. The *Wall Street Journal* further reported that "ITG's general counsel Mats Goebels has also left the firm ***in a move related to the dark pool case***." *Id.*

### C. The Individual Defendants Are Presumed to Know About ITG's "Core Business"—the POSIT Securities Exchange

273. Senior corporate executives are presumed to have had knowledge of all material facts regarding a company's core operations. *See In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12 Civ. 8557(CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) ("To fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business."). Here, the Individual Defendants had access to all material information regarding ITG's core operation, its POSIT securities exchange.

274. As ITG's longtime CEO, CFO, and General Counsel,[12] the Individuals Defendants were responsible for, and remained well informed of, critical business issues concerning POSIT. In that regard, ITG has expressly admitted that the Company's "core business has historically been focused on providing brokerage services, including POSIT access" to ITG's customers. SEC Order ¶ 14.

### D. Project Omega Violated ITG's Own Policies and Procedures

275. It is well-established that violations of a company's own internal rules and procedures are probative of scienter.

---

[12] As General Counsel, Goebels was responsible for all Company legal and regulatory matters.

276. Here, a memorandum dated April 1, 2010 from ITG's compliance department to Mr. Mittal stated, among other things, that: "'OMEGA will not have access to information regarding POSIT order flow.'" SEC Order ¶ 34.

277. Similarly, a memorandum dated June 7, 2010, from ITG's compliance department to Mr. Mittal stated, among other things, that ITG "'must ensure that OMEGA will not have access to information regarding ITG (includes POSIT) and/or AlterNet buy-side or sell-side customer order flow.'" *Id.* The June 7, 2010 memorandum also provided that Project Omega could "'not coordinate trading strategies or share order flow and/or execution information'" with employees not working on Project Omega. *Id.*

278. At this time, Goebels was the Company's General Counsel and had responsibility for regulatory and compliance matters. In that capacity, Goebels would have known of or, at the very minimum, had access to information evidencing these directives and the fact that they were not followed.

279. The policies set forth in the above-referenced memoranda were flouted by those working on Project Omega. In fact, the SEC expressly found "willful" violations of Regulation 310(b)(2), which requires a dark pool to "adopt and implement adequate oversight procedures to ensure that the safeguards and procedures for protecting subscribers' confidential trading information are followed." *Id.* ¶ 80(b).

280. By way of example, when Mr. Mittal "began managing Project Omega, he was not walled off from any confidential trading information." *Id.* ¶ 35. Nor did Mr. Mittal "relinquish any of his existing management responsibilities with respect to POSIT, ITG algorithms or smart order routers, and he continued to have access to confidential trading information of POSIT subscribers in his role as Head of Liquidity Management." *Id.*

281. Further, "[a]fter Project Omega began operating, the two primary software developers working on Project Omega were given workspaces in an 'Omega office,' which was on the same floor as their former workspaces where ITG's software development team worked (and was on a different floor from the ITG trading floor)." *Id.* ¶ 36. Omega's Series 24 supervisor "was also provided with a workspace in the 'Omega' office, but he retained his former cubicle in the customer-facing algorithmic trading group and intermittently worked from both workspaces." *Id.*

282. "Even though Project Omega had a dedicated office, certain members of the Project Omega team continued to have access to the files they had previously worked on in their pre-Omega roles at ITG." *Id.* ¶ 37. For example, Mr. Mittal "was not even assigned a workspace in the 'Omega office,' but rather continued to use his former office." *Id.* In addition, Omega's Series 24 supervisor "continued to spend 75 to 80 percent of his time working in his prior role in the customer-facing algorithmic trading group designing and improving ITG's algorithms and fielding requests and questions sent to ITG by customers regarding the algorithms." *Id.* At times, Omega's Series 24 supervisor "remotely accessed electronic files relating to Project Omega from his cubicle in the customer-facing algorithmic trading area. Similarly, while Project Omega was operating, there were times when one of the Omega software developers was also directed to work on projects for ITG's customer-facing algorithmic trading group. *Id.*

283. Notwithstanding the known improprieties within Project Omega that led to its temporary suspension, the Company never made any changes to its organizational structure. *Id.* ¶ 66. Instead, Project Omega was allowed to resume trading in late 2010. In that regard, even though "improper direct feeds" were removed, "Project Omega continued to have improper access to information identifying POSIT subscribers." *Id.* ¶ 67. Project Omega team members

"continued to coordinate with ITG's POSIT development team to identify sell-side subscribers for Omega to trade with in POSIT and to ensure that such subscribers were configured to trade 'aggressively' in POSIT." *Id*. These continuing violations of internal rules and procedures are further indicia of scienter.

### E. Gasser's and Goebels' Insider Sales During the Class Period Further Support a Strong Inference of Their Scienter

284. Gasser's and Goebels' insider sales during the Class Period reveal their motive to commit fraud.

#### 1. During the Class Period, Gasser and Goebels Together Reaped More than $2.9 Million in Insider Trading Proceeds[13]

285. After not selling any Company stock for more than a two-and-a-half year period, Gasser sold 20,000 shares of ITG stock in June 2013—the approximate mid-point of the Class Period. Gasser went on to sell an additional 44,000 shares between September 2013 and December 2013. This was the same period (the fall of 2013) in which the Defendants were put on notice of the SEC Investigation. *See supra* ¶ 64.

286. Gasser then sold another 42,000 shares of ITG stock ***before the Class Period ended and the Company's stock price declined in late July and early August of 2015***.

---

[13] To evaluate the Individual Defendants' selling activity, Lead Plaintiff used publicly-available trading data that is required to be reported to the SEC on Form 4s.

