UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------- X

IN RE INVESTMENT TECHNOLOGY
GROUP, INC. SECURITIES
LITIGATION

------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 03/23/2018

No. 15 Civ. 6369 (JFK)
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF METZLER INVESTMENT GmbH
     Lance V. Oliver
     Gregg S. Levin
     William H. Narwold
     Laura W. Ray
     MOTLEY RICE LLC

FOR DEFENDANT STEVEN R. VIGLIOTTI
     Warren R. Stern
     Charles P. Griffin
     WACHTELL, LIPTON, ROSEN & KATZ

FOR DEFENDANT MATS GOEBELS
     John N. Orsini
     Eric Seiler
     Jennifer A. Mustes
     FRIEDMAN KAPLAN SEILER & ADELMAN LLP

**JOHN F. KEENAN, United States District Judge:**

Before the Court is a motion by Metzler Investment GmbH (the "Plaintiff") for leave to file a second amended complaint in this putative securities class action on behalf of all persons and entities who purchased or acquired the publicly traded common stock of Investment Technology Group, Inc. ("ITG") between February 28, 2011 and August 3, 2015 (the "Class Period"). Plaintiff asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5

1

promulgated thereunder against ITG and Robert Gasser, Steven

Vigliotti, and Mats Goebels (collectively, the "Individual

Defendants," and together with ITG, the "Defendants").

Plaintiff asserts that new allegations in the proposed second

amended complaint (the "SAC") cure the deficiencies identified

by the Court in its previous Opinion and Order, which granted in

part and denied in part Defendants' motions to dismiss the First

Amended Complaint (the "FAC").  For the reasons below,

Plaintiff's motion for leave to file the SAC is denied.

## I. Background

The facts underlying this case were thoroughly discussed in

the Court's Opinion and Order granting in part and denying in

part Defendants' motions to dismiss (the "April 26 Order").  (See

Op. & Order, ECF No. 66 (filed Apr. 26, 2017).)  Nevertheless,

the Court will summarize the factual and procedural background

that is relevant to the instant motion.

## A. Factual Background

ITG is a publicly traded company that acts primarily as an

agency securities broker, matching customer orders to buy (or

sell) a security with orders to sell (or buy) that security.

(Am. Compl. ¶¶ 10, 13, 17, ECF No. 38 (filed Dec. 14, 2015)

[hereinafter "FAC"].)  It also provides investment research and

analytics products. (Id. ¶¶ 60, 74, 90.)  ITG's flagship product

is an alternative trading system, or "dark pool," known as

POSIT. (Id. ¶¶ 1-2, 12.)  A dark pool provides anonymity,
allowing investors to trade without immediately revealing their
identity or the size of the trade. (Id. ¶ 13.)

Gasser was ITG's chief executive officer and president from
October 2006 until August 1, 2015. (Id. ¶ 75.)  Vigliotti is
ITG's chief financial officer and a managing director, and held
both positions throughout the Class Period. (Id. ¶ 76.)  Goebels
was ITG's General Counsel and a managing director throughout the
Class Period until August 1, 2015. (Id. ¶¶ 75-76.)

In 2010, ITG's Board of Directors (the "Board") and Gasser
approved Project Omega ("Omega"), a limited scope proprietary
trading desk. (Id. ¶ 21.)  Hitesh Mittal, ITG's global head of
liquidity management, was selected to lead Omega, which operated
through a broker-dealer subsidiary of ITG. (Id. ¶¶ 21, 24-25.)
Although Mittal was instructed that Omega would "not have access
to information regarding POSIT order flow" and was prohibited
from coordinating strategies or sharing execution information
with non-Omega employees, between April 2010 and December 2010
Omega employed two trading strategies that contravened those
directives:  namely, the Facilitation Strategy and the Heatmap
Strategy. (Id. ¶¶ 28-30, 35, 43.)  These strategies relied on
ITG employees accessing confidential client trading data in
POSIT, information that was not available to POSIT customers and
that was supposed to be confidential to counterparties. (Id. ¶¶

3

30, 36.)  The April 26 Order describes these strategies in greater detail. (See Op. & Order at 7-10.)