287. In total, Gasser sold 106,000 ITG shares ***for proceeds of $1,931,516*** during the Class Period, all while the price of ITG's stock was artificially inflated. Gasser's Class Period sales and proceeds are reflected in the following table.

| DATE | NO. SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 13-Mar-2015 | 3,000 | 25.05 | $75,150 |
| 13-Mar-2015 | 6,300 | 27.59 | $173,817 |
| 13-Mar-2015 | 700 | 26.92 | $18,844 |
| 17-Feb-2015 | 9,100 | 22.71 | $206,661 |
| 06-Feb-2015 | 900 | 22.51 | $20,259 |
| 22-Dec-2014 | 2,000 | 20.58 | $41,160 |
| 17-Dec-2014 | 5,000 | 19.93 | $99,650 |
| 20-Aug-2014 | 7,500 | 17.57 | $131,775 |
| 19-Aug-2014 | 7,500 | 17.38 | $130,350 |
| 10-Dec-2013 | 4,000 | 20.15 | $80,600 |
| 20-Sep-2013 | 10,000 | 16.04 | $160,400 |
| 05-Sep-2013 | 17,500 | 17.28 | $302,400 |
| 04-Sep-2013 | 2,500 | 17.10 | $42,750 |
| 03-Sep-2013 | 10,000 | 17.00 | $170,000 |
| 07-Jun-2013 | 10,000 | 14.09 | $140,900 |
| 03-Jun-2013 | 10,000 | 13.68 | $136,800 |
| **Total:** | **106,000** | **Total:** | **$1,931,516** |

288. Gasser's trades during the Class Period are suspicious not only in their timing but also their volume.

289. To evaluate volume, Gasser's sales of ITG stock during the Class Period (1,617 days) were compared to his sales of ITG stock during the period immediately preceding the Class Period (1,617 days), beginning September 24, 2006 and ending February 27, 2011 (the "Control Period").[14] Gasser sold 19,000 shares of ITG stock during the Control Period, compared with sales

[14] Gasser's employment with ITG began on October 4, 2006, which is only 10 days after the start of the Control Period.

of 106,000 shares of ITG stock during the Class Period. As reflected in the following table, this comparison revealed a ***550% increase*** in Gasser's selling volume during the Class Period.

| **Control Period** | |
|---|---|
| **Date** | **No. Shares** |
| 16-Dec-2010 | 4,000 |
| 15-Dec-2010 | 3,000 |
| 14-Dec-2010 | 1,000 |
| 27-Aug-2010 | 1,800 |
| 25-Aug-2010 | 3,000 |
| 24-Aug-2010 | 200 |
| 12-May-2010 | 6,000 |
| **Total:** | **19,000** |

| **Class Period** | |
|---|---|
| **Date** | **No. Shares** |
| 13-Mar-2015 | 3,000 |
| 13-Mar-2015 | 6,300 |
| 13-Mar-2015 | 700 |
| 17-Feb-2015 | 9,100 |
| 06-Feb-2015 | 900 |
| 22-Dec-2014 | 2,000 |
| 17-Dec-2014 | 5,000 |
| 20-Aug-2014 | 7,500 |
| 19-Aug-2014 | 7,500 |
| 10-Dec-2013 | 4,000 |
| 20-Sep-2013 | 10,000 |
| 05-Sep-2013 | 17,500 |
| 04-Sep-2013 | 2,500 |
| 03-Sep-2013 | 10,000 |
| 07-Jun-2013 | 10,000 |
| 03-Jun-2013 | 10,000 |
| **Total:** | **106,000** |

290. Similarly, Goebels' sales during the Class Period were suspicious both in their timing and their volume.

291. Goebels sold 43,361 shares of ITG stock during the first half of the Class Period. Goebels then sold 21,800 shares of ITG stock between the time the Company first learned of the SEC Investigation and the occurrence of the price declines near or at the end of the Class Period.

292. In total, Goebels sold 65,161 shares of ITG stock for proceeds of $971,910. Goebels' Class Period sales and proceeds are reflected in the following table.

| DATE | NO. SHARES | PRICE | PROCEEDS |
|---|---|---|---|
| 16-Mar-2015 | 6,800 | 28.39 | $193,052 |
| 25-Nov-2014 | 3,600 | 20.01 | $72,036 |
| 21-Nov-2014 | 300 | 20.10 | $6,030 |
| 20-Nov-2014 | 600 | 20.00 | $12,000 |
| 18-Nov-2014 | 500 | 20.00 | $10,000 |
| 17-Nov-2014 | 5,000 | 19.56 | $97,800 |
| 12-Sep-2014 | 5,000 | 17.17 | $85,850 |
| 11-Mar-2013 | 4,900 | 12.27 | $60,123 |
| 07-Mar-2013 | 7,568 | 12.39 | $93,768 |
| 06-Mar-2013 | 3,002 | 12.36 | $37,105 |
| 06-Sep-2012 | 1,675 | 8.70 | $14,573 |
| 05-Sep-2012 | 10,716 | 8.49 | $90,979 |
| 29-Aug-2012 | 4,984 | 8.50 | $42,364 |
| 28-Aug-2012 | 516 | 8.50 | $4,386 |
| 27-Aug-2012 | 3,500 | 8.51 | $29,785 |
| 09-Mar-2011 | 1,700 | 19.00 | $32,300 |
| 07-Mar-2011 | 4,800 | 18.70 | $89,760 |
| **Total:** | **65,161** | **Total:** | **$971,910** |

293. Goebels' sales volume during the Control and Class Periods also was evaluated. Goebels sold 51,995 shares of ITG stock during the Control Period, compared with sales of 65,161

shares of ITG stock during the Class Period. As reflected in the following table, this comparison revealed a 25% increase in Goebels' selling volume during the Class Period.