In December 2010, ITG's compliance department and "senior management" learned about Omega's improper access to, and use of, POSIT customer information (the "Breaches") and suspended Omega's trading. (Id. ¶ 48.)  On December 20, 2010, ITG senior managers met with the compliance department to discuss Omega and Gasser reprimanded Mittal for the Breaches. (Id. ¶ 50.)  The following day, Omega was permitted to resume trading, albeit subject to adjustments intended to address the earlier misconduct. (Id. ¶ 51.)  Nevertheless, Omega "continued to have improper access to information identifying POSIT subscribers. In addition, the Project Omega team continued to coordinate with ITG's POSIT development team to identify the sell-side subscribers for Omega to trade within POSIT and to ensure that such subscribers were configured to trade 'aggressively' in POSIT." (Id. ¶ 53.)  Omega engaged in live trading until it was discontinued on July 11, 2011. (Id. ¶ 54.)

Plaintiff has identified various allegedly misleading statements that appear in ITG's SEC filings, press releases, and other communications with the public between 2010 and 2015. (See Op. & Order at 11-19 (summarizing allegedly misleading statements); see also FAC ¶¶ 78-241.)  As relevant to the instant motion, between February and August 2011, Defendants

4

made statements in SEC filings, an earnings call presentation, and press releases that: (1) touted ITG's "independence" and "independent agency research" model; (2) highlighted POSIT as a product that preserved clients' anonymity and protected their confidential information; and (3) emphasized ITG's compliance with applicable regulations. (Op. & Order at 25-26.)

The SEC began investigating Omega in the fall of 2013 and informed ITG of its intent to bring charges in May 2015. (FAC ¶ 64.) Between July 29 and August 4, 2015, ITG announced that it would pay a $20.3 million penalty to the SEC, parted ways with Gasser and Goebels, and "reported its disappointing earnings results for the quarter ended June 30, 2015." (Id. ¶¶ 242-243, 248-249.) During this time, the closing price of ITG's stock dropped from $24.00 per share (on July 29) to $18.48 (on August 4). (Id. ¶¶ 245, 253.)

On August 12, 2015, the SEC announced a settlement with ITG. (Id. ¶ 66.) As part of the settlement, ITG admitted to wrongdoing and acknowledged that its conduct violated federal securities laws, including Regulation ATS.[1] (Id. ¶ 67; see also Am. Compl. Ex. A, ECF No. 38-1 (filed Dec. 14, 2015).)

---

[1] Regulation ATS requires alternative trading systems, such as POSIT, to establish "safeguards and procedures to protect subscribers' confidential trading information." 17 C.F.R. § 242.301(b)(10). Regulation ATS also mandates "adequate oversight procedures to ensure that the safeguards and procedures" are followed. Id.

## B. Procedural Background

In the April 26 Order, the Court granted in part and denied in part Defendants' motions to dismiss the FAC. The Court found that Defendants made actionable statements while Omega was operating during the Class Period. (Op. & Order at 25-30.) The Court also determined that Gasser made actionable statements when comparing ITG's operations to those of a competitor and describing ITG's transparent approach to communication. (Id. at 31-32.) The Court concluded that the remaining allegedly misleading statements in the FAC were not actionable.

With respect to Gasser and ITG, the Court determined that the FAC raised an adequate inference of scienter. Specifically, the Court found that the FAC established a strong inference of Gasser's scienter after considering "all of the facts alleged, taken collectively, including Gasser's statements before, during, and after Project Omega's operation[.]" (Id. at 53 (emphasis in original) (internal quotation marks omitted).) Further, the Court concluded that Gasser's scienter could be imputed to ITG. (Id. at 59-60.)

With respect to Vigliotti and Goebels, however, the Court found that the allegations in the FAC failed to generate "the cogent and compelling inference of scienter that is required." (Id. at 54.) After considering allegations regarding Goebels' sales of ITG stock, the corporate positions each individual

6

held, Goebels' resignation, and Plaintiff's "core operations"
theory, the Court concluded that Plaintiff had not alleged an
adequate inference of scienter. (Id. at 54-59.)  The Court
observed that "Plaintiff does not show with particularity that
Goebels or Vigliotti knew facts or had access to information
suggesting the inaccuracy of the actionable statements." (Id. at
56.)  Thus, the Court dismissed the FAC against Goebels and
Vigliotti with leave to replead. (Id. at 63.)