| CONTROL PERIOD | |
|---|---|
| **Date** | **No. Shares** |
| 09-Aug-2010 | 3,979 |
| 06-Aug-2010 | 5,021 |
| 26-Aug-2009 | 6,237 |
| 04-May-2009 | 8,258 |
| 13-Aug-2008 | 4,500 |
| 28-Nov-2007 | 4,000 |
| 27-Nov-2007 | 4,000 |
| 13-Feb-2007 | 6,000 |
| 11-Dec-2006 | 10,000 |
| **Total:** | **51,995** |

| CLASS PERIOD | |
|---|---|
| **Date** | **No. Shares** |
| 16-Mar-2015 | 6,800 |
| 25-Nov-2014 | 3,600 |
| 21-Nov-2014 | 300 |
| 20-Nov-2014 | 600 |
| 18-Nov-2014 | 500 |
| 17-Nov-2014 | 5,000 |
| 12-Sep-2014 | 5,000 |
| 11-Mar-2013 | 4,900 |
| 07-Mar-2013 | 7,568 |
| 06-Mar-2013 | 3,002 |
| 06-Sep-2012 | 1,675 |
| 05-Sep-2012 | 10,716 |
| 29-Aug-2012 | 4,984 |
| 28-Aug-2012 | 516 |
| 27-Aug-2012 | 3,500 |
| 09-Mar-2011 | 1,700 |
| 07-Mar-2011 | 4,800 |
| **Total:** | **65,161** |

### 2. Trades During the Class Period Made Pursuant to 10b5-1 Plans Are Not Insulated from Scrutiny

294. In 2000, the SEC adopted Rule 10b5-1, 17 C.F.R. § 240.10b5-1, which provides that a person will be deemed to have traded "on the basis of" material, nonpublic information if the person engaging in the transaction was "aware of" that information at the time of the trade.

295. The SEC also created an affirmative defense to insider trading claims for trades made pursuant to a binding agreement or plan ("10b5-1 plans"). *Id.* Pursuant to SEC Rule 10b5-1(c), a 10b5-1 plan is a potential (but not an absolute) defense to accusations of insider

trading only if it is entered into by an insider "before becoming aware" of inside information and was established "in good faith and not as part of a plan or scheme to evade the prohibitions" against insider trading.

296. Because of this, insiders are advised to "design a trading plan with the intention that it will not be modified or amended frequently, since changes to the plan will raise issues as to a person's good faith." Thomas J. Griffith, *Corporate Counsel's Guide to Insider Trading and Reporting* § 12:26 (2015). Conversely, the adoption and/or modification of these plans while in possession of material, non-public information is highly suspicious and supportive of scienter.

297. While Gasser and Goebels only made a limited number of stock sales pursuant to a 10b5-1 plan,[15] the circumstances under which those plans were created belie any inference that they were established in good faith. Gasser's 10b5-1 plan was not established until he had been employed by the Company for more than 7.5 years. Significantly, the plan was created on May 1, 2014, several months after the SEC Investigation had commenced and after Gasser already had made approximately 81% of his Class Period sales.[16]

298. Goebels joined ITG in 1998, *see supra* ¶ 77, yet, he did not establish a 10b5-1 plan until September 18, 2014. This was months after the SEC Investigation had commenced and after Goebels already had made approximately 74% of his Class Period sales.

299. Gasser's and Goebels' sales under their respective plans also were irregular in terms of the number of shares sold and they occurred at irregular intervals. Sales pursuant to a trading

---

15 Of Gasser's 106,000 shares sold during the Class Period, only 20,000 shares, or 18%, were sold pursuant to a 10b5-1 plan. Of Goebels' 65,161 shares sold during the Class Period, only 10,000 shares, or 15%, were sold pursuant to a 10b5-1 plan.

16 Courts recognize that trading plans "'are not a cognizable defense to scienter allegations on a motion to dismiss'" when they were adopted or amended during a class period. *See, e.g.*, *George v. China Auto. Sys., Inc.*, No. 11 Civ. 7533(KBF), 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012).

plan should occur with a prescribed, regular pattern of stock sales, such as 500 shares a month on the 10th day of the month. This was not the case here. As reflected in the charts below, these defendants' trades under their respective plans were irregular and inherently suspicious.

| **GASSER PLAN SALES** | | | |
|---|---|---|---|
| **Date** | **No. Shares** | **Price** | **Proceeds** |
| 13-Mar-2015 | 3,000 | 25.05 | $75,150 |
| 13-Mar-2015 | 6,300 | 27.59 | $173,817 |
| 13-Mar-2015 | 700 | 26.92 | $18,844 |
| 17-Feb-2015 | 9,100 | 22.71 | $206,661 |
| 06-Feb-2015 | 900 | 22.51 | $20,259 |
| **Total:** | **20,000** | **Total:** | **$494,731.00** |

| **GOEBELS PLAN SALES** | | | |
|---|---|---|---|
| **Date** | **No. Shares** | **Price** | **Proceeds** |
| 25-Nov-2014 | 3,600 | 20.01 | $72,036 |
| 21-Nov-2014 | 300 | 20.10 | $6,030 |
| 20-Nov-2014 | 600 | 20.00 | $12,000 |
| 18-Nov-2014 | 500 | 20.00 | $10,000 |
| 17-Nov-2014 | 5,000 | 19.56 | $97,800 |
| **Total:** | **10,000** | **Total:** | **$197,866.00** |

300. 10b5-1 plans have been heavily scrutinized by the SEC in light of an eye-opening *Wall Street Journal* investigation that found that insiders who were trading pursuant to such plans still were trading at opportune times and reaping better-than-expected results. *See* Susan Pulliam & Rob Barry, *Executives' Good Luck in Trading Own Stock*, Wall St. J., Nov. 27, 2012. According to the article, executives still can time their trades to avoid losses and increase earnings because trading plans are not public and can be canceled or amended at any time without disclosure.