## C. Plaintiff's Motion for Leave to Amend

In the SAC, Plaintiff sets forth new allegations in an
attempt to cure the pleading deficiencies identified by the
Court regarding the claims against Vigliotti and Goebels.
Specifically, Plaintiff contends that the new allegations
support claims against Vigliotti and Goebels for violation of
§ 20(a) of the Exchange Act, and against Vigliotti for violation
of § 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder. (See Mot. to Amend Ex. A at 1 n.1, ECF No. 72-1
(filed June 12, 2017) [hereinafter "SAC"].)  The new allegations
draw from information provided by a confidential witness ("CW-
1") and Plaintiff's review of documents "circulated by and among
executive management personnel" at ITG between July 2010 and
April 2011. (Id. ¶ 83.)

CW-1 is a former ITG Board member who served on the Board
for "all of the relevant time period." (Id. ¶ 69.)  According to

7

CW-1, the Individual Defendants introduced Omega to the Board in 2010 as a "pilot program." (Id. ¶ 71.)  After insisting on "strict financial, regulatory, and compliance controls," the Board approved Omega in limited fashion. (Id. ¶¶ 73-74.)  Then, nearly four years after Omega was discontinued, "it was reported to the Board" in May 2015 that "Gasser, Vigliotti, and Goebels were aware by in or about December 2010" of the Breaches, which they did not disclose to the Board. (Id. ¶ 77.)  Also in May 2015, "the Board learned for the first time that the SEC was prepared to allege fraud charges" against ITG, although, in the fall of 2013, the Individual Defendants had informed the Board of the SEC investigation into Omega. (Id. ¶¶ 79-80.)  CW-1 therefore "concluded that Gasser, Vigliotti, and Goebels were all aware in or about December 2010" of the Breaches. (Id. ¶ 81.)

The SAC also incorporates allegations based on documents "circulated by and among executive management personnel" at ITG between July 2010 and April 2011. (Id. ¶ 83.)  For example, a presentation for the Board and "other ITG officials" in November 2010 explained that an "edge" of the Facilitation Strategy was "ITG Algorithms flow" and that an "edge" of the Heatmap Strategy was "'[l]iquidity forecast due to orders' from other ITG customers." (Id. ¶ 84.)  The presentation also "stated that one of the 'cons' of wrapping Omega within ITG itself was the

resulting 'departure from pure agency status.'" (Id.)  Vigliotti

and Goebels allegedly received a copy of the presentation. (Id.)

Additionally, in February 2011, "ITG officials, including

Vigliotti . . . gave a presentation to Board members regarding

Project Omega as part of an overall discussion of the Company's

'Strategy for 2011 and Beyond.'" (Id. ¶ 85.)  Plaintiff further

alleges that Vigliotti, Goebels, and other ITG officials

exchanged communications regarding Omega in January and February

2011. (Id. ¶¶ 85-86.)

The SAC also refers in one instance to an internal

investigation into Omega, for which ITG hired outside counsel.

(Id. ¶ 76.)  According to the SAC, the fact of the internal

investigation was kept from the Board. (Id.)

## II. Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure allows a

party to amend its pleadings with leave of the court and further

directs that "[t]he court should freely give leave when justice

so requires." Fed. R. Civ. P. 15(a)(2).  "Leave to amend, though

liberally granted, may properly be denied for:  'undue delay,

bad faith or dilatory motive on the part of the movant, repeated

failure to cure deficiencies by amendments previously allowed,

undue prejudice to the opposing party by virtue of allowance of

the amendment, futility of amendment, etc." Ruotolo v. City of

New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

"One appropriate basis for denying leave to amend is that the proposed amendment is futile." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." Id. "Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss." IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC, 783 F.3d 383, 389 (2d Cir. 2015); see also Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991) ("When the plaintiff has submitted a proposed amended complaint, the district judge may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted.").

Accordingly, "[a]s it did in reviewing Defendants' motion[s] to dismiss the FAC, the Court treats all factual allegations in the SAC as true and draws all reasonable inferences" in Plaintiff's favor. Kuriakose v. Fed. Home Loan Mortg. Corp., 897 F. Supp. 2d 168, 175 (S.D.N.Y. 2012). However, if the SAC does not "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," then leave to amend may be denied as futile.