301. A subsequent *Wall Street Journal* article notes that, "[i]n building this 'safe harbor' for executives, the SEC has unwittingly given them a defense for unethical behavior." Jean

Eaglesham & Rob Barry, *Trading Plans Under Fire*, Wall St. J., Dec. 13, 2012. According to one source cited in the article, "'[c]ompanies are using these plans as a tool . . . that allows executives to do insider trading.'" *Id.* (ellipsis in original).

302. According to a report issued by the law firm Wilson Sonsini Goodrich & Rosati in March 2013, "[t]he floodlights now aimed at such [trading] plans are the result of recent *Wall Street Journal* articles showing that corporate insiders, even those executing trades pursuant to Rule 10b5-1 plans, have generated significant profits—or avoided significant losses—by trading company stock in the days just before their companies issued market-moving news." Steve Bochner & Nicki Locker, *WSGR Insight & Analysis* (Mar. 2013). The report suggests that clients adopt "[s]imple plans with a prescribed, regular pattern of stock sales (e.g., 1,000 shares a month on the 15th day of the month)." *Id.*

303. Further, although Gasser and Goebels filed reports on Form 4 disclosing their trades and indicating that certain of them were made pursuant to 10b5-1 plans, no further information is available on the plans. Without discovery, investors cannot understand the details pertaining to the plans' creation and amendments, whether any trades pursuant to the plans were canceled, or what criteria, such as share price, may have triggered sales pursuant to the plans.

**F. Defendants' SOX Certifications Are Probative of Scienter**

304. The certification requirements set forth in the Sarbanes-Oxley Act of 2002 ("SOX") were designed to prevent senior executives from adopting a "head in the sand" defense to actions for securities fraud committed on their watch. The SEC has expressly warned corporate officers

that "a false certification potentially could be subject to . . . both Commission and private actions for violating Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5."[17]

305. As one commentator explained:

> The usual route for officers and directors facing 10b-5 liability is to plead lack of knowledge or specific intent by relying on failures in the PSLRA's proof of scienter requirement to avoid liability for having signed off on deficient reports. In an effort to counter such arguments, the SEC implemented rules pursuant to the certification provision of section 302, which specifically mandated that false certifications would expose the CEO and/or CFO to private causes of action under 10b-5.

Kourtney T. Cowart, *The Sarbanes-Oxley Act: How A Current Model in the Law of Unintended Consequences May Affect Securities Litigation*, 42 Duq. L. Rev. 293, 310-11 (2004).

306. During the Class Period, ITG's Forms 10-Q and 10-K referenced herein, *see supra* Part VI, included false and misleading SOX certifications signed by Gasser and Vigliotti.

307. Gasser and Vigliotti represented, among other things, that they had reviewed the respective quarterly or annual report for which they supplied the certification, and, further, that:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

308. Gasser and Vigliotti also represented that they were "responsible for establishing and maintaining disclosure controls and procedures . . . and internal control over financial reporting" and had, among other things:

> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

---

[17] Sec. Act Release No. 8124, Pt. II. B.6, 2002 WL 31720215 (Aug. 29, 2002) (footnote call number omitted).

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

309. The SEC found "willful" violations of Rules 301(b)(2) and 301(b)(10) of Regulation ATS due to a failure to, *inter alia*, establish adequate safeguards and implement adequate oversight procedures to protect the confidential trading information of POSIT subscribers. The fact that substantial (and/or "willful") ATS-related violations occurred within ITG suggests a conscious awareness or a high degree of recklessness on the part of those Individual Defendants who executed SOX certifications.

### G. Defendants Exhibited a Pattern of Failing to Disclose Material Information About the Transactions and Their Consequences

310. Before and during the Class Period, Defendants exhibited a pattern of failing to disclose material information to the investing public. Notably, Defendants did not reveal the existence of Project Omega for five years, including the length of the Class Period until July 29, 2015. Further, Defendants failed to disclose the SEC Investigation from its inception in 2013 until the SEC imposed a significant fine against the Company for activity that Defendants knew about—but had been covering up—for at least four-and-a-half years. Additionally, throughout the SEC Investigation, Defendants knowingly and/or recklessly failed to disclose the material risks that the

Company and its shareholders faced by virtue of the misconduct addressed (and admitted to) in the SEC Order. Defendants' history of concealing material information, as detailed herein, further supports an inference of scienter.

### H. Defendants Violated Numerous SEC Regulations in Failing To Disclose Material Information About the SEC Investigation and Related Risks

311. SEC rules and regulations govern the preparation and content of disclosures made by public companies in SEC filings. In failing to disclose material information about the SEC Investigation and related risks, Defendants violated these rules and regulations. When, as here, these violations are coupled with other corresponding evidence of fraudulent intent, *see supra* ¶¶ 261-310, they are probative of scienter.

312. SEC Regulation S-K requires that every Form 10-Q and Form 10-K filing contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"), drafted in compliance with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. The MD&A requirements are intended to provide material historical and prospective textual disclosures that enable investors and others to assess the financial condition and results of operations of a company, with emphasis on that company's prospects for the future.

313. Item 303(a)(3) of Regulation S-K requires that the MD&A section of a company's periodic filings with the SEC (i.e., Forms 10-Q and 10-K), among other things:

> (i) Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.
>
> (ii) Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and

> revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

17 C.F.R. § 229.303(a)(3).

314. Regulation S-K also states that "[t]he discussion and analysis [section] shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."