Balintulo v. Ford Motor Co., 796 F.3d 160, 164-65 (2d Cir. 2015) (internal quotation marks omitted).

## III. Discussion

### A. New Scienter Allegations

Plaintiff contends that the SAC establishes Vigliotti's scienter because it demonstrates that he "knew no later than December 2010 of the salient details of Project Omega[.]" (Mot. To Amend Ex. C at 2, ECF No. 72-3 (filed June 12, 2017).) In opposition, Vigliotti argues that the allegations in the SAC generate an inference of non-fraudulent intent that is more compelling than an inference of scienter and, moreover, that the SAC fails to allege his awareness of Omega's ongoing access to POSIT customer information in 2011. (Vigliotti Mem. in Opp'n at 6, 8, ECF No. 78 (filed July 14, 2017).)  The Court finds that the SAC does not establish the strong inference of Vigliotti's scienter that is required.

### 1. Applicable Law

The Supreme Court has defined scienter as "a mental state embracing intent to deceive, manipulate, or defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976)).  To state a claim under § 10(b) and Rule 10b-5, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required

state of mind." 15 U.S.C. § 78u-4(b)(2). To qualify as "strong," the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (quoting Tellabs, 551 U.S. at 314).

In the Second Circuit, a plaintiff may establish scienter in either of two ways: by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 106 (2d Cir. 2015) (quoting ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007)). "Conscious misbehavior 'encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount.'" In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011) (quoting Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000)). "Recklessness is sufficiently pled where the plaintiff specifically alleges that defendants either (1) knew facts or had access to information contradicting their public statements, or (2) failed to review or check information they had a duty to monitor." Id. "In the context of securities fraud, a 'reckless disregard for the

truth' means 'conscious recklessness,' defined as 'a state of mind approximating actual intent, and not merely a heightened form of negligence.'" Id. (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009)).

## 2. Analysis

According to the SAC, Vigliotti:  (1) knew about Omega throughout 2010 and the possibility that it could entail "reputational, legal, and regulatory risks"; (2) learned in December 2010 of the Breaches; (3) did not notify the Board of the Breaches at the time that he learned of them or any time thereafter; (4) subsequently advocated for Board approval of Omega; and (5) signed ITG's Annual Report for the year ended December 31, 2010 (the "2010 Annual Report"), which, as the Court found in the April 26 Order, contained actionable statements. (See SAC ¶¶ 71-73, 76, 77, 81-82; see also Op. & Order at 25-30.)

To support its claim that Vigliotti acted with scienter, Plaintiff focuses on Vigliotti's alleged knowledge of the Breaches and when he allegedly acquired that knowledge. According to CW-1, "in or about May 2015, it was reported to the Board" that Vigliotti was aware of the Breaches "by in or about December 2010." (Id. ¶ 77.)  Plaintiff also alleges that unspecified "documents and information" support CW-1's conclusion that Vigliotti was aware "in or about December 2010

13

that Mr. Mittal had engaged in breaches of the financial,
regulatory, and compliance controls established in connection
with Omega[.]" (Id. ¶ 81.)  Additionally, the SAC references
various internal documents, allegedly available to Vigliotti
between July 2010 and April 2011, which relate to Omega but do
not contain any information regarding the Breaches or when
Vigliotti became aware of them. (See id. ¶¶ 83-86.)  However, as
Vigliotti observes, the amended allegations "do not say that
[he] was aware in 2011 that the Omega team had access to POSIT
customer information and was ensuring that sell-side customers
were configured to trade 'aggressively.'" (Vigliotti Mem. in
Opp'n at 8.)

        The success of Plaintiff's theory, then, rests on the
allegation that Vigliotti "was aware of Omega's breaches of
ITG's financial, regulatory, and compliance controls no later
than December 2010," and yet proceeded to sign the 2010 Annual
Report. (Pl. Reply to Vigliotti Mem. in Opp'n at 3, ECF No. 83
(filed Aug. 11, 2017).)  Where "plaintiffs contend defendants
had access to contrary facts, they must specifically identify
the reports or statements containing this information."
Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital
Inc., 531 F.3d 190, 196 (2d Cir. 2008) (quoting Novak, 216 F.3d
at 309).  However, Plaintiff has not identified any specific

report or statement showing that Vigliotti learned of the Breaches by December 2010.