315. Defendants violated the affirmative disclosure duties imposed by Item 303 by failing to disclose, among other things, the following material information in ITG's Forms 10-Q and 10-K filed during the Class Period: (i) that the SEC was conducting an investigation of the Company regarding Project Omega; and (ii) that ITG was exposed to the risk and/or uncertainty that the investigations were reasonably likely to result in a significant fine, financial penalty, or reputational harm, and/or have an adverse impact on the Company's revenues and operations. These concealed facts were required to be disclosed because they were, among other things: (i) "material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition"; (ii) "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations"; and/or (iii) "unusual or infrequent events or transactions or . . . significant economic changes that [were] materially affect[ing] the amount of reported income from continuing operations."[18]

---

[18] In addition, Item 503(c) of Regulation S-K, 17 C.F.R. § 229.503(c), requires a "discussion of the most significant factors that make [an] offering speculative or risky." This obligation is incorporated into periodic filings by Item 1A of the instructions to Forms 10-K and 10-Q. *See*

316. Item 103 of Regulation S-K, 17 C.F.R. § 229.103, governing the disclosure of legal proceedings, requires an issuer to disclose in its periodic SEC filings (i.e., Forms 10-Q and 10-K) "proceedings known to be contemplated by governmental authorities," as follows:

> Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceeding and the relief sought. Include similar information as to any such proceedings known to be contemplated by governmental authorities.

317. The SEC considers the disclosure of loss contingencies of such importance to an informed investment decision that it issued Article 10-01 of Regulation S-X, 17 C.F.R. § 210.10-01. Under that provision, disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

318. In direct contravention of the foregoing requirements, ITG failed to disclose the SEC Investigation and contemplated proceedings until July 29, 2015. In addition, none of the Class Period Forms 10-Q or 10-K disclosed the existence of Project Omega, the risks associated with the SEC Investigation of Project Omega and any potential harm resulting therefrom, including penalties, fines, injunctive prohibitions, or reputational injury. Indeed, the Company flatly (and,

---

SEC Form 10-K, Annual Report (Form 10-K), at Part I, Item 1A – Risk Factors ("Set forth, under the caption 'Risk Factors,' where appropriate, the risk factors described in Item 503(c) of Regulation S-K (§ 229.503(c) of this chapter) applicable to the registrant."), http://www.sec.gov/about/forms/form10-K.pdf. Here, given the admitted conduct, *see, e.g.*, ¶¶ 262-64, which made it extremely likely that the SEC could successfully prove a case pertaining to Project Omega, ITG's investors were entitled to know that the Company was exposed to significant legal liability, financial penalties, and related reputational damage that could adversely affect its business.

at the very minimum, recklessly) denied that any legal proceedings or claims would have a material adverse effect on it. *See, e.g.*, ¶¶ 210, 231.

### I. Defendants Violated Generally Accepted Accounting Principles in Failing to Disclose the SEC Investigation and Related Risks

319. GAAP are principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. Compliance with GAAP is a fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). It is well-established that GAAP violations will support an inference of scienter.

320. Accounting Standards Codification Topic 450 ("ASC 450"), *Contingencies*, governs the disclosure and accrual of contingencies. ASC 450 defines a contingency as "[a]n existing condition, situation, or set of circumstances involving uncertainty as to possible gain (gain contingency) or loss (loss contingency) to an entity that will ultimately be resolved when one or more future events occur or fail to occur." Examples of loss contingencies include, without limitation: (a) injury or damage caused by products sold; (b) risk of loss or damage of property by fire, explosion, or other hazards; (c) actual or possible claims and assessments; (d) threat of expropriation of assets; and (e) pending or threatened litigation.

321. In accordance with ASC 450, GAAP requires the accrual of a loss contingency by a charge against income when: (i) information available prior to issuance of the financial statements indicates that it is probable (i.e., likely) that a contingent liability or potential loss has been incurred; and (ii) the amount of the loss can be reasonably estimated. In situations where both conditions are not met, ASC 450 requires "disclosure of the contingency . . . when there is at

least a reasonable possibility [i.e., a greater than slight chance] that a loss or an additional loss may have been incurred."

322. Actual or possible claims and assessments and pending or threatened litigation are sources of significant potential liability for a public company. ASC 450 requires disclosure of a contingency involving an *unasserted* claim or assessment when there is a manifestation by a potential claimant of awareness of a possible claim or assessment. Even when there is *no* manifestation by a potential claimant of awareness of a possible claim or assessment, disclosure is nevertheless required if it is *probable* that a claim will be asserted and there is a *reasonable possibility* that the outcome will be unfavorable.

323. ITG's Class Period SEC filings failed to comply with GAAP and the provisions of ASC 450. As an initial matter, Defendants knew the SEC was conducting an investigation since the fall of 2013, concerning the improprieties relating to Project Omega, ITG's failure to make adequate disclosures relating to Project Omega, and improper access by employees to highly confidential customer trade and execution data. Defendants further knew, or recklessly disregarded, that the Company faced significant financial or other exposure as a result of the SEC Investigation. Moreover, Defendants knew, since at least December 2010, that improprieties existed within Project Omega, yet still disregarded the exposure the Company faced. They also never fully disclosed Project Omega or the risks flowing from it. Finally, throughout the pendency of the SEC Investigation, Defendants falsely (and, at the very minimum, recklessly) denied that any legal proceedings or claims would have a material adverse effect on the Company.

324. In recognition of the materiality of a regulatory or criminal investigations and proceedings, public companies frequently publicly report the receipt of subpoenas and/or other indications that regulatory or other governmental authorities may pursue charges of wrongdoing.

Public companies also frequently disclose the existence of regulatory investigations, as well as settlement discussions with regulators and law enforcement authorities. Over the past decade, tens, if not hundreds, of public companies have disclosed matters such as these.