Instead, based on unspecified "documents and information," CW-1 concluded that Vigloitti was aware of the Breaches by December 2010. (SAC ¶ 81.)  Such an allegation falls short of the particularity that is required to allege that Vigliotti acted with scienter when he signed the 2010 Annual Report. See Glaser v. The9, Ltd., 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) ("[A]ctual identification of reports or other documents indicating defendants' recklessness as to their public statements' truth or falsity suggests an inference of scienter strong enough to survive [a] motion to dismiss.").

Again relying on CW-1, Plaintiff also alleges that "in or about May 2015, it was reported to the Board" that Vigliotti was aware of the Breaches "by in or about December 2010." (Id. ¶ 77.)  Precisely who reported to the Board and the source of the reported information is not described.  Other courts in this District have discounted allegations based on information supplied by a confidential witness that was not obtained first-hand. See, e.g., Janbay v. Canadian Solar, Inc., No. 10 Civ. 4430 (RWS), 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013) ("Moreover, the information attributed to [the confidential witnesses] was not first-hand information. . . .  Such second-hand information, obtained only through intermediaries,

15

undermines 'the likelihood that he had personal knowledge of the allegation[.]'" (quoting Glaser, 772 F. Supp. 2d at 595).) Accordingly, the Court concludes that the amended allegations based on information supplied by CW-1 do not support a strong inference that Vigliotti acted with scienter.

Plaintiff also emphasizes Vigliotti's alleged failure to check information that he had a duty to monitor. Under Second Circuit authority, a strong inference of scienter may arise where a complaint sufficiently alleges that a defendant "failed to check information [he] had a duty to monitor[.]" Novak, 216 F.3d at 311. Here, Plaintiff claims that Vigliotti had a duty to monitor internal controls related to Omega and that his alleged failure to do so—and subsequent signing of the 2010 Annual Report—establishes his recklessness. (Pl. Reply to Vigliotti Mem. in Opp'n at 5-6.) The Court disagrees for several reasons.

First, as explained above, Plaintiff has not pled with particularity that Vigliotti knew of the Breaches by December 2010. If Vigliotti did not have such knowledge at that time, then he did not recklessly fail to "ensure known issues [with Omega] did not continue post-December 2010." (Id. at 5.) Second, even assuming Vigliotti knew of the Breaches by December 2010, such knowledge, combined with his alleged awareness of the

mere fact of an internal investigation into the Breaches,[2] does not support a strong inference of scienter.  If the internal investigation did not "uncover any unlawful activity of a material proportion," In re Sanofi Sec. Litig., 155 F. Supp. 3d 386, 407 (S.D.N.Y. 2016), or if it revealed that the misconduct associated with the Breaches had been resolved, then the more compelling inference to be drawn is an alternative non-fraudulent one.

Finally, Plaintiff argues that, even if Vigliotti was not aware of any Omega-related misconduct that was ongoing in February 2011, he nevertheless acted with scienter by signing the 2010 Annual Report because he knew about Omega and "Omega itself" was "entirely contrary to the statements in the" 2010 Annual Report "about ITG's independence, and its protection of customers' order integrity and anonymity[.]" (Pl. Reply to Vigliotti Mem. in Opp'n at 4.)  However, nothing in the internal documents referenced in the SAC leads to the inference that Vigliotti knew by December 2010 that Omega had already compromised—or would continue to compromise—ITG's "independence" or "protection of [its] customers' order integrity and anonymity."  Plaintiff refers to one presentation from late 2010

---

[2] The SAC does not describe who authorized the internal investigation, when it occurred, or what, if any, findings resulted from it. (See SAC ¶ 76.)

that purportedly notified Vigliotti that Omega's operation might result in "departure from pure agency status." (SAC ¶ 84.) There is no allegation, however, that ITG represented itself as a "pure agent" in the 2010 Annual Report. (See id. ¶ 108 ("ITG is an independent agency research broker[.]"; see also id. ¶ 113 (disclosing that "[a] portion of our revenues is derived from principal trading for our own account where we incur risk.").) In any event, the Court has explained that it is the combination of ITG's trading to benefit its own account and Omega's misconduct related to customer information that made certain statements actionable. (See Op. & Order at 28-29.) Thus, Vigliotti's mere knowledge of "Omega itself"—without knowledge of the Breaches or the continued misconduct related to customer information in 2011—is insufficient to establish his scienter with respect to the actionable statements in the 2010 Annual Report.