325. For example, while UBS AG, Deutsche Bank AG, and Credit Suisse AG (Credit Suisse) announced in July 2014, they were being investigated by U.S. regulators regarding the operations of their dark pools, ITG did not. In January 2015, UBS agreed to pay $14 million to settle allegations with the SEC regarding charges of creating an uneven playing field inside its dark pool. Still, ITG did not disclose the pendency of the SEC Investigation until July 29, 2015.

### J. The Cumulative Knowledge of ITG's Executives Is Imputed to the Company

326. Under applicable law, the cumulative knowledge of a company's employees may be imputed to the company and supports a finding of corporate scienter. *See, e.g., See Hi-Crush*, 2013 WL6233561, at *25 ("The scienter of an employee acting within the scope of employment can be imputed to the employer.").

327. Here, the SEC Order contains a number of admissions regarding ITG's knowledge. *See supra* ¶ 262. Among other things, ITG has admitted that its senior management recommended, and ITG's Board (which included Gasser) approved, Project Omega. *See id.* ¶ 22. In December 2010, ITG's senior management (among them Gasser) and its Compliance Department learned that Project Omega was improperly accessing subscriber order information. *See id* ¶¶ 60-64. The scienter of Gasser and all other employees at ITG acting within the scope of their employment is imputed to the Company.

## IX. LOSS CAUSATION

328. Throughout the Class Period, the trading price of ITG's common stock was artificially inflated as a result of the foregoing materially incomplete, false and misleading statements. As detailed above, Defendants failed to disclose numerous material facts, including,

but not limited to: (i) the existence of Project Omega; (ii) that certain of Project Omega's operations were in violation of the federal securities laws; and (iii) these operations subjected ITG to scrutiny and material sanctions by the SEC and loss of business from wary customers.

329. These materially false and misleading statements, individually and collectively, concealed pervasive misconduct at ITG, resulting in the stock being artificially inflated until, as indicated herein, the relevant truth about ITG was revealed. While each of these misrepresentations was independently fraudulent, they all were motivated by Defendants' desire to artificially inflate ITG's stock price and to provide, among other things, the false assurance that ITG was an "independent," conflict-free broker that operated in compliance with federal securities laws including, but not limited to, Regulation ATS. These materially false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period. Indeed, Defendants' materially false and misleading statements had the intended effect and caused, or were a substantial contributing cause of ITG's stock trading at artificially inflated levels, reaching as high as $32.07 per share[19] during the Class Period.

330. A truer picture of ITG's operational circumstances was revealed: (i) on July 29, 2015, after the stock market closed, when the Company issued a press release disclosing that ITG was nearing a settlement with the SEC relating to a previously undisclosed investigation of the Company; (ii) on August 3, 2015, when it was disclosed that Gasser and Goebels had been removed from their positions and, later that same day, when ITG issued an earnings announcement for the second quarter of 2015, in which it detailed the Company's wrongdoing and revealed the magnitude of its ongoing liabilities associated with the SEC Investigation; and (iii) and on August

[19] Intra-day trading price for ITG stock on April 27, 2015.

4, 2015, before the market open, when ITG held its earnings call for the second quarter of 2015, announcing volume market share was down about 25% in the U.S. and that the Company expected a significant amount of legal and other fees related to the SEC matter in the third quarter. When these revelations were made on July 29, and August 3-4, 2015, they served as an indication to the market that Defendants' prior Class Period statements were materially false and misleading.

**A. July 29, 2015 Corrective Disclosures**

331. The truth about the Project Omega and the ensuing SEC scrutiny began to emerge on July 29, 2015, when, after the market closed, the Company issued a press release disclosing that ITG was nearing a settlement with the SEC relating to a previously undisclosed investigation of the Company. The press release stated in relevant part:

> **ITG ANNOUNCES PRELIMINARY SECOND QUARTER 2015 EARNINGS GUIDANCE, INCLUDING RESERVE FOR PROBABLE SEC SETTLEMENT**
>
> **Also Announces Resignation of Board Member Kevin O'Hara**
>
> NEW YORK, July 29, 2015 (GLOBE NEWSWIRE) -- ITG (NYSE: ITG), a leading independent execution broker and research provider, today announced that it expects its results for the second quarter of 2015 to be a GAAP net loss of $10.2 million, or $0.30 per diluted share, including a reserve for a probable settlement with the Securities and Exchange Commission ("SEC") and related fees totaling $22.6 million pre-tax and $21.6 million after taxes, or $0.62 per diluted share. Excluding the impact of these charges, adjusted net income is expected to be $11.4 million, or $0.32 per diluted share.
>
> **Probable SEC Settlement**
>
> During the second quarter of 2015, ITG commenced settlement discussions with the Staff of the Division of Enforcement of the SEC (the "SEC Enforcement Division") in connection with the SEC's investigation into a proprietary trading pilot operated within ITG's AlterNet Securities, Inc. ("AlterNet") subsidiary for sixteen months in 2010 through mid-2011. The investigation is focused on customer disclosures, Form ATS regulatory filings and customer information controls relating to the pilot's trading activity, which included (a) crossing against sell-side clients in POSIT and (b) violations of ITG policy and procedures by a

> former employee. These violations principally involved information breaches for a period of several months in 2010 regarding sell-side parent orders flowing into ITG's algorithms and executions by all customers in non-POSIT markets that were not otherwise available to ITG clients. ITG has negotiated a potential settlement with the Staff of the SEC Enforcement Division. Based on the terms of the potential settlement, ITG would pay an aggregate amount of $20.3 million representing a civil penalty of $18 million, disgorgement of approximately $2.1 million in trading revenues and prejudgment interest of approximately $250,000. As a result, ITG reserved $20.3 million for a probable settlement with the SEC and incurred $2.3 million in legal and other related costs associated with this matter during the second quarter of 2015.
>
> Final resolution of this matter is subject to preparation and negotiation of documentation satisfactory to all the parties, including approval by ITG's Board of Directors and authorization by the SEC. ITG can provide no assurances that a satisfactory final agreement will be reached and that authorization by the SEC will be obtained or with respect to the timing or definitive terms of any such agreement or approvals.
>
> Until this matter is fully resolved, ITG expects to continue to incur costs, primarily professional fees and expenses, which may be significant.
>
> . . . .
>
> **Board Member Resignation**
>
> On July 23, 2015, Kevin J.P. O'Hara resigned from ITG's Board of Directors effective immediately.