Accordingly, the Court concludes that the SAC does not generate a strong inference that Vigliotti acted with scienter.

## B. New Control Person Allegations

Plaintiff argues that the SAC states claims against Vigliotti and Goebels for control person liability under § 20(a) because they allegedly knew "no later than December 2010 of the salient details of Project Omega." (Mot. to Amend Ex. C at 2, ECF No. 72-3.) In his opposition, Vigliotti asserts that the

SAC fails to allege his culpable participation in any primary violation for the same reasons as it fails to plead that he acted with scienter. (Vigliotti Mem. in Opp'n at 11.) Goebels also argues that the SAC fails to allege his culpable participation and, moreover, fails to allege that he had control over any actionable statements. (Goebels Mem. in Opp'n at 6, ECF No. 77 (filed July 14, 2017).) The Court finds that the SAC does not adequately plead that Vigliotti or Goebels were culpable participants.

## 1. Applicable Law

Section 20(a) "imposes liability on 'every person who, directly or indirectly, controls any person liable' for securities fraud." Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC, 164 F. Supp. 3d 568, 577 (S.D.N.Y. 2016) (quoting 15 U.S.C. § 78t(a)). "To state a claim of control person liability under § 20(a), 'a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (quoting ATSI, 493 F.3d at 108).

"Determining whether an individual defendant is a 'controlling person' is 'a fact-intensive inquiry that generally

19

should not be resolved on a motion to dismiss.'" <u>In re Banco Bradesco S.A. Sec. Litig.</u>, 277 F. Supp. 3d 600, 669 (S.D.N.Y. 2017) (quoting <u>In re BioScrip, Inc. Sec. Litig.</u>, 95 F. Supp. 3d 711, 741 (S.D.N.Y. 2015)). "In order for an individual to incur Section 20(a) liability, he 'must not only have control over the primary violator, but have control over the transaction in question.'" <u>Id.</u> (quoting <u>In re Smith Barney Transfer Agent Litig.</u>, 884 F. Supp. 2d 152, 166 (S.D.N.Y. 2012)). Corporate officers "usually are presumed to possess the ability to control the actions of their employees," and "directors and officers who sign registration statements or other SEC filings are presumed to control those who draft those documents." <u>Id.</u> (quoting <u>In re BioScrip</u>, 95 F. Supp. 3d at 741). "Because fraud is not an essential element of a § 20(a) claim, Plaintiffs need not plead control in accordance with the particularity required under Rule 9(b)." <u>In re Virtus Inv. Partners, Inc. Sec. Litig.</u>, 195 F. Supp. 3d 528, 542 (S.D.N.Y. 2016) (quoting <u>McIntire v. China MediaExpress Holdings, Inc.</u>, 927 F. Supp. 2d 105, 122 (S.D.N.Y. 2013)).

"Most courts in this district have held that . . . culpable participation is a scienter requirement for which a plaintiff must allege some level of culpable participation at least approximating recklessness in the section 10(b) context in order to survive a motion to dismiss." <u>Id.</u> at 543 (quoting <u>In re</u>

ShengdaTech, Inc. Sec. Litig., No. 11 Civ.1918(LGS), 2014 WL
3928606, at *10 (S.D.N.Y. Aug. 12, 2014)); see also In re
ForceField Energy Inc. Sec. Litig., 15 Civ. 3020 (NRB), 2017 WL
1319802, at *16 & n.8 (S.D.N.Y. Mar. 29, 2017) (recognizing some
disagreement among courts in this District regarding the
pleading requirements for § 20(a) claims, collecting cases, and
"sid[ing] with most judges in th[is] District" by finding that a
plaintiff "must plead culpable participation with scienter").
Accordingly, "[t]o allege culpable participation, Plaintiffs
must plead at a minimum particularized facts establishing a
controlling person's conscious misbehavior or recklessness in
the sense required by Section 10(b)." Cohen v. Stevanovich, 722
F. Supp. 2d 416, 435 (S.D.N.Y. 2010).