ITG Settlement Press Release.

332. The July 29, 2015 press release also attached as an exhibit Mr. O'Hara's resignation letter, which stated, in part, that "over the last several months, continuous fundamental, strategic and vital differences of opinion and direction have transpired at the Board level and, in particular, between me and the Board's leadership." O'Hara Resignation Letter.

333. As a result of these disclosures regarding the Company's probable settlement with the SEC and Mr. O'Hara's resignation, the closing price of ITG's stock dropped in a statistically significant manner from $24.00 per share on July 29, 2015, to $18.36 per share on July 30, 2015,

a decline of $5.64 per share or approximately 24% on heavier than usual volume. This decrease was a result of a portion of the artificial inflation caused by Defendants' materially false and misleading statements being removed from the stock price.

334. The market's negative reaction to the July 29, 2015 disclosures is demonstrated in the following ITG common stock price and volume chart:




335. The timing and magnitude of ITG's July 30, 2015 stock price decline negates any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates

the clear divergence of ITG's stock price from its benchmark index[20] as the truth became known to the market:




**B. August 3-4, 2015 Corrective Disclosures**

336. Prior to the market open on August 3, 2015, the Company issued a press release announcing that it was replacing Gasser as CEO. *See* Management Changes Press Release. The Company further disclosed that its Board had concluded a review of the "SEC matter" and "'hope[d] to expeditiously finalize the settlement and to work with our customers, shareholders and employees to restore confidence in our company and its capabilities.'" *Id.* That same day, a media report stated Goebels would no longer be serving as ITG's General Counsel and, further, that this move was tied to the SEC Investigation. *See ITG Ousts CEO* Article.

337. As a result of these disclosures regarding the removal of key ITG personnel and the possible SEC settlement, the closing price of ITG's stock dropped in a statistically significant manner from $20.35 per share on July 31, 2015, to $18.48 per share on August 3, 2015, a decline

---

20 ITG uses the Russell 2000 Index ("RTY Index") as a benchmark in its own filings. *See* 2014 Form 10-K at 23.

of $0.84 per share or more than 4% on heavier than usual volume. This decrease was a result of a portion of the artificial inflation caused by Defendants' materially false and misleading statements being removed from the stock price.

338. After the market closed on August 3, 2015, ITG issued a press release reporting its financial results for the second quarter of 2015. *See* Second Quarter 2015 Results Press Release. The press release stated, *inter alia*:

> Second quarter 2015 highlights included:
>
> - GAAP net loss of $10.2 million, or $0.30 per diluted share compared to GAAP net income of $12.9 million, or $0.35 per diluted share for the second quarter of 2014. The GAAP net loss for the second quarter of 2015 includes a reserve for a probable settlement with the SEC and related legal and other fees totaling $22.6 million pre-tax and $21.6 million after taxes, or $0.62 per diluted share.
>
> - As previously announced, the probable SEC settlement relates to customer disclosures, Form ATS regulatory filings and customer information controls relating to a proprietary trading pilot operated by ITG subsidiary AlterNet for 16 months in 2010 through mid-2011, which included (a) crossing against sell-side clients in POSIT and (b) violations of ITG policy and procedures by a former employee. These violations principally involved information breaches for a period of several months in 2010 regarding sell-side parent orders flowing into ITG's algorithms and executions by all customers in non-POSIT markets that were not otherwise available to ITG clients.

*Id*.

339. Prior to the market open on August 4, 2015, ITG held its earnings call for the second quarter of 2015. *See* Q2 2015 Earnings Call. During the call, Vigliotti reported that, *inter alia*, "[i]n the three trading days since we announced the potential SEC settlement . . . in the U.S. our volume market share was down about 25%." *Id.* Further, Vigliotti stated that, "[w]hile we recorded the reserve for the potential settlement in the second quarter, there was and still is a fair amount of work to do in the third quarter to reach a final settlement order. As a result, we expect a significant amount of legal and other fees related to this matter in the third quarter." *Id.*

340. As a result of these disclosures regarding the Company's disappointing earnings results stemming from the SEC Investigation, in addition to its loss of business, the closing price of ITG's stock dropped in a statistically significant manner from $19.51 per share on August 3, 2015, to $18.48 per share on August 4, 2015, a decline of $1.03 per share or approximately 5.3% on heavier than usual volume. This decrease was a result of a portion of the artificial inflation caused by Defendants' materially false and misleading statements being removed from the stock price.

341. The market's negative reaction to the August 3-4, 2015 disclosures, on the heels of the July 29 disclosures, is demonstrated in the following ITG common stock price and volume charts:






342. The timing and magnitude of ITG's August 3-4, 2015 stock price decline, only a few short days after the July 30, 2015 stock price decline, negates any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This point is evidenced by the charts below, which demonstrates the clear divergence of ITG's stock price from its benchmark as the truth became known to the market:






## X. APPLICABILITY OF PRESUMPTION OF RELIANCE

343. Lead Plaintiff is entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact which there was a duty to disclose.

344. In the alternative, Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory, because the Company's common stock traded in an efficient market during the Class Period, as follows:

a. The Company's common stock was actively traded on the NYSE, an informationally efficient market, throughout the Class Period.

b. The Company's common stock traded at high weekly volumes during the Class Period.

c. As a regulated issuer, the Company filed periodic public reports with the SEC.

d. The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

e. The market reacted promptly to public information disseminated by the Company.

f. The Company's securities were covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms. Each of these reports was publicly available and entered the public marketplace.

g. The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock.