## 2. Analysis

As the Court has previously determined, Plaintiff has
alleged a primary violation of § 10(b) by ITG. (See Op. & Order
at 60-61.)  Accordingly, the only remaining issues relevant to
the instant motion are whether (1) Vigliotti and Goebels had
control over the primary violator, and (2) Vigliotti and Goebels
were culpable participants in the primary violation.  Because
the Court concludes that the SAC does not plead the culpable
participation of Vigliotti or Goebels, it does not consider the
parties' respective arguments regarding control over the primary
violator.

Plaintiff's arguments with respect to Vigliotti's culpable participation overlap entirely with its arguments related to Vigliotti's scienter. (See Pl. Reply to Vigliotti Mem. in Opp'n at 8 ("Taken together, these facts adequately plead a strong inference of [Vigliotti's] scienter and, by extension, culpable participation.").) In light of the Court's conclusion that the SAC does not establish a sufficient inference of Vigliotti's scienter under a recklessness theory, the Court finds that Plaintiff has not adequately pled that Vigliotti was a culpable participant for the purposes of § 20(a).

The new allegations against Goebels are identical to those against Vigliotti. (See SAC ¶ 77 ("CW-1 further stated that, in or about May 2015, it was reported to the Board . . . that Gasser, Vigliotti, and Goebels were aware by in or about December 2010 of Mr. Mittal's breaches[.]"), ¶ 81 ("CW-1 concluded that Gasser, Vigliotti, and Goebels were all aware in or about December 2010 that Mr. Mittal had engaged in breaches[.]").) Thus, for the same reasons that the SAC fails to show that Vigliotti was a culpable participant, it also does not establish that Goebels was a culpable participant.

Plaintiff emphasizes one point of distinction between Vigliotti and Goebels. Namely, Plaintiff relies on Goebels' position as ITG's General Counsel and argues that, because Goebels served in such a capacity, he necessarily learned

certain information about Omega and possessed special duties with respect to it. (See Pl. Reply to Goebels Mem. in Opp'n at 4, 8 ECF No. 82 (filed Aug. 11, 2017) (noting that internal investigation into Omega was "presumably overseen by [Goebels], given his job title and responsibilities" and that "[b]y virtue of his position as ITG's chief of legal and regulatory compliance, Goebels had a duty to ensure the Omega breaches ended after learning of them by December 2010.").)  Plaintiff cites two cases in support of the proposition that Goebels' position as General Counsel warrants special consideration when evaluating his liability as a culpable participant. See Thorpe v. Walter Inv. Mgmt., Corp., 111 F. Supp. 3d 1336, 1373-74 (S.D. Fla. 2015); New York City Emps.' Ret. Sys. v. Berry, 616 F. Supp. 2d 987, 1000 (N.D. Cal. 2009).  Both cases are from beyond this Circuit and, thus, are not binding on the Court.  Case law in this Circuit consistently makes clear that it is not proper to infer a defendant's awareness of information that contradicts public statements "solely because of his corporate position." In re Sanofi, 155 F. Supp. 3d at 407 (collecting cases).

Accordingly, the Court concludes that the new allegations in the SAC do not cure the deficiencies in the § 20(a) claims against Vigliotti or Goebels.  Furthermore, given the Court's earlier determination that the SAC fails to establish a strong inference of scienter with respect to Vigliotti, it is

appropriate to deny Plaintiff's motion as futile. See Health-Chem Corp. v. Baker, 915 F.2d 805, 810 (2d Cir. 1990) ("Although Fed. R. Civ. P. 15(a) provides that leave to amend should be given freely when justice so requires, where, as here, there is no merit in the proposed amendments, leave to amend should be denied.").

### Conclusion

For the reasons above, the SAC fails to cure the deficiencies identified by the Court in the April 26 Order. Accordingly, Plaintiff's motion for leave to file the SAC is DENIED. ITG and Gasser are directed to file an answer to Plaintiff's remaining claims by no later than fourteen days from the date of this Opinion.

The Clerk of the Court is respectfully directed to close the motion docketed at ECF No. 72.

**SO ORDERED.**

Dated:    New York, New York
           March 23, 2018

John F. Keenan
United States District Judge