345. Without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other members of the Class purchased shares of the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed.

## XI. CONTROL PERSON ALLEGATIONS / GROUP PLEADING

346. By virtue of the Individual Defendants' positions within the Company, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and Board meetings, including committees thereof, and through reports and other information provided to them in connection with their roles and duties as the Company officers and/or directors.

347. It is appropriate to treat the Individual Defendants collectively as a group for pleading purposes and to presume that the materially false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and public statements, as alleged herein, was the result of the collective actions of the Individual Defendants identified above. The Individual Defendants, by virtue of their high-level positions within the Company,

directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged herein.

348. The Individual Defendants were involved in drafting, producing, reviewing, approving, and/or disseminating the materially false and misleading statements and information alleged herein, were aware of or recklessly disregarded the fact that materially false and misleading statements were being issued regarding the Company and themselves, and approved or ratified these statements, in violation of the federal securities laws.

349. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

350. The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents alleged herein to

be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports and releases detailed herein.

351. Each of the Individual Defendants is liable as a participant in a scheme, plan, and course of conduct that operated as a fraud and deceit on Class Period purchasers of the Company's securities.

## XII. INAPPLICABILITY OF SAFE HARBOR

352. Defendants acted with scienter because at the time that they issued public documents and other statements in the Company's name they knew, or with extreme recklessness disregarded the fact, that such statements were materially false and misleading or omitted material facts. Moreover, Defendants knew such documents and statements would be issued or disseminated to the investing public, knew that persons were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of such statements and documents as primary violators of the federal securities laws.

353. As set forth in detail throughout this Complaint, Defendants, by virtue of their control over, and/or receipt, of the Company's materially misleading statements and their positions with the Company that made them privy to confidential proprietary information, used such information to artificially inflate the Company's financial results. Defendants were informed of, participated in, and knew of the improprieties and unlawful conduct alleged herein and understood their material effect on the Company's business and future prospects. With respect to non-forward-looking statements and omissions, Defendants knew and recklessly disregarded the falsity and misleading nature of that information, which they caused to be disseminated to the investing public.

354. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. None of the statements pleaded herein are forward-looking statements and no such statement was identified as a forward-looking statement when made. Rather, the statements alleged herein to be materially false and misleading by affirmative misstatement and/or omissions of material fact all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any putative forward-looking statements.

355. Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading because they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIII. CLASS ACTION ALLEGATIONS

356. Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities that, between February 28, 2011, through August 3, 2015, inclusive, purchased or otherwise acquired shares of the Company's common stock, and were damaged thereby. Excluded from the Class are: Defendants; members of the immediate families of the

Individual Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

357. The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, the Company had between approximately 34.2 million and 41.6 million shares of common stock outstanding and actively trading on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

358. Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

359. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

360. Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual members of the Class. The questions of law and fact common to the Class include:

a. whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b. whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

c. whether and to what extent the market price of the Company's common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

d. whether Defendants acted with the requisite level of scienter;

e. whether the Individual Defendants were controlling persons of the Company;

f. whether reliance may be presumed; and

g. whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

361. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**
**Violation of § 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

362. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

363. This Count is asserted pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC against all Defendants.

364. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material

fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein, (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of the Company's common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

365. The Individual Defendants were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and having engaged in a plan, scheme and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

366. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

367. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for the Company's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at such artificially inflated prices. As set forth herein, when the true facts were subsequently

disclosed, the price of the Company's common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

368. By virtue of the foregoing, Defendants are liable to Lead Plaintiff and members of the Class for violations of Section 10(b) of the Exchange Act and Rule 10b-5.

**COUNT II**
**Violation of § 20(a) of the Exchange Act**
**Against the Individual Defendants**

369. Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

370. This Count is asserted pursuant to Section 20(a) of the Exchange Act against each of the Individual Defendants.

371. As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making false and misleading statements in connection with the purchase and sale of the Company's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter and ITG is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

372. As set forth above, the Individual Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and exercised the same.

373. By virtue of the foregoing, the Individual Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

374. The Individual Defendants acted knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

375. In ignorance of the false and misleading nature of the Company's statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market prices for the Company's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at an artificially inflated price during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the price of the Company's common stock declined precipitously and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth began to be disclosed.

376. By reason of the foregoing, the Individual Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

A. Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Motley Rice LLC as class counsel pursuant to Rule 23(g);

B. Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorney's fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as the Court deems just and proper.

## XV. JURY DEMAND

Lead Plaintiff demands a trial by jury of all issues so triable.

DATED: December 14, 2015

Respectfully submitted,

**MOTLEY RICE LLC**
*s/ William H. Narwold*
William H. Narwold
Mathew Jasinski
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
Email: bnarwold@motleyrice.com
mjasinski@motlyrice.com

Gregg S. Levin (*pro hac vice* forthcoming)
Lance V. Oliver (*pro hac vice* forthcoming)
William S. Norton
28 Bridgeside Boulevard
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
Emails: glevin@motleyrice.com
loliver@motleyrice.com
bnorton@motleyrice.com

*Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 14, 2015.

*s/ William H. Narwold*
William H. Narwold
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: (860) 882-1681
Facsimile: (860) 882-1682
Email: bnarwold@motleyrice.com